**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| DONALD J. TRUMP,<br>1600 Pennsylvania Avenue NW<br>Washington, D.C. 20500,<br><br>                                        Plaintiff,<br><br>        v.<br><br>COMMITTEE ON WAYS AND MEANS,<br>UNITED STATES HOUSE OF<br>REPRESENTATIVES,<br>RICHARD NEAL, in his official capacity as<br>Chairman of the House Ways and Means<br>Committee,<br>ANDREW GROSSMAN, in his official<br>capacity as Chief Tax Counsel of the House<br>Ways and Means Committee,<br>1102 Longworth House Office Building,<br>Washington, D.C. 20515,<br><br>LETITIA JAMES, in her official capacity as<br>Attorney General of New York State,<br>The Capitol<br>Albany, NY 12224,<br><br>MICHAEL R. SCHMIDT, in his official<br>capacity as Commissioner of the New York<br>State Department of Taxation and Finance,<br>W.A. Harriman Campus<br>Albany, NY 12227,<br><br>                                        Defendants. | No. 1:19-cv-2173-CJN |

**AMENDED COMPLAINT**

Plaintiff Donald J. Trump, in his capacity as a private citizen, brings this action against

Defendants for declaratory and injunctive relief and alleges as follows:

**INTRODUCTION**

1.      The House Ways and Means Committee (Committee) is pursuing President Trump's

federal tax returns. After the Treasury Department declined to produce them, the Committee filed a

lawsuit in this Court. *See* Doc. 1, *Comm. on Ways & Means v. U.S. Dept. of Treasury*, No. 1:19-cv-1974

(D.D.C.). President Trump, in his capacity as a private citizen, has intervened in that suit. *See* Doc. 14, *Ways & Means*, No. 1:19-cv-1974.

2.    The Treasury Department denied the Committee's request for the President's federal returns because it determined that the request had no legitimate legislative purpose. As Secretary Mnuchin explained after compiling a 42-page chronology of public statements from prominent Democrats: "The public record demonstrates that the animating purpose of [the Committee's request] was and remains exposure of a political opponent's private tax information." Doc. 1-7 at 5, *Ways & Means*, No. 1:19-cv-1974; *accord Congressional Committee's Request for the President's Tax Returns Under 26 U.S.C. § 6103(f)*, 43 Op. O.L.C. __, __ (June 13, 2019) (slip op. 26).

3.    The State of New York shares this "animating purpose" and is eager to help the Committee expose the President's private tax information. Once it became clear that Treasury would not divulge the President's federal returns, New York passed a law allowing the Committee to get his state returns. Dubbed the TRUST Act, this law directs the Commissioner of the New York State Department of Taxation and Finance (Commissioner) to grant the Committee's request for the President's state tax returns if the Committee has already requested the President's federal returns from Treasury. *See* 2019 Sess. Law News of N.Y. Chs. 91, 92 (July 8, 2019) (Senate Bill S6146; Assembly Bill A7750). That hyper-specific condition was, not coincidentally, already satisfied for the intended target of the Act: President Trump.

4.    New York legislators admitted that the TRUST Act's purpose was to help the Committee expose the President's private tax information for political gain; its purpose was their purpose. And New York Democrats designed the TRUST Act to be a complement to the Committee's litigation over the President's federal tax returns—a "workaround," an "'in case of emergency break glass'" option, a "constitutional escape hatch should [the Committee] not want to wait for the federal court case and its appeals process to be finalized." The TRUST Act also grew out of a larger campaign

in New York to uncover and expose the President's private financial information in the hopes of damaging him politically.

5.     Committee Chairman Richard Neal was initially reluctant to use the TRUST Act. The New York returns have nothing to do with the reason he gave for requesting the President's federal returns: "investigating the mandatory presidential audit program at the IRS to determine whether or not the program needs to be codified into federal law." In fact, if Chairman Neal requested the New York returns, it would prove one of the defendants' key arguments in the litigation over the federal returns—that the Chairman is trying to expose the President's financial information for political gain, not to study the IRS's audit procedures.

6.     Despite his initial reluctance, Chairman Neal has recently changed his tune on the TRUST Act. According to a news report published yesterday, Chairman Neal is facing intense pressure from his fellow Democrats to invoke the TRUST Act and obtain the President's state tax returns. Succumbing to this pressure, the Chairman recently announced that he does not oppose using the TRUST Act and that House counsel was "reviewing" it now.

7.     That review could end—and Chairman Neal could decide to request the President's state returns—at any time, with no notice to the President. And New York could respond to the request nearly instantaneously, mooting the President's ability to object before his tax records are disclosed. President Trump was thus forced to bring this lawsuit to safeguard his legal rights.

8.     The President is entitled to relief. Because the Committee's jurisdiction is limited to federal taxes, no legislation could possibly result from a request for the President's state tax returns. The Committee thus lacks a legitimate legislative purpose for using the TRUST Act. This Court has "the power, either by injunction or declaratory judgment, to stay the issuance" of any request under the Act. *U.S. Servicemen's Fund v. Eastland*, 488 F.2d 1252, 1259 (D.C. Cir. 1973), *approved in relevant part*, *Eastland v. U.S. Servicemen's Fund*, 421 U.S. 491, 501 n.14 (1975).

9.      The TRUST Act also violates the First Amendment. As revealed by its text, history, effect, and stated purposes, the New York Legislature enacted it to discriminate and retaliate against President Trump for his speech and politics. This Court should declare it unconstitutional and enjoin its operation. 28 U.S.C. §2201; 42 U.S.C. §1983.

## JURISDICTION AND VENUE

10.     This Court has subject-matter jurisdiction because this action arises under the Constitution and laws of the United States, 28 U.S.C. §1331, and alleges civil-rights violations, *id.* §1343.

11.     Venue is proper because the Committee resides in this District and a substantial part of the events or omissions giving rise to the claims occurred in this District. *Id.* §1391. The District is where the TRUST Act is aimed and where the President's injury and virtually all of the relevant conduct will occur. For example, the Committee will request the President's tax returns here, New York will send the returns here, the Committee will review the returns here, the Committee will hold hearings (including testimony from New York officials) about the returns here, the Committee will use the returns to draft and consider legislation here, and the Committee will decide whether and how to disclose the returns here.

## PARTIES

12.     Plaintiff Donald J. Trump is the 45th President of the United States. He is a member of the Republican Party. President Trump brings this suit in his individual capacity as a private citizen.

13.     Defendant Committee on Ways and Means is a standing committee of the United States House of Representatives. Both the House and the Committee are currently controlled by the Democratic Party.

14.     Defendant Richard Neal is the U.S. Representative for Massachusetts' First District and the Chairman of the House Ways and Means Committee. He is a member of the Democratic

Party. Chairman Neal is one of three officials empowered by the TRUST Act to request the President's state tax returns. The Chairman is sued in his official capacity.

15.     Defendant Andrew Grossman is the Chief Tax Counsel of the House Ways and Means Committee. Grossman advises the Committee and the Chairman on tax issues, and he was hired to be the "point person" on the Committee's quest to obtain the President's tax returns. He is responsible for drafting, approving, sending, and reviewing any request for the President's state tax returns. Grossman is sued in his official capacity.

16.     Defendant Letitia James is the Attorney General of the State of New York. She is a member of the Democratic Party. The Attorney General is responsible for enforcing state laws and has a statutory right to intervene in cases where the constitutionality of state legislation is challenged. N.Y. Executive Law §71. She routinely uses the courts in this District to pursue litigation, especially against the President. As Attorney General, she is currently the lead petitioner in *State of New York v. EPA*, No. 19-____ (D.C. Cir.) (filed Aug. 13, 2019); the lead plaintiff in *New York State v. McCarthy*, No. 13-cv-1553 (D.D.C.); and an amicus in *Doe v. Trump*, No. 17-cv-1597 (D.D.C.); *English v. Trump*, No. 17-cv-2534 (D.D.C.); *Wilderness Soc'y v. Trump*, No. 17-cv-2587 (D.D.C.); *Hopi Tribe v. Trump*, No. 17-cv-2590 (D.D.C.); *Grace v. Sessions*, No. 18-cv-1853 (D.D.C.); *Bostock v. Clayton Cty.*, Nos. 17-1618, 17-1623, 18-107 (U.S.); and *N.Y. State Rifle & Pistol Ass'n, Inc. v. City of New York*, No. 18-280 (U.S.). In her prior position, she was an amicus in *N.Y. Republican State Cmte. v. SEC*, Nos. 14-1194, 14-5242 (D.C. Cir.). In the last several years, the Attorney General has regularly appeared in the District for events, conferences, seminars, interviews, and other meetings. In April 2019 alone, she delivered a lecture at Howard University (her law school alma mater) and, on a separate trip, held a press conference on the steps of the Supreme Court. She has also made substantial campaign expenditures in the District and solicited and received campaign contributions from donors within the District. The Attorney General is sued in her official capacity.

17.     Defendant Michael R. Schmidt is the Commissioner of the New York State Department of Taxation and Finance. He is a member of the Democratic Party. He lived and worked in the District in 2011-12 as a policy analyst for the U.S. Department of Treasury. He also served as economic policy advisor to Hillary Clinton on her most recent presidential campaign. The Commissioner is sued in his official capacity.

## BACKGROUND

### I.      Under Article I of the Constitution, congressional committees cannot investigate private individuals without a "legitimate legislative purpose."

18.     "The powers of Congress … are dependent solely on the Constitution," and "no express power in that instrument" allows Congress to investigate individuals or to demand their private information. *Kilbourn v. Thompson*, 103 U.S. 168, 182-89 (1880). The Constitution instead permits Congress to enact certain kinds of legislation. *See, e.g.*, Art. I, §8. Thus, Congress' power to investigate "is justified solely as an adjunct to the legislative process." *Watkins v. United States*, 354 U.S. 178, 197 (1957). "Congress is not invested with a general power to inquire into private affairs. The subject of any inquiry always must be one on which legislation could be had." *Eastland*, 421 U.S. at 504 n.15 (cleaned up); *see also Quinn v. United States*, 349 U.S. 155, 161 (1955) ("[T]he power to investigate" does not "extend to an area in which Congress is forbidden to legislate."). In other words, the inquiry must have a "legitimate legislative purpose." *Eastland*, 421 U.S. at 501 n.14.

19.     "Oversight" and "transparency," in a vacuum, are not legitimate purposes that can justify requesting the confidential information of a private citizen. For more than a century, the Supreme Court has been quite "sure" that neither the House nor the Senate "possesses the general power of making inquiry into the private affairs of the citizen." *Kilbourn*, 103 U.S. at 190. "[T]here is no congressional power to expose for the sake of exposure." *Watkins*, 354 U.S. at 200. "No inquiry is an end in itself; it must be related to, and in furtherance of, a legitimate task of the Congress." *Id.* at 187.

20.     Moreover, the legislative purpose justifying a committee's investigation must fall within that committee's jurisdiction. "The theory of a committee inquiry is that the committee members are serving as the representatives of the parent assembly in collecting information for a legislative purpose." *Watkins*, 354 U.S. at 200. Congress therefore must "spell out that group's jurisdiction and purpose with sufficient particularity." *Id.* at 201. The committee "must conform strictly to the resolution" creating its jurisdiction. *Exxon Corp. v. FTC*, 589 F.2d 582, 592 (D.C. Cir. 1978). And when an investigation is "novel" or "expansive," courts will construe the committee's jurisdiction "narrowly." *Tobin v. United States*, 306 F.2d 270, 275 (D.C. Cir. 1962).

21.     "[T]he records called for" by Congress must also be "pertinent to the [congressional] inquiry." *McPhaul v. United States*, 364 U.S. 372, 380 (1960). This "pertinency" requirement ensures that Congress is "coping with a problem that falls within its legislative sphere." *Watkins*, 354 U.S. at 206. If the congressional subpoena is not "reasonably 'relevant to the inquiry,'" then it lacks a legitimate purpose. *McPhaul*, 364 U.S. at 381-82; *accord Hearst v. Black*, 87 F.2d 68, 71 (D.C. Cir. 1936); *Bergman v. Senate Special Comm. on Aging*, 389 F. Supp. 1127, 1130 (S.D.N.Y. 1975).

22.     Finally, because Congress must have a legislative purpose for its inquiries, it cannot demand personal, confidential information to exercise "any of the powers of law enforcement." *Quinn*, 349 U.S. at 161. Those enforcement powers "are assigned under our Constitution to the Executive and the Judiciary." *Id.* Because Congress is not "a law enforcement or trial agency," congressional investigations conducted "for the personal aggrandizement of the investigators" or "to 'punish' those investigated" are "indefensible." *Watkins*, 354 U.S. at 187. Our tripartite system of separated powers requires that "any one of the[] branches shall not be permitted to encroach upon the powers confided to the others, but that each shall by the law of its creation be limited to the exercise of the powers appropriate to its own department and no other." *Kilbourn*, 103 U.S. at 190-91.

II.     **Under the First Amendment, States cannot discriminate or retaliate against individuals for their speech or politics.**

23.     The First Amendment, as incorporated against the States by the Fourteenth, protects the freedoms of speech and association. *Tashjian v. Republican Party of Conn.*, 479 U.S. 208, 214 (1986). "[P]olitical belief and association constitute the core of those activities protected by the First Amendment," *Elrod v. Burns*, 427 U.S. 347, 356 (1976), and the First Amendment "has its fullest and most urgent application to speech uttered during a campaign for political office." *Citizens United v. FEC*, 558 U.S. 310, 339-40 (2010).

24.     Because a State cannot "produce a result which it could not command directly," laws that do not directly regulate speech or association still violate the First Amendment if they "deny a benefit to a person because of his constitutionally protected speech or associations." *Perry v. Sindermann*, 408 U.S. 593, 597 (1972); *accord Rutan v. Republican Party of Ill.*, 497 U.S. 62, 78 (1990). This is true even if the person "has no 'right' to [the] governmental benefit" and "the government may deny him the benefit for any number of reasons." *Perry*, 408 U.S. at 597. And the withheld benefit can be something "as trivial as failing to hold a birthday party." *Rutan*, 497 U.S. at 75 n.8. "[T]he government's reason for [acting] is what counts." *Heffernan v. City of Paterson*, 136 S. Ct. 1412, 1418 (2016).

25.     Accordingly, a law violates the First Amendment if it was enacted to discriminate or retaliate against an individual for his protected speech. "Official reprisal for protected speech offends the Constitution." *Hartman v. Moore*, 547 U.S. 250, 256 (2006). Laws "based on the identity of the speaker" are "instruments to censor"; they "run the risk that 'the State has left unburdened those speakers whose messages are in accord with its own views.'" *Citizens United*, 558 U.S. at 340; *NIFLA v. Becerra*, 138 S. Ct. 2361, 2378 (2018). At bottom, States cannot pass legislation "when the specific motivating ideology or the opinion or perspective of the speaker is the rationale." *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995). It does not matter if the retaliation or discrimination

is unsuccessful at chilling the target's speech. The constitutionality of discriminatory and retaliatory action cannot turn on "the plaintiff's will to fight." *Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 500 (4th Cir. 2005).

26.     Similarly, a law violates the First Amendment if it was enacted to discriminate or retaliate against an individual for his politics. *See Branti v. Finkel*, 445 U.S. 507, 516-17 (1980). This prohibition "reflects the First Amendment's hostility to government action that prescribes what shall be orthodox in politics." *Heffernan*, 136 S. Ct. at 1417 (cleaned up). Laws based on partisan discrimination or retaliation "press" individuals "to conform their beliefs and associations to some state-selected orthodoxy." *Rutan*, 497 U.S. at 76.

27.     These constitutional rules are implicated whenever speech or politics motivated the legislation "at least in part." *Cruise-Gulyas v. Minard*, 918 F.3d 494, 497 (6th Cir. 2019). To determine whether an impermissible purpose exists, courts first look at the "face" of the law to see if, for example, it has been "'gerrymander[ed]'" to target particular individuals. *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 564 (2011); *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 533-34 (1993). "Facial neutrality" is "not determinative," however. *Lukumi*, 508 U.S. at 533-34. An impermissible purpose can also be detected from "the effect of a law in its real operation" and other evidence in "the record." *Id.* at 535; *Sorrell*, 564 U.S. at 564. "Relevant evidence includes, among other things, the historical background of the decision under challenge, the specific series of events leading to the enactment or official policy in question, and the legislative or administrative history, including contemporaneous statements made by members of the decisionmaking body." *Lukumi*, 508 U.S. at 540.

## III.    The Committee's partisan efforts to uncover the President's tax information.

28.     During the 2016 election, then-Candidate Trump declined to disclose his federal tax returns, citing ongoing IRS audits and the need to not prejudice his rights in those proceedings. His

tax returns became a major campaign issue, with Secretary Clinton repeatedly insinuating that their nondisclosure suggested they contained politically damaging information. As she framed the criticism at one presidential debate, "[W]hy won't he release his tax returns? … Maybe he's not as rich as he says he is. Second, maybe he's not as charitable as he says he is. Third, we don't know all of his business dealings …. Or maybe he doesn't want the American people ... to know that he's paid nothing in federal taxes.... It must be something really important, even terrible, that he's trying to hide."

29.    Ultimately, this issue was litigated in the 2016 election. Voters heard the criticisms from Secretary Clinton, and they elected President Trump anyway. Democrats in Congress and across the country, however, have only become more eager to disclose the President's tax returns for political gain.

30.    During the 115th Congress, when they were still the minority party, House Democrats gave a variety of reasons for wanting the President's tax returns. Their statements all had a common theme: the tax returns would contain damaging information about President Trump that the House Democrats would release to the public. Then-Leader Nancy Pelosi, for example, said there was a "popular demand" for the President's tax returns, which she suspected would reveal "a Russia connection" and "what [the] Russians have on Donald Trump." In a press conference with the House Democratic Leadership, she reiterated her concern about Russia and called on the Ways and Means Committee to "make those tax returns public." Committee Democrats released a report stating they "remain steadfast in our pursuit to have his individual tax returns disclosed to the public." Then-Ranking Member Richard Neal said he wanted the public to "see the tax forms" and for "the media to sift and sort" them. Representative Lloyd Doggett, another Committee member, said "[t]he public has an interest in knowing of the President's personal and business affairs"; he suspected the returns would show that the President "will benefit personally" from tax reforms, has "payments to or from Russians," and has "conflicts with and entanglements with foreign governments and potential

violations of the Emoluments Clause." *See also* Doc. 1-7, *Ways and Means*, No. 1:19-cv-1974 (collecting many more similar statements).

31.     After the 2018 midterm elections, Democrats took control of the House and, with it, the power to issue subpoenas. Knowing he could not request the President's tax returns unless he had a legitimate legislative purpose, Chairman Neal began "contruct[ing]" a "case" that "would stand up under the critical scrutiny of the federal courts." He had to be "meticulous about [his] choice of words," he said, because his request would "become the basis of a long and arduous court case." He implored his fellow Democrats to "resist the emotion of the moment," not "step on [their] tongue[s]," and "approach this gingerly and make sure the rhetoric that is used does not become a footnote to the court case." "This has to be part of a carefully prepared and documented legal case," Chairman Neal explained. "It will be done judiciously and methodically, but it will be done."

32.     In "construct[ing]" his "case," Chairman Neal knew he could not rely on any of the rationales that Democrats had offered in the past. A bare desire to expose the President's tax information would be illegal, and the Ways and Means Committee has no jurisdiction over "emoluments," "conflicts of interest," or "Russia." But the Ways and Means Committee had to make the request, House Democrats believed, because only it can both request the President's returns and disclose them to the public.

33.     So Chairman Neal came up with a new rationale. In his April 3, 2019 letter to the IRS Commissioner, he requested six years' worth of tax returns and other information regarding President Trump and eight Trump entities. He justified his request in terms of "the Federal tax laws"— specifically, determining "the extent to which the IRS audits and enforces the Federal tax laws against a President." Doc. 1-1, *Ways and Means*, No. 1:19-cv-1974.

34.     Chairman Neal's rationale was pretextual, as he had admitted it would be. While House Democrats had offered countless justifications for obtaining the President's tax returns, no one had

ever mentioned a desire to find out how the IRS audits Presidents. The Chairman's request, moreover, bore little resemblance to an effort to investigate how the IRS audits Presidents. It asked for the information of only one President, asked for open files for which audits have not been completed, and never asked the IRS for the most relevant information—namely, how it audits Presidents. In a series of letters, attorneys for the President and Treasury Department challenged this newly-minted rationale as illegitimate. *See* Docs. 1-3; 1-4; *Ways and Means*, No. 1:19-cv-1974. The Chairman did not dispute that his new rationale was pretextual; he merely insisted that no one could "question or second guess the motivations of the Committee." Doc. 1-5, *Ways and Means*, No. 1:19-cv-1974.

35.     On May 6, 2019, the Treasury Department indicated it could not comply with the Committee's request for the President's federal tax returns. *See* Doc. 1-9, *Ways & Means*, No. 1:19-cv-1974. After compiling and reviewing over 40 pages of Democrats' public statements, Secretary Mnuchin concluded that the Committee's request lacked a legitimate legislative purpose. It was instead a partisan effort to expose the President's private tax information. *See* Doc. 1-7, *Ways & Means*, No. 1:19-cv-1974. The Department of Justice agreed. *See Congressional Committee's Request for the President's Tax Returns Under 26 U.S.C. § 6103(f)*, 43 Op. O.L.C. __, __ (June 13, 2019) (slip op. 26). The Treasury Department later declined a Committee subpoena for the same information. *See* Doc. 1-14, *Ways & Means*, No. 1:19-cv-1974.

36.     On July 2, 2019, the Committee filed a lawsuit to compel compliance with its subpoena. *See* Doc. 1, *Ways & Means*, No. 1:19-cv-1974. President Trump (and the eight Trump entities whose tax returns were requested) intervened. *See* Doc. 14, *Ways & Means*, No. 1:19-cv-1974. That suit is currently pending in this Court.

**IV.     New York's partisan efforts to uncover the President's tax information.**

37.     Like House Democrats, Democratic officials in New York have used every tool at their disposal to expose the President's private financial information. And like House Democrats, their goal is to retaliate against President Trump and damage him politically.

38.     The Attorney General of New York State, for example, took office following a campaign where she promised to "begin … an investigation into the Trump Administration with respect to his finances in the State of New York" and bring "the days of Donald Trump … to an end." On several occasions she stated, "The president of the United States has to worry about three things: 1. Mueller 2. Cohen, and 3. Tish James. We're all closing in on him." She represented that, if elected, "we will join with law enforcement and other attorneys general across this nation in removing this president from office." "I will be shining a bright light into every dark corner of his real estate dealings." "[W]e're going to definitely sue him. We're going to be a real pain in the ass. He's going to know my name personally." The Attorney General pledged to "root out corruption" in "DC" by "[i]nvestigat[ing] Trump businesses." She released a three-point plan explaining how she would "[f]ight[] corruption in the Trump Administration." The Attorney General also tweeted to Democrats in Congress, promising "to help Democrats take on Donald Trump" and "investigate" him.

39.     The Attorney General has made good on her promise. She is closely coordinating with House Democrats in a joint effort to obtain and expose the President's financial information. For example, she and the House issued near-simultaneous subpoenas seeking information about how the President acquired the Trump International Hotel in the District of Columbia.. She and the House also issued near-simultaneous subpoenas to investigate specific topics that Michael Cohen raised in testimony to the House Oversight Committee in February 2019. Several of these subpoenas (some of which are not yet public) seek the exact same information from the exact same parties.

40.     Democrats in the New York Legislature have been just as relentless.

41.    Their first attempt to expose the President's financial information was not subtle. Shortly before the President's inauguration, Senator Brad Hoylman (D-Manhattan) introduced Senate Bill S8217. His bill would have required candidates for President to publicly disclose their federal income tax returns from the last five years, or else their names would not appear on the New York ballot and they could not receive New York's electoral votes. Lest anyone be confused about the target of S8217, Senator Hoylman named it the Tax Returns Uniformly Made Public Act, or TRUMP Act.

42.    The official "Justification" for the TRUMP Act began by lamenting that, "[u]ntil the 2016 presidential election, every president since Jimmy Carter has disclosed at least one year['s] worth of tax returns before taking office." The TRUMP Act thus would "give the American people important insight into a candidate's financial standing" by answering questions like "How much does the candidate earn, and from whom? Are they paying a higher or lower overall tax rate than the average American? To whom do they owe money? Have they utilized loopholes in tax laws to avoid or evade paying taxes?"

43.    Senator Hoylman made similar public statements about the TRUMP Act's purpose. "Sadly," he said, "President-elect Donald Trump repeatedly refused to release copies of his federal income taxes." As a "response," "New York should take corrective action and make the provision of tax returns a qualification to appear on the ballot for President of the United States. And I hope other state legislatures will follow New York's lead and introduce their own version of the TRUMP Act."

44.    The TRUMP Act was also introduced in the New York Assembly. It was reintroduced in the 2017-18 legislative session (as A4072 and S26) and the 2019-20 legislative session (as A4493 and S32). Democratic legislators in nearly 30 States introduced similar legislation.

45.    In the 2017-18 session, the Senate Elections Committee rejected the TRUMP Act on a 5-4, party-line vote. Senator Hoylman lambasted "Senate Republicans" for "carrying the water for Donald Trump to help keep his tax returns secret from New Yorkers."

46.     Senator Hoylman quickly devised another plan to expose the President's finances. Working with Assemblymember Buchwald (D-Westchester), the two introduced Assembly Bill A7462 and Senate Bill S5572—the Tax Returns Uphold Transparency and Honesty Act, or TRUTH Act. The TRUTH Act would have required the Commissioner to publish the President's state income tax returns from the last five years.

47.     The TRUTH Act was reintroduced in the 2019-20 legislative session (as A1390 and S2271). It gained over 100 Democratic cosponsors.

48.     Although the TRUTH Act would have applied to other officials who run for statewide office, its true target was President Trump. After introducing the legislation, Senator Hoylman, Assemblymember Buchwald, and others held a press conference where they stood in front of a red banner with white lettering that said "#ReleaseTheReturns." Assemblymember Buchwald remarked, "For over forty years, U.S. Presidents have released their tax returns, a precedent broken by President Trump"; "[i]t is essential that the President's tax returns be released." "If lawmakers in Washington won't force President Trump to release his returns," Senator Hoylman added, "lawmakers in Albany should instead." "Trump broke over four decades worth of tradition by not releasing his returns, by thumbing his nose at the American people"; "[w]e want to reverse that, and we think we are in a unique position as New Yorkers to do so."

49.     According to Assemblymember Buchwald and Senator Holyman, they got the idea for the TRUTH Act from an op-ed and article written by a University of Chicago law professor. The op-ed (titled "There's a Quick and Easy Way to See Trump's Tax Returns") and the article pitched the idea of disclosing the President's state tax returns as a workaround—a way to expose the same information from his federal returns without engaging in protracted litigation with the Treasury Department. The New York returns, the professor explained, would help resolve "one of the big concerns about Trump's [federal] tax returns": that "he just hasn't been paying taxes for the last several

decades … that he's been reporting a federal [adjusted gross income] of zero, while all the while holding himself out as a billionaire, which suggests that he's either a liar or a tax cheat." "The tax experts I've spoken to," Senator Holyman echoed, "think we'll get a good snapshot of what's on [President Trump's] federal form."

50.     Like the TRUMP Act, the TRUTH Act died in committee during the 2017-18 legislative session.

51.     So Senator Hoylman and Assemblymember Buchwald devised a third way to target the President. By this time, the House Ways and Means Committee had formally requested the President's federal returns and the Treasury Department had suggested that the request was illegal. So Senator Hoylman and Assemblymember Buchwald devised legislation that would use the Committee's request for the President's federal returns as a way to disclose his state returns. They named the legislation the Tax Returns Released Under Specific Terms Act, or TRUST Act.

52.     The initial draft of the TRUST Act applied to the President alone. Yet a lawyer advised the drafters to broaden the bill so its supporters would have "plausible deniability." Governor Andrew Cuomo likewise warned against "politiciz[ing] the process" by passing a law that conspicuously targeted President Trump. While he supported the effort to force "transparency and disclosure" on President Trump, he said the law should "appl[y] to everybody."

53.     The next draft of the TRUST Act incorporated this advice. It would have instructed the Commissioner to produce "any returns or return information" requested by the House Ways and Means Committee. 2019 Sess. Law News of N.Y. Ch. 91.

54.     The final version of the TRUST Act reverted to a more targeted approach. Instead of allowing the Committee to obtain anyone's state tax returns, the TRUST Act limits the Committee's access to returns filed by "the president of the United States," "vice-president of the United States," U.S. Congressmen representing New York, "any person who served in or was employed by … the

executive staff of the president, in the executive office of the president, or in an acting or confirmed capacity in a position subject to confirmation by the United States senate," and several state and local officials. The TRUST Act also allows the Committee to receive returns filed by "a partnership, firm, association, corporation, joint-stock company, trust or similar entity" that one of the listed individuals "directly or indirectly control[s]" or owns "ten percent or more of the voting securities." The returns can be for "any current or prior year." 2019 Sess. Law News of N.Y. Ch. 92.

55.     To receive state returns under the TRUST Act, the chair of either the House Ways and Means Committee, the Senate Finance Committee, or the Joint Committee on Taxation must submit a "written request" to the Commissioner. The request must "certif[y]" that three conditions are met: (1) "such reports or returns have been requested related to, and in furtherance of, a legitimate task of the Congress," (2) "the requesting committee has made a written request to the United States secretary of the treasury for related federal returns or return information, pursuant to 26 U.S.C. Section 6103(f)", and (3) any inspection by another Committee or the full House or Senate will be done "in a manner consistent with federal law." *Id.*

56.     Before giving the Committee a state return, the Commissioner must "redact any copy of a federal return (or portion thereof) attached to, or any information on a federal return that is reflected on" it. *Id.*

57.     New York legislators viewed the TRUST Act as a way to help the Committee accomplish the reason it requested the President's federal return: obtaining and exposing his private tax information for political gain. As Senator Holyman explained, "[N]o one is above the law and we have a situation in Washington where a coequal branch of government has requested tax information from the White House and it is being stonewalled." "New York, as the home of the president and the headquarters for some of his companies, has a unique role and responsibility in that regard to allow Congress to do its constitutionally-mandated job." Only New York could "help head off the

constitutional crisis brewing between Congress and the White House over refusal to comply with the request for Donald Trump's tax returns." "As the situation in Washington unfolds the desire by my colleagues is even greater to pass this bill," Senator Hoylman added. "Applying pressure in New York is a positive thing for the efforts by Chairman Neal." Other Democratic legislators made similar statements. Senator Andrea Stewart-Cousins voted for the TRUST Act because "[n]o one is above the law and we see things unfolding, that, really, is blocking the ability for our counterparts on the congressional level to actually do their responsibility." Senator Michael Gianaris voted for it to "send a message that no one is above the law…. [W[e have a president who is defying the norms of checks and balances and the balance of power in this country." Assemblymember Thomas Abinanti echoed that "the President has spurned the tradition of releasing his own tax returns, and he has intentionally and publicly thwarted the legitimate and necessary oversight of Congress."

58.     In addition to helping House Democrats achieve their partisan goals, Democratic legislators in New York passed the TRUST Act to further their own partisan goal of politically damaging the President. Comparing the TRUST Act to the TRUMP Act and TRUTH Act, Senator Hoylman said, "I don't care how we get it done, frankly"; "I want the route that is most politically feasible." "What's at stake here," Senator Hoylman stated, is "the desire of New Yorkers and the American people to seek the truth behind Trump's taxes." "Typically in politics, where there's smoke there's fire." "A lot of New Yorkers, and frankly, Americans have questions about what he's hiding," and "we have a responsibility to do so as the state that is the home state for President Trump and many of his businesses." When asked why the TRUST Act is not "blatantly political," Senator Hoylman responded, "We as New Yorkers shouldn't be bystanders to the preservation of our democracy" and "Donald Trump has broken over 40 years of political traditions by not releasing his tax returns." When asked a similar question, Assemblymember Buchwald admitted that "[o]bviously it is a bill dominated by Democratic support" but added that some non-Democrats also "want

President Trump to release his taxes." "Making sure that the public has information about the man currently in the White House is something that I feel is incumbent upon us to make sure is released." "New York state could play a unique role with regards to transparency of tax returns in connection with the president," Assemblymember Buchwald explained, "because he's a New York state resident and his state tax returns would have his worldwide income." "Tax returns" are also "a real window into what's going on in a person's mind." Carl E. Heastie, the Democratic speaker of the Assembly, echoed that "there seems to be nationwide desire" to see Mr. Trump's taxes. Senator Luis Sepúlveda described the law as a way to "resist" the "current president [who] is potentially breaking every rule."

59.     When the TRUST Act first passed the Senate, the Senate issued a press release titled, "Senate Stands Up to President Trump." The article begins, "The Senate passed legislation today that will have a major impact … by holding President Donald Trump accountable," and quotes Senate Majority Leader Andrea Stewart-Cousins as saying, "This President and his administration have repeatedly shown a true hostility to the rule of law and presidential customs." Later, the article even describes the bill as the "Trump Taxes" bill.

60.     The Legislature's illegitimate motives did not go unnoticed. Assemblymember Michael Benedetto, a Democrat, stated, "Make no mistake, I have complete disdain with what is going on in this administration in Washington." "But … the purpose [of the TRUST Act] is obviously political in nature .… No Legislature should craft legislation for political reasons just to get a few people they consider their enemies." Assemblymember Carrie Woerner, who voted for the TRUST Act, lamented that it was "an intrusion … driven by politics." Governor Cuomo also expressed initial reservations about the TRUST Act because "if we have to pass a law that is clearly designed to help a Democratic Congress access Donald Trump's tax returns it will be in the courts for years, because this really does raise serious constitutional questions."

61.     Governor Cuomo nevertheless signed the TRUST Act on July 8. "[T]his bill," the Governor declared in a formal statement, "gives Congress the ability to fulfill its Constitutional responsibilities … and ensure that no one is above the law." Senator Hoylman similarly tweeted, "BREAKING: @NYGovCuomo just signed my legislation with @DavidBuchwald allowing the US Congress to obtain Trump's NY state tax returns. No one is above the law. Not even the President."

62.     The TRUST Act took effect "immediately." 2019 Sess. Law News of N.Y. Ch. 91, §19.

63.     But for the TRUST Act, Congress could not obtain the President's state tax returns. New York law generally makes it a crime and a removable offense for an official to divulge state tax information. *See* N.Y. Tax Law §§1825; 994. While this duty of secrecy has always had exceptions, no exception for congressional requests concerning the President existed until the TRUST Act was enacted. *See, e.g.,* N.Y. Tax Law §697 (2016).

## V.     The Committee is poised to request the President's state returns from New York.

64.     Now that the TRUST Act is in effect, Chairman Neal could request and obtain the President's state tax returns at any time.

65.     At first, the Chairman said he would not use the TRUST Act. The state returns "wouldn't matter for our purposes," Neal stated, noting that his stated rationale for requesting the federal returns was reviewing how the IRS audits Presidents. Chairman Neal also noted that "[w]e don't have jurisdiction over New York taxes." As he revealed to reporters, his request for the New York returns could "boost the Trump administration's argument that Congress is going after his tax returns as part of a political vendetta and fishing expedition, not as part of its legislative or oversight duties," torpedoing the "prudent[] … case" he had constructed.

66.     But things are changing fast. According to an NBC news report from yesterday, Chairman Neal's hesitation about using the TRUST Act has "landed [him] in hot water." Progressive groups are "infuriated" that he has not yet requested the President's state tax returns, lambasting his

inaction as showing insufficient "zeal for oversight" and "doing pretty much everything possible to make sure [House Democrats] don't get [the President's returns] before November 2020." Chairman Neal also gained a primary challenger yesterday, who launched his campaign by criticizing the Chairman's lack of "urgency" on this issue.

67.     The NBC report quoted an aide to one of the Committee Democrats, who said there was "widespread frustration from members of the committee at how slowly this process [of getting the President's tax information] has moved." Recently, Representative Doggett said, "we should take a look" at "New York's information." Referencing the TRUST Act, Representative Pascrell said he supports "any tool … that might shed sunlight on Trump's tax return history" because the country needs to know what he "is hiding" and whether he "is a crook." Representative Judy Chu, another Committee member, declared that "[t]he new law out of New York State is a new and interesting option that I believe should be considered and examined as we move forward."

68.     Other House Democrats have added their voices to this growing chorus. Representative Maxine Waters, who chairs the House Financial Services Committee, said that "I'm for" "[w]hatever it takes to get" the President's tax returns. Representative Pramila Jayapal, co-chair of the House Progressive Caucus, similarly said, "Yes, absolutely, we need to ask [for the state returns]. We need to know." Representative Charlie Crist answered a question about the TRUST Act by asking rhetorically, "Why not? I don't think there is any downside for us."

69.     Democrats are also tying the TRUST Act to the Committee's lawsuit for the President's federal tax returns, characterizing the state returns as a backup plan in case the federal suit is unsuccessful or takes too long. According to Representative Nadler, also a New Yorker and the Chair of the House Judiciary Committee, the TRUST Act means "we can turn to New York State" "[i]f confronted with inability to receive the federal tax return." He called the Act a "workaround to a White House that continues to obstruct and stonewall the legitimate oversight work of Congress."

Senator Hoylman likewise framed the TRUST Act as giving "Congress a constitutional escape hatch should they not want to wait for the federal court case and its appeals process to be finalized, which potentially could take months to years." Assembly Speaker Heastie predicted that Chairman Neal would use the bill as "'in case of emergency break glass' type legislation." So did Representative Hakeem Jeffries, the fifth highest ranking Democrat in the House: "continued obstruction from the administration … may cause the chairman of the Ways and Means Committee to change his mind."

70.     In the face of all this pressure, Chairman Neal recently changed his stance toward the TRUST Act. He clarified that "*House counsel* … have legitimate concerns about [requesting the President's state returns], *not me*." (Emphases added.) On July 12, the Chairman revealed that "House counsel" has been asked to reconsider using the TRUST Act to request the President's state tax returns and "is reviewing all of that right now." Chairman Neal did not specify when this review will end.

71.     Chairman Neal could invoke the TRUST Act, and the Commissioner could disclose the President's state tax returns, immediately. The Act was drafted for speed: The Chairman can make a request at any time. The supposed "conditions" that must be satisfied are, by design, all things that the Committee has already said or done. The Act does not require any notice to the President or anyone else, and there is no procedure for the President to object. The statute imposes no waiting period on the Commissioner either; he can respond virtually instantaneously (after making simple redactions).

72.     Accordingly, because Chairman Neal has expressed a renewed interest in utilizing the TRUST Act, President Trump had no choice but to file this lawsuit to protect his constitutional rights.

## COUNT I
### Violation of Article I of the Constitution and the House Rules
### (Committee, Chairman Neal, and Grossman)

73.     Plaintiff incorporates all his prior allegations.

74.     The Chairman cannot invoke the TRUST Act and request the President's state tax returns without a legitimate legislative purpose.

75.     No legitimate legislative purpose exists to request the President's state tax returns. The Committee has no authority to regulate New York income taxes. And state tax returns would not give the Committee pertinent information about federal taxes, since the TRUST Act requires that any federal information be redacted. The primary purpose of any request under the TRUST Act would be exposure for the sake of exposure, law enforcement, or some other wholly impermissible goal—not pursuing valid federal legislation.

76.     The Chairman also lacks statutory jurisdiction to request the President's state tax returns. The House Rules authorize the Committee to oversee "Federal laws," not state tax laws. And nothing in the House Rules allows the Committee to demand the private financial information of a sitting President.

## COUNT II
### Retaliation and Discrimination in Violation of the First Amendment
### (All Defendants)

77.     Plaintiff incorporates all his prior allegations.

78.     The First Amendment prohibits laws enacted for the purpose of discriminating or retaliating against an individual for his politics or speech.

79.     New York legislators have admitted, on countless occasions, that the TRUST Act's purpose is to expose the private tax information of one individual—President Trump—for political gain. Tellingly, the law is tailored to fit the precise circumstances of the President's current dispute with the Ways and Means Committee, and its practical operation will affect only President Trump. It was passed to help House Democrats expose the President's private tax information, adopting and furthering their unlawful purposes.

80.     The TRUST Act singles out President Trump because he is a Republican and a political opponent. It was enacted to retaliate against the President because of his policy positions, his political beliefs, and his protected speech, including the positions he took during the 2016 campaign.

81.     The unconstitutionality of the TRUST Act means that the Committee cannot use it to request the President's state tax information. If the TRUST Act is declared unconstitutional and unenforceable, then New York law would again require officials to keep the President's tax information confidential, even from a committee of Congress.

**WHEREFORE**, Plaintiff asks this Court to enter judgment in his favor and provide the following relief:

a.     A declaratory judgment that the Committee lacks a legitimate legislative purpose for obtaining the President's state tax information;

b.     A permanent injunction prohibiting the Committee from making a written request under the TRUST Act, or taking any other action to request, inspect, review, use, maintain, or disclose the President's state tax information;

c.     A declaratory judgment that the TRUST Act violates the First Amendment;

d.     A permanent injunction prohibiting the Attorney General from enforcing the TRUST Act;

e.     A permanent injunction prohibiting the Commissioner from complying with any written request under the TRUST Act, or from taking any other action to disclose the President's state tax information;

f.     A temporary restraining order and preliminary injunction granting the relief specified above during the pendency of this action;

g.     An order under the All Writs Act requiring the Attorney General or Commissioner to notify the Court and Plaintiff if they receive a request for the President's state tax information, and requiring them to refrain from complying with that request until Plaintiff has an opportunity to be heard in court;

h.     An order under the All Writs Act requiring the Committee, Chairman Neal, or Grossman to notify the Court and Plaintiff before the Chairman makes a request under the TRUST Act for the President's state tax information, and requiring the Chairman to refrain from making that request until Plaintiff has an opportunity to be heard in court;

    i.       Plaintiff's reasonable costs and expenses, including attorneys' fees; and

    j.       All other preliminary and permanent relief that Plaintiff is entitled to, including equitable relief under the All Writs Act to protect this Court's jurisdiction.


Dated: July 23, 2019                      Respectfully submitted,

                                          *s/ William S. Consovoy*

                                     William S. Consovoy (D.C. Bar #493423)
                                     Thomas R. McCarthy (D.C. Bar #489651)
                                     Cameron T. Norris
                                     CONSOVOY MCCARTHY PLLC
                                     1600 Wilson Blvd., Ste. 700
                                     Arlington, VA 22209
                                     (703) 243-9423
                                     will@consovoymccarthy.com
                                     tom@consovoymccarthy.com
                                     cam@consovoymccarthy.com

                                     Patrick Strawbridge
                                     CONSOVOY MCCARTHY PLLC
                                     Ten Post Office Square
                                     8th Floor South PMB #706
                                     Boston, MA 02109
                                     patrick@consovoymccarthy.com

                                     *Counsel for Plaintiff*