**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

DONALD J. TRUMP,

                                        Plaintiff,

v.                                                          Case No. 1:19-cv-2173-CJN

COMMITTEE ON WAYS AND MEANS,
UNITED STATES HOUSE OF
REPRESENTATIVES; RICHARD NEAL, in
his official capacity as Chairman of the House
Ways and Means Committee; ANDREW
GROSSMAN, in his official capacity as Chief
Tax Counsel of the House Ways and Means
Committee; LETITIA JAMES, in her official
capacity as Attorney General of New York
State; and MICHAEL R. SCHMIDT, in his
official capacity as Commissioner of the New
York State Department of Taxation and
Finance,

                                        Defendants.

**PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES
IN OPPOSITION TO THE NEW YORK DEFENDANTS' MOTION TO DISMISS
FOR LACK OF PERSONAL JURISDICTION AND IMPROPER VENUE**

# TABLE OF CONTENTS

Table of Authorities ....................................................................................................................... ii

Introduction ...................................................................................................................................... 1

Background ........................................................................................................................................ 2

Argument ........................................................................................................................................... 7

    I.      The motion is premature. ............................................................................................ 7

           A.      The President is entitled to jurisdictional discovery. ................................... 8

           B.      Congress has not yet requested the President's state tax returns. ........................ 12

    II.     The motion should be denied. .................................................................................. 15

           A.      This Court has personal jurisdiction over the New York Defendants. ................. 15

           B.      This district is a proper venue. .................................................................... 24

    III.    The motion serves no real purpose. ......................................................................... 30

Conclusion ....................................................................................................................................... 34

# TABLE OF AUTHORITIES

## Cases

*281 Care Comm. v. Arneson*,
  638 F.3d 621 (8th Cir. 2011) ......................................................................................... 12

*Acorda Therapeutics Inc. v. Mylan Pharm. Inc.*,
  817 F.3d 755 (Fed. Cir. 2016) ....................................................................................... 16

*Aggarao v. MOL Ship Mgmt. Co.*,
  675 F.3d 355 (4th Cir. 2012) ......................................................................................... 24

*Armstrong v. Exceptional Child Ctr., Inc.*,
  135 S. Ct. 1378 (2015) ................................................................................................... 11

*Astrazeneca Pharm. LP v. Burwell*,
  197 F. Supp. 3d 53 (D.D.C. 2016) ................................................................................. 14

*Attkisson v. Holder*,
  241 F. Supp. 3d 207 (D.D.C. 2017) ............................................................................... 26

*Autolog Corp. v. Regan*,
  731 F.2d 25 (D.C. Cir. 1984) ......................................................................................... 31

*Belbacha v. Bush*,
  520 F.3d 452 (D.C. Cir. 2008) ....................................................................................... 14

*Brunette Mach. Works, Ltd. v. Kockum Indus., Inc.*,
  406 U.S. 706 (1972) ....................................................................................................... 25

*\*Burger King Corp. v. Rudzewicz*,
  471 U.S. 462 (1985) ................................................................................... 13, 18, 23, 24

*Burnett v. Al Baraka Inv. & Dev. Corp.*,
  274 F. Supp. 2d 86 (D.D.C. 2003) ................................................................................... 9

*\*Calder v. Jones*,
  465 U.S. 783 (1984) .......................................................................................... 18, 19, 21

*Caribbean Broad. Sys., Ltd. v. Cable & Wireless PLC*,
  148 F.3d 1080 (D.C. Cir. 1998) ....................................................................................... 8

*Companhia Brasileira Carbureto De Calcio v. Applied Indus. Materials Corp.*,
  35 A.3d 1127 (D.C. 2012) ........................................................................................ 19, 21

*Crane v. Carr*,
  814 F.2d 758 (D.C. Cir. 1987) .................................................................................... 8, 10

*Crane v. N.Y. Zoological Soc.*,
  894 F.2d 454 (D.C. Cir. 1990) ....................................................................................... 16

*Davis v. Grant Park Nursing Home LP*,
  639 F. Supp. 2d 60 (D.D.C. 2009) ................................................................................... 8

\*Principal authority

*Delta Sigma Theta Sorority, Inc. v. Bivins,*
    215 F. Supp. 3d 12 (D.D.C. 2013) ................................................................. 8, 9

*Diamond Chem. Co. v. Atofina Chemicals, Inc.,*
    268 F. Supp. 2d 1 (D.D.C. 2003) .................................................................. 8, 9

*Dombrowski v. Eastland,*
    387 U.S. 82 (1967) ......................................................................................... 33

*Dooley v. United Techs. Corp.,*
    786 F. Supp. 65 (D.D.C. 1992) ...................................................................... 11

*Douglas v. Chariots for Hire,*
    918 F. Supp. 2d 24 (D.D.C. 2013) ..................................................... 25, 27, 29

*Edmond v. U.S. Postal Serv. Gen. Counsel,*
    949 F.2d 415 (D.C. Cir. 1991) ..................................... 8, 9, 10, 11, 15, 21, 22

*El-Fadl v. Cent. Bank of Jordan,*
    75 F.3d 668 (D.C. Cir. 1996) ........................................................................ 8, 9

*Envtl. Def. Fund, Inc. v. EPA,*
    485 F.2d 780 (D.C. Cir. 1973) ....................................................................... 32

*Envtl. Research Int'l, Inc. v. Lockwood Greene Engineers, Inc.,*
    355 A.2d 808 (D.C. 1976) (en banc) ............................................................. 20

*Ervin & Assocs., Inc. v. Cisneros,*
    939 F. Supp. 793 (D. Colo. 1996) ................................................................. 26

*Etchebarne-Bourdin v. Radice,*
    982 A.2d 752 (D.C. 2009) ....................................................................... 20, 23

*Ex parte Young,*
    209 U.S. 123 (1908) ....................................................................................... 12

*Exelon Generation Co., LLC v. Grumbles,*
    380 F. Supp. 3d 1 (D.D.C. 2019) ................................................................... 28

*Family Fed'n for World Peace v. Hyun Jin Moon,*
    129 A.3d 234 (D.C. 2015) ............................................................................. 22

*FC Inv. Grp. LC v. IFX Markets, Ltd.,*
    529 F.3d 1087 (D.C. Cir. 2008) ...................................................................... 8

*Gorman v. Ameritrade Holding Corp.,*
    293 F.3d 506 (D.C. Cir. 2002) ................................................................. 10, 18

*Greater Yellowstone Coal. v. Bosworth,*
    180 F. Supp. 2d 124 (D.D.C. 2001) ............................................................... 29

*GTE New Media Servs. Inc. v. BellSouth Corp.,*
    199 F.3d 1343 (D.C. Cir. 2000) ...................................................................... 9

*Gulf Ins. Co. v. Glasbrenner,*
    417 F.3d 353 (2d Cir. 2005) .......................................................................... 24

*Gulf Oil Corp. v. Gilbert*,
   330 U.S. 501 (1947) ................................................................................................ 29

*Helmer v. Doletskaya*,
   393 F.3d 201 (D.C. Cir. 2004) ........................................................................... 18, 19

*Higginson v. Becerra*,
   733 F. App'x 402 (9th Cir. 2018) ........................................................................... 31

*Houghton v. Audio Leasing Corp.*,
   1988 WL 21194 (9th Cir. Mar. 7, 1988) ................................................................ 15

*Hulme v. Ferris*,
   1987 WL 11702 (D.D.C. May 21, 1987) ............................................................... 15

*IMAPizza, LLC v. At Pizza Ltd.*,
   334 F. Supp. 3d 95 (D.D.C. 2018) ......................................................................... 16

*Imbler v. Pachtman*,
   424 U.S. 409 (1976) ................................................................................................ 21

*In re Vitamins Antitrust Litig.*,
   94 F. Supp. 2d 26 (D.D.C. 2000) ........................................................................... 10

*Int'l Shoe Co. v. Washington*,
   326 U.S. 310 (1945) ................................................................................................ 16

*Jericho Baptist Church Ministries, Inc. (D.C.) v. Jericho Baptist Church Ministries, Inc. (Md.)*,
   223 F. Supp. 3d 1 (D.D.C. 2016) ........................................................................... 26

*Jung v. Ass'n of Am. Med. Colleges*,
   300 F. Supp. 2d 119 (D.D.C. 2004) .................................................................. 11, 22

*Kitchen v. Herbert*,
   755 F.3d 1193 (10th Cir. 2014) ............................................................................. 12

*Kopff v. Battaglia*,
   425 F. Supp. 2d 76 (D.D.C. 2006) ......................................................................... 15

*League of Women Voters of Fla. v. Browning*,
   2008 WL 11332046 (S.D. Fla. May 29, 2008) ...................................................... 26

*Leroy v. Great Western United Corp.*,
   443 U.S. 173 (1979) ................................................................................................ 27

*\*Lex Tex Ltd., Inc. v. Skillman*,
   579 A.2d 244 (D.C. 1990) ................................................................................. 20, 21

*M&N Plastics, Inc. v. Sebelius*,
   997 F. Supp. 2d 19 (D.D.C. 2013) ......................................................................... 29

*Morris v. SSE, Inc.*,
   843 F.2d 489 (11th Cir. 1988) ............................................................................... 15

*Mouzavires v. Baxter*,
   434 A.2d 988 (D.C. 1981) (en banc) ..................................................................... 18

*Mwani v. bin Laden*,
  417 F.3d 1 (D.C. Cir. 2005) ............................................................................... 15

*NAACP, Jefferson Cty. Branch v. Brock*,
  619 F. Supp. 846 (D.D.C. 1985) ....................................................................... 32

*Naartex Consulting Corp. v. Watt*,
  722 F.2d 779 (D.C. Cir. 1983) ............................................................................. 8

*Oppenheimer Fund, Inc. v. Sanders*,
  437 U.S. 340 (1978) .............................................................................................. 8

*Patel v. Phillips*,
  933 F. Supp. 2d 153 (D.D.C. 2013) .................................................................... 26

*Pharm. Research & Mfrs. of Am. v. Thompson*,
  259 F. Supp. 2d 39 (D.D.C. 2003) ...................................................................... 32

*Pinson v. Samuels*,
  761 F.3d 1, 6 (D.C. Cir. 2014) ............................................................................ 32

*Powell ex rel. United Food & Commercial Workers Union & Employers Midwest Pension Fund v. Ocwen Fin.
  Corp.*, 2019 WL 1227939 (S.D.N.Y. Mar. 15, 2019) ....................................... 15

*Purdue Research Found. v. Sanofi-Synthelabo, S.A.*,
  338 F.3d 773 (7th Cir. 2003) ................................................................................. 8

*Quarles v. Gen. Inv. & Dev. Co.*,
  260 F. Supp. 2d 1 (D.D.C. 2003) ........................................................................ 25

*Quincy Cable TV, Inc. v. FCC*,
  768 F.2d 1434 (D.C. Cir. 1985) .......................................................................... 31

*Reprod. Health Servs. of Planned Parenthood of St. Louis Region, Inc. v. Nixon*,
  428 F.3d 1139 (8th Cir. 2005) ............................................................................. 17

*Rochon v. FBI*,
  691 F. Supp. 1548 (D.D.C. 1988) ................................................................. 19, 20

*Rose v. Silver*,
  394 A.2d 1368 (D.C. 1978) ................................................................................. 21

*Ross v. Ross*,
  358 N.E.2d 437 (Mass. 1976) ............................................................................. 20

*SEC v. Ernst & Young*,
  775 F. Supp. 411 (D.D.C. 1991) ........................................................................... 8

*Serv. Women's Action Network v. Mattis*,
  320 F. Supp. 3d 1082 (N.D. Cal. 2018) ............................................................. 27

*Sharp Elecs. Corp. v. Hayman Cash Register Co.*,
  655 F.2d 1228 (D.C. Cir. 1981) ......................................................... 13, 26, 27, 28, 29

*Shoppers Food Warehouse v. Moreno*,
  746 A.2d 320 (D.C. 2000) .................................................................................. 24

*Smith v. Jenkins*,
  452 A.2d 333 (D.C. 1982) ......................................................................................... 18

*South Carolina v. Katzenbach*,
  383 U.S. 301 (1966) ................................................................................................... 33

*Steinberg v. Int'l Criminal Police Org.*,
  672 F.2d 927 (D.C. Cir. 1981) ............................................................................. 19, 23

*Treppel v. Reason*,
  793 F. Supp. 2d 429 (D.D.C. 2011) .......................................................................... 25

*Turner v. Abbott*,
  53 F. Supp. 3d 61 (D.D.C. 2014) .............................................................................. 23

*U.S. Servicemen's Fund v. Eastland*,
  488 F.2d 1252 (D.C. Cir. 1973) ................................................................................. 33

*United States v. AT&T Co.*,
  551 F.2d 384 (D.C. Cir. 1976) .................................................................................... 1

*United States v. Ferrara*,
  54 F.3d 825 (D.C. Cir. 1995) ..................................................................................... 17

*United States v. Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers of Am., AFL-CIO*,
  776 F. Supp. 144 (S.D.N.Y. 1991) ............................................................................ 33

*United States v. N.Y. Tel. Co.*,
  434 U.S. 159 (1977) ................................................................................................... 32

*Va. Office for Prot. & Advocacy v. Stewart*,
  563 U.S. 247 (2011) ................................................................................................... 17

*\*Van Wagenberg v. Van Wagenberg*,
  215 A.2d 812 (Md. 1966) .......................................................................................... 20

*Vann v. U.S. Dep't of Interior*,
  701 F.3d 927 (D.C. Cir. 2012) .................................................................................. 17

*Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.*,
  535 U.S. 635 (2002) ................................................................................................... 11

*Wagner v. Taylor*,
  836 F.2d 566 (D.C. Cir. 1987) .................................................................................. 14

*Walden v. Fiore*,
  571 U.S. 277 (2014) ................................................................................................... 19

*Will v. Mich. Dep't of State Police*,
  491 U.S. 58 (1989) ..................................................................................................... 17

*Xie v. Sklover & Co., LLC*,
  260 F. Supp. 3d 30 (D.D.C. 2017) ............................................................................ 18

**Statutes**

2019 Sess. Law News of N.Y. Ch. 91 ................................................................................4, 12

2019 Sess. Law News of N.Y. Ch. 92 ................................................................................4, 12

28 U.S.C. §1391(b)(1) ........................................................................................................ 30

28 U.S.C. §1391(b)(2) .....................................................................................13, 25, 26, 27

28 U.S.C. §1402(b) ............................................................................................................. 26

28 U.S.C. §1406(a) ................................................................................................. 28, 29, 30

D.C. Code §13-421 ............................................................................................................. 16

D.C. Code §13-422 ................................................................................................. 10, 16, 32

D.C. Code §13-423 ....................................................................................................... 16, 32

D.C. Code §13-423(a)(1) ............................................................................................... 13, 17

D.C. Code §13-423(a)(3) ......................................................................................... 13, 21, 22

D.C. Code §13-423(a)(4) .................................................................................... 10, 13, 22, 23

N.Y. Exec. Law §63-a ......................................................................................................... 12

N.Y. Tax Law §1091(e) ...................................................................................................5, 12

N.Y. Tax Law §1146 ............................................................................................................. 4

N.Y. Tax Law §1287 ............................................................................................................. 4

N.Y. Tax Law §1296 ............................................................................................................. 4

N.Y. Tax Law §1299-F .......................................................................................................... 4

N.Y. Tax Law §1414(a) ....................................................................................................5, 12

N.Y. Tax Law §1418 ............................................................................................................. 4

N.Y. Tax Law §1518 ............................................................................................................. 4

N.Y. Tax Law §1554(c) ....................................................................................................5, 12

N.Y. Tax Law §1555 ............................................................................................................. 4

N.Y. Tax Law §1825 ........................................................................................................... 12

N.Y. Tax Law §202 ............................................................................................................... 4

N.Y. Tax Law §203(1) ......................................................................................................5, 12

N.Y. Tax Law §211 ............................................................................................................... 4

N.Y. Tax Law §266 ..........................................................................................................5, 12

N.Y. Tax Law §266 ..........................................................................................................5, 12

N.Y. Tax Law §314 ............................................................................................................... 4

N.Y. Tax Law §437 ............................................................................................................... 4

N.Y. Tax Law §491 ............................................................................................................... 4

N.Y. Tax Law §499 ............................................................................................................ 4

N.Y. Tax Law §514 ............................................................................................................ 4

N.Y. Tax Law §527(h) .................................................................................................. 5, 12

N.Y. Tax Law §691(e) ................................................................................................... 5, 12

N.Y. Tax Law §697 ............................................................................................................ 4

N.Y. Tax Law §697 (2016 version) .................................................................................. 31

N.Y. Tax Law §697(e)(4) .............................................................................................. 5, 12

N.Y. Tax Law §697(f) ...................................................................................................... 13

N.Y. Tax Law §697(f-1) ............................................................................... 2, 4, 5, 13, 19, 22

N.Y. Tax Law §994 ............................................................................................................ 4

## Other Authorities

@TishJames, Twitter (June 27, 2018),
   bit.ly/2m8UPCL ........................................................................................................ 5

@TishJames, Twitter (Oct. 10, 2018),
   bit.ly/2lEl43N ........................................................................................................... 5

@TishJames, Twitter (Oct. 20, 2018),
   bit.ly/2m2uKoF ........................................................................................................ 5

3/12/2019 Tr., Inside Politics,
   CNN, cnn.it/2kD3Bs2 .............................................................................................. 5

*Attorney General James Responds to President Trump's Lawsuit*,
   Att'y Gen. Press Office (Jul. 23, 2019), on.ny.gov/2ka6l04 .................................. 32

*Congressional Committee's Request for the President's Tax Returns Under 26 U.S.C. §6103(f)*,
   43 Op. O.L.C. __ (June 13, 2019) ........................................................................... 2

*Democrats' Bid to Get Trump's Tax Returns Before the 2020 Election Isn't Looking Good*,
   Vox (Aug. 26, 2019), bit.ly/2lCKcYG ..................................................................... 2

Fed. R. Civ. P. 12(a)(4)(A) ............................................................................................. 14

Fed. R. Civ. P. 4(k)(1)(A) ............................................................................................... 16

*Fighting Corruption No Matter Where It Lies*,
   Tish James for Att'y Gen., bit.ly/2M0rcuG ........................................................... 5

*House Democrats Hire Counsel for Fight to Get Trump's Tax Returns*,
   Bloomberg (Dec. 7, 2018), bloom.bg/2lMbMm3 ................................................... 2

*How New York Democrats Plan to Unlock Trump's Taxes*,
   Politico (May 22, 2019), politi.co/2k85qgu ........................................................... 4

*Judges of the Southern District of New York*,
   nysd.uscourts.gov/judges.php (last visited Sept. 9, 2019) .................................... 29

*N.Y. Gov. Cuomo Signs Bill Allowing Congress to Access Trump's State Tax Returns*,
NBC News (July 9, 2019), bit.ly/2m87s0R ..................................................................... 3

*New York Attorney General Subpoenas Two Banks Related to Trump Organization Projects*,
CNN (Mar. 12, 2019), cnn.it/2F6fazn ............................................................................ 6

*New York Is Offering Trump's Taxes, But Democrats May Not Bite*,
Bloomberg (May 14, 2019), bloom.bg/2k83d4N ........................................................... 3

*New York State Legislature Passes "TRUST Act", Enabling Congress to Request Trump's State Tax Returns*,
Sen. Brad Hoylman (May 22, 2019), bit.ly/2kcYLBS ................................................... 3

*New York's New Top Attorney Moves to Take on Trump*,
CNN Wire (Jan. 3, 2019), bit.ly/2lHdepU .................................................................... 5

*NY Lawmakers Seek Backdoor Means to Release Trump's Taxes*,
WBFO (May 3, 2019), bit.ly/2kzZaOP ......................................................................... 4

*NY Senate OKs Releasing Trump State Tax Return*,
AP (May 8, 2019), bit.ly/2kApsjZ ................................................................................ 3

*Push to Obtain Trump's N.Y. Tax Returns Wins Cuomo's Support*,
N.Y. Times (Apr. 8, 2019), nyti.ms/2GaMdTt ............................................................. 4

S5072 Sponsor Memo.,
bit.ly/2k50IQB ............................................................................................................. 31

*Senate Bill S5072A*,
N.Y.S. Senate, bit.ly/2k50IQB ..................................................................................... 3

*Senate Stands Up to President Trump*,
N.Y.S. Senate (May 8, 2019), bit.ly/2kaMg9V ............................................................. 4

*United States District Courts—National Judicial Caseload Profile* (June 30, 2019),
bit.ly/33CJOL2 ............................................................................................................. 29

*Why Letitia James Wants to Take on Donald Trump*,
Now This News (Sept. 12, 2018), bit.ly/2k8bLsp ......................................................... 5

Wright & Miller,
14D Fed. Prac. & Proc. Juris. §3806 (4th ed.) .............................................................. 24

Wright & Miller,
14D Fed. Prac. & Proc. Juris. §3807 (4th ed.) .........................................................28, 29

Wright & Miller,
14D Fed. Prac. & Proc. Juris. §3826 (4th ed.) .............................................................. 25

Wright & Miller,
5B Fed. Prac. & Proc. Civ. §1351 (3d ed.) ...............................................................15, 24

**INTRODUCTION**

The New York Defendants' description of this case is unmoored from reality. This is not an action by "a New York tax return filer" against "New York officials" to "challenge the constitutionality of a New York statute governing the treatment of New York tax information." Mot. (Doc. 36-1) 1. It is an action by the sitting President of the United States against a committee of Congress to challenge its constitutional authority to obtain his private tax information. New York is merely a custodian who is willing to divulge the President's information to Congress—no different from his accountant in *Trump v. Mazars*, No. 19-5142 (D.C. Cir.), or his banks in *Trump v. Deutsche Bank, AG*, No. 19-1540 (2d Cir.). Cases like this one are really "a clash between the executive and legislative branches"; the *Congressional* Defendants are "the real defendant[s] in interest." *United States v. AT&T Co.*, 551 F.2d 384, 385 (D.C. Cir. 1976). This lawsuit "plainly belongs" in the District of Columbia. Mot. 1.

The Court should deny the New York Defendants' motion to dismiss for three main reasons. *First*, the motion is premature. President Trump has a right to take jurisdictional discovery, which he has not yet been afforded. Nor would it make sense to resolve personal jurisdiction or venue before the Court sees how Congress requests the President's state tax returns, and how New York plans to furnish them. *Second*, if personal jurisdiction and venue must be decided now, they should be resolved in the President's favor. Having concocted a plan to send the President's tax returns to D.C., with the intent to injure him there, working in close coordination with Congress, the New York Defendants cannot now complain about being haled into a D.C. court. Their request to transfer this entire case to the Southern District of New York—including the claims against the Congressional Defendants—is baseless. *Third*, dismissing the New York Defendants would not meaningfully affect this litigation. Because the President would continue challenging the constitutionality of the TRUST Act, the New York Defendants would likely rejoin this case as intervenors. And, whether or not they are parties, this Court could enjoin them under the All Writs Act. For all these reasons and more, this Court should deny (or postpone deciding) the New York Defendants' motion to dismiss.

1

## BACKGROUND

Plaintiff Donald J. Trump is the 45th President of the United States.[1] Several institutions controlled by the Democratic Party, including the U.S. House and the State of New York, want to obtain and disclose his private financial information because they think it will harm him politically. Am. Compl. (Doc. 30) 10 ¶29, 13 ¶37, 14 ¶44. The President's tax returns are their "Holy Grail." *Democrats' Bid to Get Trump's Tax Returns Before the 2020 Election Isn't Looking Good*, Vox (Aug. 26, 2019), bit.ly/2lCKcYG.

The House Ways and Means Committee, led by Chairman Richard Neal, is currently pursuing the President's federal tax returns. Am. Compl. (Doc. 30) 1-2 ¶1, 4-5 ¶14. Andrew Grossman is the Committee's Chief Tax Counsel and the "point person" for obtaining the President's tax information. Am. Compl. 5 ¶15; *House Democrats Hire Counsel for Fight to Get Trump's Tax Returns*, Bloomberg (Dec. 7, 2018), bloom.bg/2lMbMm3. On April 3, 2019, Chairman Neal asked the IRS to divulge the President's federal tax information for the last six years. Am. Compl. 11 ¶33; Doc. 1-1, *Comm. on Ways & Means v. U.S. Dept. of Treasury* ("*Ways & Means*"), No. 1:19-cv-1974 (D.D.C.). Two days later, the President's private attorneys wrote a public letter to the Treasury Department explaining why the Committee's request was illegal and urging it to "refrain from divulging the requested information until it receives a formal legal opinion from the Justice Department's Office of Legal Counsel." Am. Compl. 12 ¶34; Doc. 1-3, *Ways & Means*. The Treasury Department agreed and, after being advised that the request was in fact illegal, it informed the Committee that it could not comply. Am. Compl. 12 ¶35; Docs. 1-7, 1-9, 1-10, 1-14, 1-15, *Ways & Means*; *Congressional Committee's Request for the President's Tax Returns Under 26 U.S.C. §6103(f)*, 43 Op. O.L.C. __ (June 13, 2019). The Committee thus filed a

---

[1] Because this case involves the President's private tax records, he brought this suit solely in his personal capacity. But this brief will refer to him as "the President" because the TRUST Act would not apply to him if he weren't "the president of the United States." *E.g.*, N.Y. Tax Law §697(f-1). *Cf.* Mot. 2 n.2.

lawsuit in this Court to compel the disclosure of the President's federal tax information. Am. Compl. 12 ¶36; Doc. 1, *Ways & Means*.

On April 8—shortly after the President's lawyers resisted the Committee's request for the President's federal tax returns—the TRUST Act was introduced in the New York State Legislature. Am. Compl. 16 ¶51; *Senate Bill S5072A*, N.Y.S. Senate, bit.ly/2k50IQB. This timing was not coincidental. The TRUST Act was expressly pitched as a way to help Congress's D.C.-based efforts to obtain the President's private tax information and expose it to the public. Am. Compl. 15-22 ¶¶49, 51-52, 57-61, 69. Senator Hoylman, the Act's main sponsor, explained that "we have a situation in Washington where a coequal branch of government … is being stonewalled"; that "New York … has a unique role and responsibility … to allow Congress to do its constitutionally-mandated job"; that his bill would "help head off the constitutional crisis brewing between Congress and the White House," would be "a positive thing for the efforts by Chairman Neal," and would give "Congress a constitutional escape hatch"; and that his "colleagues[']" "desire … to pass this bill" had become "even greater" "[a]s the situation in Washington unfolds." Am. Compl. 17-18, 22 ¶¶57, 69.[2] Assemblymember Buchwald, the Act's other main sponsor, added that "[the President's] state tax returns would have his worldwide income," and so the TRUST Act would help Congress by "[m]aking sure that the public has information about the man currently in the White House." Am. Compl. 19

---

[2] *NY Senate OKs Releasing Trump State Tax Return*, AP (May 8, 2019), bit.ly/2kApsjZ; *New York State Legislature Passes "TRUST Act", Enabling Congress to Request Trump's State Tax Returns*, Sen. Brad Hoylman (May 22, 2019), bit.ly/2kcYLBS; *N.Y. Gov. Cuomo Signs Bill Allowing Congress to Access Trump's State Tax Returns*, NBC News (July 9, 2019), bit.ly/2m87s0R; *New York Is Offering Trump's Taxes, But Democrats May Not Bite*, Bloomberg (May 14, 2019), bloom.bg/2k83d4N.

¶58.[3] Other legislators made similar statements. *See* Am. Compl. 17-19, 22 ¶¶57-60, 69.[4] Even Governor Cuomo, who ultimately signed the TRUST Act, once admitted it was "clearly designed to help a Democratic Congress access Donald Trump's tax returns." Am. Compl. 19 ¶60.[5]

The TRUST Act is carefully drafted to do just that. The Act creates a new exception to New York's various prohibitions on disclosing state tax information. *See* 2019 Sess. Law News of N.Y. Chs. 91, 92 (amending N.Y. Tax Law §§697, 202, 211, 314, 437, 491, 499, 514, 994, 1146, 1287, 1296, 1299-F, 1418, 1518 & 1555). It allows "the commissioner" of the New York State Department of Taxation and Finance (currently, Michael Schmidt) to "furnish" the state tax information of the "president of the United States[']" to "certain committees of the United States Congress" once particular steps are taken. *E.g.*, N.Y. Tax Law §697(f-1). Namely, the Commissioner must receive a "written request" from "the chairperson of the committee on ways and means of the United States House of Representatives, the chairperson of the committee on finance of the United States Senate, or the chairperson of the joint committee on taxation of the United States Congress." *Id.* §697(f-1)(1). The chairperson must

---

[3] *How New York Democrats Plan to Unlock Trump's Taxes*, Politico (May 22, 2019), politi.co/2k85qgu; *Push to Obtain Trump's N.Y. Tax Returns Wins Cuomo's Support*, N.Y. Times (Apr. 8, 2019), nyti.ms/2GaMdTt.

[4] *See also, e.g.*, *Senate Stands Up to President Trump*, N.Y.S. Senate (May 8, 2019), bit.ly/2kaMg9V:

- Sen. Hoylman: "Today, the New York State Senate voted to do its part to assist Congress in fulfilling its oversight responsibilities by passing the TRUST Act…. We must ensure that Congress can't be blocked in their attempts to hold even the highest elected officials in the land accountable."
- Sen. Gounardes: "The public has a right to know…. I am proud to support legislation to ensure that Congress has all they need to fulfill their constitutional duty to perform rigorous oversight."
- Sen. Rivera: "I am infuriated that members of the Trump administration are not complying with Congressional investigations."
- Sen. Stavisky: "[W]e must stand with our Congressional colleagues to hold this administration accountable."
- Sen. Thomas: "The public has a right to know … Senator Hoylman's TRUST Act will ensure that Congress can fulfill its oversight duties."

[5] *NY Lawmakers Seek Backdoor Means to Release Trump's Taxes*, WBFO (May 3, 2019), bit.ly/2kzZaOP.

"certif[y]" that the state tax information is "related to, and in furtherance of, a legitimate task of the Congress"; that any inspection by the House or Senate "shall occur in a manner consistent with federal law"; and that "the requesting committee has made a written request to the United States secretary of the treasury for related federal returns or return information." *Id.* §697(f-1)(2). That last condition, of course, references the President's ongoing dispute with the House Ways and Means Committee over his federal returns.

New York tax law generally, and its disclosure rules specifically, are enforced by the Attorney General. *See, e.g.*, N.Y. Tax Law §§203(1), 266, 512(f)(3), 527(h), 691(e), 1091(e), 697(e)(4), 1414(a), 1554(c). The current officeholder, Letitia James, was elected in November 2018 after running a campaign that focused almost entirely on President Trump. She often promised to bring "the days of Donald Trump … to an end" and help "remov[e] the president from office" by "investigat[ing] … his finances." Am. Compl. 13 ¶38.[6] She also repeatedly pledged to expose corruption in "D.C." by investigating "the Trump administration," "Trump businesses," and "the President himself." Am. Compl. 13 ¶38.[7] And she said that she "[l]ook[ed] forward to … help[ing] Democrats" in the House "take on Donald Trump." Am. Compl. 13 ¶38.[8]

Since taking office, the Attorney General has made good on those promises. She is currently coordinating with several House committees in a joint effort to obtain and expose the President's financial information. Am. Compl. 13 ¶39. A few of those joint efforts have been reported to the public. For example, the Attorney General has reportedly subpoenaed Deutsche Bank for records

---

[6] *Why Letitia James Wants to Take on Donald Trump*, Now This News (Sept. 12, 2018), bit.ly/2k8bLsp; *New York's New Top Attorney Moves to Take on Trump*, CNN Wire (Jan. 3, 2019), bit.ly/2lHdepU; 3/12/2019 Tr., Inside Politics, CNN, cnn.it/2kD3Bs2.

[7] *Fighting Corruption No Matter Where It Lies*, Tish James for Att'y Gen., bit.ly/2M0rcuG; @TishJames, Twitter (Oct. 20, 2018), bit.ly/2m2uKoF; @TishJames, Twitter (Oct. 10, 2018), bit.ly/2lEl43N.

[8] @TishJames, Twitter (June 27, 2018), bit.ly/2m8UPCL.

"related to the Trump International Hotel in Washington" and to the President's "effort to buy the Buffalo Bills" when he was a private businessman. *New York Attorney General Subpoenas Two Banks Related to Trump Organization Projects*, CNN (Mar. 12, 2019), cnn.it/2F6fazn. This subpoena is concededly based on the testimony of Michael Cohen to Congress, explores the same topics as a similarly timed investigation by the House Oversight Committee, and is issued to the same financial institution as similarly timed subpoenas from the House Intelligence and Financial Services Committees. *See id.*; Doc. 1, *Trump v. Comm. on Oversight & Reform of the U.S. House of Reps.*, No. 19-cv-1136 (D.D.C.); Doc. 1, *Trump v. Deutsche Bank, AG*, No. 19-cv-3826 (S.D.N.Y.).

The Attorney General is also pursuing a steady stream of litigation against the President and his administration, including seven active cases in this Court and the D.C. Circuit. Am. Compl. 5 ¶16. She is the lead petitioner in *New York v. EPA*, No. 19-1165 (D.C. Cir.); the lead plaintiff in *New York State v. McCarthy*, No. 13-cv-1553 (D.D.C.); and an amicus in *Doe v. Trump*, No. 17-cv-1597 (D.D.C.); *English v. Trump*, No. 17-cv-2534 (D.D.C.); *Wilderness Soc'y v. Trump*, No. 17-cv-2587 (D.D.C.); *Hopi Tribe v. Trump*, No. 17-cv-2590 (D.D.C.); and *Grace v. Sessions*, No. 18-cv-1853 (D.D.C.).

The President filed this case less than two months ago. *See* Compl. (Doc. 1). Once Chairman Neal announced that he had begun reviewing whether to use the TRUST Act to obtain the President's state tax returns—a law that does not require notice to the President or provide him any opportunity to object—the President had to file this suit. He contends that a request for his state tax returns should be enjoined or declared unconstitutional for two independent reasons: one, Congress cannot make such a request because it would lack a legitimate legislative purpose and, two, New York cannot comply with such a request because the TRUST Act retaliates and discriminates against the President for his speech and politics. Am. Compl. 22-24.

The President's original complaint sued three defendants in their official capacities: the House Ways and Means Committee, the Attorney General (the official charged with enforcing the TRUST

Act), and the Commissioner (the official who must comply with requests under the TRUST Act). The two New York Defendants are no strangers to D.C. They have lived here, attended school and worked here, and continue to conduct various personal and professional business here. *See* Am. Compl. 5-6 ¶¶16-17. In his amended complaint, the President added two more defendants to this case: Chairman Neal (the official who will make the request under the TRUST Act) and Grossman (the committee counsel who will draft, review, approve, and have advance notice of requests under the TRUST Act). *See* Am. Compl. 4-5 ¶¶ 14-15.

Shortly after filing his original complaint, the President moved for an emergency application under the All Writs Act. *See* Emergency App. (Doc. 6). He explained that, without an order requiring the Committee or the New York Defendants to give him notice and a window for judicial review, "his claims could become ripe and then moot almost instantaneously … thereby depriving the Court of jurisdiction to decide his claims." Order on Emergency App. (Doc. 25) 2. The President's application was resolved—at least temporarily—when the New York Defendants agreed to give the President his requested relief while their motion to dismiss is pending (plus one week). *Id.* at 3-4; Am. Order (Doc. 29). If the New York Defendants' motion to dismiss is granted, the President will renew his emergency request for All Writs Act relief against the New York Defendants and the Congressional Defendants and ask this Court to rule within a week. If the New York Defendants' motion to dismiss is denied, the President will ask this Court to order the New York Defendants to continue providing the relief that they are currently providing.

## ARGUMENT

The New York Defendants' motion to dismiss should be denied. It is premature, meritless, and futile.

### I.     The motion is premature.

This Court should deny the New York Defendants' motion as premature. The President has a right to conduct jurisdictional discovery on both personal jurisdiction and venue. And this Court

should wait to resolve either issue until the facts fully crystallize—i.e., after Chairman Neal requests the President's returns and the New York Defendants reveal how they will comply with that request.

### A.      The President is entitled to jurisdictional discovery.

This Court should not resolve personal jurisdiction or venue until the President receives a reasonable opportunity to conduct jurisdictional discovery. Discovery is not "limited to the merits of a case"; it is also "available to ascertain the facts bearing" on "jurisdiction or venue." *Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 351 & n.13 (1978). Because personal jurisdiction and venue are affirmative defenses, not claims for relief, a plaintiff need not allege anything in his complaint to obtain jurisdictional discovery. *See Purdue Research Found. v. Sanofi-Synthelabo, S.A.*, 338 F.3d 773, 782 (7th Cir. 2003) ("'[A] complaint need not include facts alleging personal jurisdiction.'"); *SEC v. Ernst & Young*, 775 F. Supp. 411, 412 (D.D.C. 1991) ("Venue need not be alleged in the complaint."). Instead, jurisdictional discovery should be "freely permitted." *Edmond v. U.S. Postal Serv. Gen. Counsel*, 949 F.2d 415, 425 (D.C. Cir. 1991). "'This Circuit's standard for permitting jurisdictional discovery is quite liberal.'" *Davis v. Grant Park Nursing Home LP*, 639 F. Supp. 2d 60, 75 n.12 (D.D.C. 2009).

To receive jurisdictional discovery in this Circuit, the plaintiff merely needs "'a good faith belief that such discovery will enable [him] to show'" personal jurisdiction or venue. *Diamond Chem. Co. v. Atofina Chemicals, Inc.*, 268 F. Supp. 2d 1, 15 (D.D.C. 2003) (quoting *Caribbean Broad. Sys., Ltd. v. Cable & Wireless PLC*, 148 F.3d 1080, 1090 (D.C. Cir. 1998)); *Delta Sigma Theta Sorority, Inc. v. Bivins*, 215 F. Supp. 3d 12, 15 (D.D.C. 2013) (quoting *FC Inv. Grp. LC v. IFX Markets, Ltd.*, 529 F.3d 1087, 1093-94 (D.C. Cir. 2008)). It is "hard to imagine a situation where a plaintiff could not" meet this standard—at least when he has received "no discovery at all." *Diamond Chem.*, 268 F. Supp. 2d at 15; *El-Fadl v. Cent. Bank of Jordan*, 75 F.3d 668, 676 (D.C. Cir. 1996) (distinguishing *Naartex Consulting Corp. v. Watt*, 722 F.2d 779, 788 (D.C. Cir. 1983)); *accord Crane v. Carr*, 814 F.2d 758, 760 & n.2 (D.C. Cir. 1987) (R.B. Ginsburg, J.). A plaintiff can satisfy this "good faith" standard even if his "present

jurisdictional allegations are insufficient," his arguments "fall short of a *prima facie* case," the existing record is "plainly inadequate," and the court "cannot tell whether jurisdictional discovery will assist" him. *El-Fadl*, 75 F.3d at 676; *GTE New Media Servs. Inc. v. BellSouth Corp.*, 199 F.3d 1343, 1352 (D.C. Cir. 2000); *Edmond*, 949 F.2d at 425. The plaintiff is still "entitled to reasonable discovery" in these circumstances, "lest the defendant defeat the jurisdiction of a federal court by withholding information on its contacts with the forum." *El-Fadl*, 75 F.3d at 676.

The President has more than a "good faith" basis for requesting jurisdictional discovery. Based on the public record alone, the New York Defendants have many contacts with D.C. The Attorney General frequently litigates here, with nine cases currently pending in D.C.-based courts. Both Defendants lived here, the Attorney General's law-school alma mater is here, and the Commissioner worked here. In addition to these personal incentives to frequent the District, their positions as prominent statewide officials consistently bring them here for events, conferences, seminars, interviews, and the like. *See* Am. Compl. 5-6 ¶¶16-17. Courts in this Circuit have found a "good faith" basis for jurisdictional discovery based on far fewer contacts. *See, e.g.*, *Delta Sigma Theta*, 215 F. Supp. 3d at 15-16 (granting discovery even though the plaintiff identified only "one" potentially relevant contact); *Diamond Chem.*, 268 F. Supp. 2d at 16 (granting discovery "despite Plaintiff's paltry showing under all three [of its] theories of personal jurisdiction"); *Burnett v. Al Baraka Inv. & Dev. Corp.*, 274 F. Supp. 2d 86, 97 (D.D.C. 2003) (granting discovery when the plaintiff pointed to language on the defendant's website and only one instance of "litigation" in the forum); *El-Fadl*, 75 F.3d at 676 (reversing the denial of discovery because the plaintiff's "allegations, although they fall short of a prima facie case [of personal jurisdiction], are not 'conclusory' to the extent that [he] has alleged specific transactions" and "[h]is theory that [the defendant] may have had further, as yet unknown, connections to the District is not implausible").

While these contacts could probably never create *general* personal jurisdiction over the New York Defendants, D.C. Code §13-422, they could certainly create *specific* personal jurisdiction. Subsection (a)(4) of the D.C. long-arm statute, for example, asks whether the defendant "regularly does or solicits business" or "engages in any other persistent course of conduct" in D.C. *Id.* §13-423(a)(4). This provision "is satisfied by connections considerably less substantial than those it takes to establish general … jurisdiction," and the connections can "be *un*related to the claim in suit." *Crane*, 814 F.2d at 763. Though the public record suggests that the New York Defendants will satisfy this provision, the President cannot know for sure without jurisdictional discovery into their contacts with D.C. *See Gorman v. Ameritrade Holding Corp.*, 293 F.3d 506, 513 (D.C. Cir. 2002) (reversing because the long-arm statute "requires an examination of the frequency and volume" of the defendant's contacts "[b]ut those facts are unavailable because [the plaintiff] was not permitted to undertake discovery"); *Crane*, 814 F.2d at 760 (reversing because the plaintiff "pointed to links [the defendant] has with the District … sufficient at least to permit further inquiry regarding personal jurisdiction [under subsection (a)(4)]"). Because the President "can supplement [his] jurisdictional allegations through discovery," "jurisdictional discovery is justified." *In re Vitamins Antitrust Litig.*, 94 F. Supp. 2d 26, 35 (D.D.C. 2000).

Separately, the President is entitled to jurisdictional discovery under a "conspiracy theory." *Edmond*, 949 F.2d at 425. No one questions this Court's personal jurisdiction over the Congressional Defendants, who will request, review, use, and potentially disclose the President's state tax returns in D.C. But if the New York Defendants are conspiring with the Congressional Defendants, all of that conduct can be attributed to the New York Defendants too. *See id.* And they *are* conspiring. As the President has explained, the Attorney General—after running a campaign where she pledged to help House Democrats expose the President's financial information—is coordinating with the House and duplicating its subpoenas with subpoenas of her own. *Supra* 5. Notably, while the New York Defendants deny several of the President's jurisdictional allegations in their motion, they say nothing

about this allegation. They tacitly concede that the Attorney General is "closely coordinating with House Democrats in a joint effort to obtain and expose the President's financial information." Am. Compl. ¶39.

The President is entitled to discovery on the nature, scope, and contours of this coordination between the Attorney General and the House. District courts "c[an] allow[] discovery" on conspiracy-based personal jurisdiction even "in the absence of specific and nonspeculative allegations" about the conspiracy. *Edmond*, 949 F.2d at 427; *see also Jung v. Ass'n of Am. Med. Colleges*, 300 F. Supp. 2d 119, 141-42 (D.D.C. 2004) (explaining that it would be "inequitable" to require plaintiffs to "demonstrat[e]" a conspiracy for purposes of personal jurisdiction before they "had the opportunity to conduct [jurisdictional] discovery"). And it is an outright "abuse of discretion to deny jurisdictional discovery where the plaintiff has specifically alleged: (1) the existence of a conspiracy, (2) the nonresident's participation, and (3) an injury-causing act of the conspiracy within the forum's boundaries." *Edmond*, 949 F.2d at 425; *see also Dooley v. United Techs. Corp.*, 786 F. Supp. 65, 79-80 & n.13 (D.D.C. 1992) (explaining that the third *Edmond* factor is not always required). The President has alleged that here, with deafening silence from the New York Defendants.

The New York Defendants incorrectly suggest, in a footnote, that jurisdictional discovery is unavailable against the Attorney General because she enjoys sovereign immunity. Mot. 20 n.8. (They make no such argument about the Commissioner.) Sovereign immunity does not apply here because the President sued the Attorney General under *Ex parte Young*. To determine "whether the doctrine of *Ex parte Young* avoids an Eleventh Amendment bar to suit, a court need only conduct a straightforward inquiry into whether the complaint … seeks relief properly characterized as prospective" and alleges that the state officer is "violating, or planning to violate, federal law." *Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 645 (2002); *Armstrong v. Exceptional Child Ctr., Inc.*, 135 S. Ct. 1378, 1384 (2015). The President's complaint does precisely that. *See* Am. Compl. 23-24.

The Attorney General is a proper *Ex parte Young* defendant. A state officer can be sued under *Ex parte Young* if she has "some connection with the enforcement of the [challenged] act," regardless whether her connection is "declared in the … act" itself. *Ex parte Young*, 209 U.S. 123, 157 (1908); *see also 281 Care Comm. v. Arneson*, 638 F.3d 621, 632-33 (8th Cir. 2011) (explaining that the defendant's connection can be "tenuous" and does not require "primary authority to enforce the challenged law" or "full power to redress a plaintiff's injury"). In *Ex Parte Young* itself, the Court allowed the plaintiff to sue a state attorney general, reasoning that "the attorney general, under his power existing at common law, and by virtue of … various statutes, had … the right and the power to enforce … the act in question." 209 U.S. at 161.

So too here. The TRUST Act is part of New York's laws regulating the secrecy of state tax returns. *See* 2019 Sess. Law News of N.Y. Chs. 91, 92. Officials who violate these laws can be "dismissed from office," *e.g.*, N.Y. Tax Law §697(e)(4)(A)—an enforcement action that only the Attorney General can bring. *See* N.Y. Exec. Law §63-a. Officials who violate these laws are also subject to criminal penalties, N.Y. Tax Law §1825, which the Attorney General has "concurrent jurisdiction" to impose for personal income taxes and corporate taxes, *id.* §§691(e), 1091(e). The Attorney General is also tasked more broadly with collecting taxes and enforcing the tax laws. *See, e.g., id.* §§203(1), 266, 512(f)(3), 527(h), 1414(a), 1554(c). These strong connections to the enforcement of the TRUST Act are more than sufficient to make the Attorney General a proper *Ex Parte Young* defendant, and thus subject to jurisdictional discovery. *See 281 Care Comm.*, 638 F.3d at 632-33; *Kitchen v. Herbert*, 755 F.3d 1193, 1202-03 (10th Cir. 2014). This Court should deny the New York Defendants' motion and give the President a reasonable opportunity to conduct discovery on personal jurisdiction and venue.

**B.     Congress has not yet requested the President's state tax returns.**

Jurisdictional discovery aside, this Court should not resolve the New York Defendants' motion until Chairman Neal actually requests the President's state tax returns. It would be premature

to adjudicate personal jurisdiction or venue without first seeing his request—and, more importantly, how the New York Defendants plan to respond to it. The TRUST Act does not specify how the Commissioner must "furnish" the President's tax returns. *E.g.*, N.Y. Tax Law §697(f-1). But how New York exercises that authority matters.

Consider personal jurisdiction. Will New York hand deliver the returns to the Committee, or send them remotely via mail, email, or fax? Will New York send officers to "testify" in D.C. about the tax returns, as its tax laws contemplate? *See, e.g.*, *id.* §697(f). The answers to these questions could matter under the Due Process Clause, since "territorial presence frequently will enhance a potential defendant's affiliation with a State and reinforce the reasonable foreseeability of suit there." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 476 (1985). The answers could also matter under the D.C. long-arm statute, which requires a greater showing for misconduct occurring outside the District than inside. *Compare* D.C. Code §13-423(a)(4), *with id.* §13-423(a)(3). Yet another provision of the long-arm statute turns on how the defendant "transact[ed] any business in the District of Columbia," *id.* §13-423(a)(1)—something this Court cannot evaluate in detail until New York prepares to comply with the Committee's request.

Or consider venue. Whether this district is a proper venue turns on whether "a substantial part of the events … giving rise to the claim occurred" in D.C. *See* 28 U.S.C. §1391(b)(2). This analysis, too, will be better informed if the Court can assess when, where, and how Congress and New York will request and deliver the President's returns. *See Sharp Elecs. Corp. v. Hayman Cash Register Co.*, 655 F.2d 1228, 1229 (D.C. Cir. 1981) (explaining that this provision of the venue statute requires courts to evaluate "'the totality of events'").

Given these various uncertainties and possible permutations, the Court should delay deciding the New York Defendants' motion until Chairman Neal requests the President's returns. There is no need to rush. So long as the motion to dismiss remains pending, the President is protected from the

risk of case-mooting harm and the New York Defendants are spared from litigating in this forum. *See* Doc. 29 (imposing notice and nondisclosure requirements on the New York Defendants "during the pendency of [their] Motion [to Dismiss] and for a period of one week from the Court's decision"); Fed. R. Civ. P. 12(a)(4)(A) (requiring no answer from the defendant until "14 days after" the court "denies" its motion to dismiss). And this approach would allow the Court to decide personal jurisdiction and venue on a concrete factual record, rather than forcing it to speculate about how future events will unfold.

Alternatively, this Court should deny the New York Defendants' motion as premature, enjoin the New York Defendants again under the All Writs Act, stay this litigation, and allow the New York Defendants to challenge personal jurisdiction and venue anew when the Committee requests the President's returns. This approach, too, would protect the President's rights, allow the New York Defendants to avoid litigation until their defenses are resolved, and create a more concrete record to resolve personal jurisdiction and venue. (It also might allow the Court to avoid reaching the merits altogether, if the Committee represents that it will not request the President's state returns or makes no request before the 116th Congress adjourns.) That the New York Defendants object to personal jurisdiction and venue is no barrier to granting relief to the President under the All Writs Act. The Act exists so that courts can "impose a temporary restraint in order to preserve the status quo pending ripening of the claim for judicial review," including claims about "whether it has jurisdiction." *Wagner v. Taylor*, 836 F.2d 566, 571 (D.C. Cir. 1987); *Belbacha v. Bush*, 520 F.3d 452, 455-56 (D.C. Cir. 2008); *see, e.g.*, *Astrazeneca Pharm. LP v. Burwell*, 197 F. Supp. 3d 53, 55-56 (D.D.C. 2016).

Whatever route the Court ultimately prefers—granting jurisdictional discovery, waiting to resolve the motion, denying the motion as premature and granting relief under the All Writs Act, or some combination—the one route it should not take is trying to resolve the New York Defendants'

objections to personal jurisdiction and venue now. The record is incomplete, the facts have not yet materialized, and the motion is premature.

## II. The motion should be denied.

Even if the New York Defendants' motion must be decided right away, it should be denied. When evaluating personal jurisdiction and venue, this Court should "assume that the [President's] claims are meritorious." *Kopff v. Battaglia*, 425 F. Supp. 2d 76, 80 (D.D.C. 2006). The New York Defendants have not invoked Rule 12(b)(6), and they admit that their current motion is "limited to [their] personal jurisdiction and venue defenses." Mot. 20 n.8. Thus, their arguments about sovereign immunity, the First Amendment, the Speech or Debate Clause, and other issues, *see* Mot. 19-20, 26, 27 n.10, are "misguided" because they "really go[] to the merits." *Houghton v. Audio Leasing Corp.*, 1988 WL 21194, at *1 (9th Cir. Mar. 7, 1988); *Hulme v. Ferris*, 1987 WL 11702, at *2 n.2 (D.D.C. May 21, 1987); *Powell ex rel. United Food & Commercial Workers Union & Employers Midwest Pension Fund v. Ocwen Fin. Corp.*, 2019 WL 1227939, at *8 (S.D.N.Y. Mar. 15, 2019).

As for the New York Defendants' actual arguments about personal jurisdiction and venue, they lack merit. This Court can exercise personal jurisdiction over the New York Defendants under no less than three provisions of the long-arm statute. And venue is proper here under the transactional-venue provision of the general venue statute.

### A. This Court has personal jurisdiction over the New York Defendants.

Absent an "evidentiary hearing," plaintiffs can defeat a motion to dismiss by making "a *prima facie* showing" of personal jurisdiction. *Edmond*, 949 F.2d at 424. This burden is "not a heavy one." Wright & Miller, 5B Fed. Prac. & Proc. Civ. §1351 (3d ed.). To satisfy it, plaintiffs can "rest their argument on their pleadings," or "bolster[]" those allegations with "affidavits and other written materials" regardless of "admissibility." *Mwani v. bin Laden*, 417 F.3d 1, 7 (D.C. Cir. 2005). "[A]llegations in the complaint" that "are uncontroverted by defendant's affidavits or deposition testimony" must be taken "as true." *Morris v. SSE, Inc.*, 843 F.2d 489, 492 (11th Cir. 1988); *accord IMAPizza, LLC*

*v. At Pizza Ltd.*, 334 F. Supp. 3d 95, 108 n.2 (D.D.C. 2018). And all "factual discrepancies … must be resolved in favor of the plaintiff." *Crane v. N.Y. Zoological Soc.*, 894 F.2d 454, 456 (D.C. Cir. 1990).

This Court has personal jurisdiction over the New York Defendants if they are "subject to the jurisdiction of a court of general jurisdiction" in the District of Columbia. Fed. R. Civ. P. 4(k)(1)(A). The D.C. courts' jurisdiction over nonresidents is governed by the D.C. long-arm statute. *See* D.C. Code §§13-421 *et seq.* The long-arm statute creates general personal jurisdiction over individuals who have an "enduring relationship" with the District. *See id.* §13-422. And it creates specific personal jurisdiction in several scenarios, three of which matter here:

> (a) A District of Columbia court may exercise personal jurisdiction over a person, who acts directly or by an agent, as to a claim for relief arising from the person's --
>
> > (1) transacting any business in the District of Columbia;
> >
> > …
> >
> > (3) causing tortious injury in the District of Columbia by an act or omission in the District of Columbia;
> >
> > (4) causing tortious injury in the District of Columbia by an act or omission outside the District of Columbia if he regularly does or solicits business, engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed, or services rendered, in the District of Columbia ….

*Id.* §13-423. In addition to the long-arm statute, exercises of personal jurisdiction must comply with the Due Process Clause. Due process is satisfied if the nonresident defendant has enough "minimum contacts" with the forum that the litigation would not offend "'traditional notions of fair play and substantial justice.'" *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945). When the plaintiff challenges a defendant's "planned future conduct in the State," these minimum contacts can include "planned" or "future" activities that have not yet occurred. *Acorda Therapeutics Inc. v. Mylan Pharm. Inc.*, 817 F.3d 755, 759-62 (Fed. Cir. 2016).

These same legal principles apply when the defendant is a state officer sued in his official capacity. While the D.C. Circuit has not yet decided "whether a State official sued in his official capacity should be treated as if he were the State for jurisdictional purposes," *United States v. Ferrara*,

54 F.3d 825, 831 (D.C. Cir. 1995), the answer should be no. While official-capacity suits against state officers are sometimes "no different from a suit against the State itself," *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989), official-capacity suits under *Ex parte Young* "'are not treated as actions against the State,'" *id.* at 71 n.10. The *Ex parte Young* doctrine "rests on the premise … that when a federal court commands a state official to do nothing more than refrain from violating federal law, he is not the State." *Va. Office for Prot. & Advocacy v. Stewart*, 563 U.S. 247, 255 (2011). True, the conduct that the plaintiff challenges—"enforcement of an allegedly unconstitutional statute"—is really the State's conduct. *Reprod. Health Servs. of Planned Parenthood of St. Louis Region, Inc. v. Nixon*, 428 F.3d 1139, 1145 (8th Cir. 2005); *see Vann v. U.S. Dep't of Interior*, 701 F.3d 927, 929 (D.C. Cir. 2012) (explaining that *Ex Parte Young* "is based on a 'fiction'" because the government is "'the real party in interest'" and, "[a]s a practical matter," the government and the official "are one and the same"). But "because an unconstitutional legislative enactment is 'void,'" an *Ex parte Young* defendant is "'stripped of his official or representative character and is subjected *in his person* to the consequences.'" *Stewart*, 563 U.S. at 255 (emphasis added). So "although [a state official] is named in her official capacity," courts must evaluate their "jurisdiction over her person"—namely, "[her] contacts with the District of Columbia." *Ferrara*, 54 F.3d at 832-33 (Silberman, J., concurring).

Here, the President has made a "prima facie showing" of personal jurisdiction over both New York Defendants. If the Court resolves this issue now—based on the President's current allegations, without the benefit of discovery or an actual request from the Committee—it should conclude that it has specific personal jurisdiction over these defendants under subsections (a)(1), (a)(3), and (a)(4) of the long-arm statute.

**Subsection (a)(1)**: Under subsection (a)(1), this Court has personal jurisdiction if the President's claim against the New York Defendants arises from their "transacting any business in the District of Columbia." D.C. Code §13-423(a)(1). Subsection (a)(1) has been construed to be

"'coextensive with the due process clause.'" *Helmer v. Doletskaya*, 393 F.3d 201, 205 (D.C. Cir. 2004) (quoting *Mouzavires v. Baxter*, 434 A.2d 988, 992 (D.C. 1981) (en banc)). In other words, "the statutory and constitutional prongs of the personal jurisdiction inquiry merge." *Xie v. Sklover & Co., LLC*, 260 F. Supp. 3d 30, 39 (D.D.C. 2017); *accord Smith v. Jenkins*, 452 A.2d 333, 336 (D.C. 1982).

The Due Process Clause is satisfied when the defendant "has 'purposefully directed' his activities at residents of the forum and the litigation results from alleged injuries that 'arise out of or relate to' those activities." *Burger King*, 471 U.S. at 472-73 (cleaned up). When these conditions are met, even "a single act" can create personal jurisdiction and there is no requirement that the defendant "*physically* enter the forum State." *Id.* at 475-76 & n.18; *Mouzavires*, 434 A.2d at 992-93; *accord Gorman*, 293 F.3d at 511. In *Calder v. Jones*, for example, an actress filed a libel suit in California state court against employees of the National Inquirer. 465 U.S. 783, 784-85 (1984). The employees were Florida residents, they wrote and edited the article in Florida, and they had only occasionally visited California. *Id.* at 785. But the article "concerned" the actress and circulated in California, where she worked and lived; in other words, California was "the focal point both of the story and of the harm suffered." *Id.* at 788-89. The defendants did not act "with mere untargeted negligence," rather "their intentional … actions were expressly aimed at California" and "they knew that the brunt of [the] injury would be felt by [the actress] in the State in which she lives and works." *Id.* at 789-90. In short, the Florida defendants committed "an alleged wrongdoing intentionally directed at a California resident, and jurisdiction over them [wa]s proper on that basis." *Id.* at 790.

Jurisdiction over the New York Defendants is proper on the same basis. If the New York Defendants send the President's state tax returns to the Committee, they will commit "an alleged wrongdoing intentionally directed at a [D.C.] resident." *Id.* By delivering the returns, they will "have purposefully reached out beyond their State" and made "physical entry into [D.C.]—either … in person or through an agent, goods, mail, or some other means." *Walden v. Fiore*, 571 U.S. 277, 285

(2014). D.C. will be "the focal point both of [their conduct] and of the harm suffered." *Calder*, 465 U.S. at 788. The President is not harmed by the New York Defendants confidentially gathering his information in New York, but by the New York Defendants disclosing his private information to a hostile Committee in D.C. And causing harm in D.C. will be the New York Defendants' intent. The TRUST Act's "forum-focused" nature, *Walden*, 571 U.S. at 290, is clear from its text: it expressly covers "the president," who lives and works in D.C.; it requires a request from three congressional officials, who live and work in D.C.; and it requires the Commissioner to "furnish" the returns to Congress in D.C. for use in D.C. *See, e.g.*, N.Y. Tax Law §697(f-1). Indeed, the entire impetus for the TRUST Act was to help the Committee (in D.C.) in its ongoing efforts (in D.C.) to obtain and use private tax information (in D.C.) of the President (in D.C.). *Supra* 4. Personal jurisdiction is thus available here for the same reason it was available in *Calder*: The President "need not go to [New York] to seek redress from persons who, though remaining in [New York], knowingly cause [him] injury in [D.C.]." 465 U.S. at 790.

Corresponding with Congress and sending tax returns to a committee in D.C. constitutes "transacting any business" under subsection (a)(1). *Contra* Mot. 16-17. The argument "that business contacts can lead to personal jurisdiction under the long-arm statute only where that business is commercial in nature … [n]ot only … fl[ies] in the face of the actual language of the long-arm statute— which speaks of 'transacting *any* business'—it is flatly contradicted by case law." *Rochon v. FBI*, 691 F. Supp. 1548, 1559-60 (D.D.C. 1988) (cleaned up; citing *Steinberg v. Int'l Criminal Police Org.*, 672 F.2d 927, 931 n.7 (D.C. Cir. 1981)). D.C. courts give the phrase "transacting any business" an "'an expansive interpretation' that is 'coextensive with the due process clause.'" *Helmer*, 393 F.3d at 205. Under the Due Process Clause, personal jurisdiction can be based not just on defendants' commercial business for profit, but also on their official "business" with the government. *See Companhia Brasileira Carbureto De Calcio v. Applied Indus. Materials Corp.*, 35 A.3d 1127, 1133 n.6 (D.C. 2012) (explaining that under

"normal principles of due process," "individuals who petition the government might well have 'minimum contacts' with the District sufficient to confer personal jurisdiction in suits arising out of those contacts"); *e.g.*, *Lex Tex Ltd., Inc. v. Skillman*, 579 A.2d 244, 244, 249 (D.C. 1990) (exercising personal jurisdiction under subsection (a)(1) where the defendant conducted "legal representation before the United States Patent and Trademark Office").

Other jurisdictions agree. *See, e.g.*, *Ross v. Ross*, 358 N.E.2d 437, 439 (Mass. 1976) ("The statute's reference to 'transacting any business' does not require that the defendant have engaged in commercial activity. That language is general and applies to any purposeful acts by an individual, whether personal, private, or commercial."). Indeed, shortly before the D.C. long-arm statute was amended in 1970, Maryland's high court held that the phrase "transacting any business" in Maryland's long-arm statute "does not limit jurisdiction to contacts which have their roots in the market-place," rather "it is the doing of an act … in the state[] which is determinative." *Van Wagenberg v. Van Wagenberg*, 215 A.2d 812, 820-21 (Md. 1966). That interpretation is decisive here because "'Congress[] inten[ded] to provide the District of Columbia with a long arm statute equivalent in scope to … Maryland.'" *Etchebarne-Bourdin v. Radice*, 982 A.2d 752, 762 (D.C. 2009).

The "government contacts" doctrine does not help the New York Defendants either. *Contra* Mot. 17-18. This "doctrine does not provide a blanket exception for all governmental contacts," *Rochon*, 691 F. Supp. at 1559, or "a blanket prohibition against assertions of personal jurisdiction in all cases involving interplay with the federal government," *Lex Tex*, 579 A.2d at 250 n.15. True, several cases predating the 1970 amendments to the D.C. long-arm statute—and one case decided shortly thereafter, *Envtl. Research Int'l, Inc. v. Lockwood Greene Engineers, Inc.*, 355 A.2d 808 (D.C. 1976) (en banc)—construed the doctrine broadly. They suggested that government contacts simply "did not constitute the transaction of business with the meaning of the [long-arm] statute." *Id.* at 813. But the D.C. Court of Appeals has since clarified the doctrine's proper scope. After the 1970 amendments,

the government-contacts doctrine is no longer a limitation on the scope of the long-arm statute. *See Rose v. Silver*, 394 A.2d 1368, 1374 (D.C. 1978); *Lex Tex*, 579 A.2d at 249. Nor is it a requirement of due process, at least when the defendant's government contacts are what give rise to the plaintiff's claim. *See Rose*, 394 A.2d at 1374 & n.6; *Lex Tex*, 579 A.2d at 249-50; *Companhia Brasileira*, 35 A.3d at 1134 n.6. Instead, "the First Amendment provides the only principled basis" for the government-contacts doctrine; the doctrine's scope is tied "solely to the First Amendment." *Rose*, 394 A.2d at 1374.

Here, however, the New York Defendants have never explained how exercising personal jurisdiction over them would possibly violate the First Amendment. The New York Defendants do not have a First Amendment right to send the President's tax returns to D.C.—in their official capacities, on behalf of New York, as required by a state statute, in response to a request from Congress. *See Lex Tex*, 579 A.2d at 250. To the contrary, the President contends that this exact conduct would *violate* the First Amendment. *See* Am. Compl. 23-24, 8-9. The New York Defendants might disagree, but their concerns go to the "substantive" merit of the President's claim—not personal jurisdiction. *Calder*, 465 U.S. at 790.

**Subsection (a)(3)**: Even if the act of sending state tax returns to D.C. with the intent to cause harm here did not count as "transacting any business" under subsection (a)(1), it could still count as "causing tortious injury in the District of Columbia by an act … in the District of Columbia" under subsection (a)(3) of the long-arm statute. D.C. Code §13-423(a)(3). Constitutional injuries remedied by 42 U.S.C. §1983 are considered "tortious." *See Edmond*, 949 F.2d at 424 (holding that an alleged Fourth Amendment violation was a "tortious injury" under subsection (a)(3)); *Imbler v. Pachtman*, 424 U.S. 409, 417 (1976) ("[Section 1983] creates a species of tort liability"). Further, the President's "injury"—disclosure of his private financial information to Congress—will plainly occur "in" D.C. And the New York Defendants' illegal "act" will occur "in" D.C. too—at least if they personally deliver the President's returns to the Committee or testify about them here.

Alternatively, personal jurisdiction exists under subsection (a)(3) based on the *Congressional* Defendants' conduct. As explained earlier, a defendant who conspires to injure the plaintiff can be held accountable under subsection the long-arm statute for the conduct of his co-conspirators. *See Edmond*, 949 F.2d at 425. "So long as any one co-conspirator commits at least one overt act in furtherance of the conspiracy in the forum jurisdiction, there is personal jurisdiction over all members of the conspiracy." *Jung*, 300 F. Supp. 2d at 141. Here, setting aside the broader conspiracy between the House and the Attorney General to obtain the President's private financial information, *supra* 10, the New York Defendants are certainly accountable for the Congressional Defendants' conduct with respect to the President's state tax returns. The TRUST Act requires New York and Congress to conspire together to obtain the President's returns: Chairman Neal must submit a request, Chairman Neal must certify that certain conditions are satisfied, the Commissioner must prepare the returns and make the necessary redactions, and the parties must work together to deliver and discuss the returns. *See, e.g.*, N.Y. Tax Law §697(f-1). Because the Congressional Defendants will request, review, and use the President's returns in D.C., subsection (a)(3) of the long-arm statute attributes those acts to the New York Defendants. In other words, because they are the Congressional Defendants' co-conspirators, the New York Defendants will have "caus[ed] tortious injury in the District of Columbia by an act … in the District of Columbia." D.C. Code §13-423(a)(3). That makes all their conduct reviewable by this Court, "'not … limited to [their] acts within the District.'" *Family Fed'n for World Peace v. Hyun Jin Moon*, 129 A.3d 234, 244 n.13 (D.C. 2015).

**Subsection (a)(4)**: At the very least, sending the President's state tax returns to Congress will "caus[e] tortious injury in the District of Columbia by an act … *outside* the District of Columbia." D.C. Code §13-423(a)(4) (emphasis added). Personal jurisdiction thus exists under subsection (a)(4) if the New York Defendants "regularly do[] or solicit[] business, engage[] in any other persistent course of conduct, or derive[] substantial revenue from goods used or consumed, or services rendered, in the

District of Columbia." *Id.* These "plus factors" exist to "'filter out cases in which the in-forum impact is an isolated event'" by ensuring there is "'some other reasonable connection between the state and the defendant.'" *Etchebarne-Bourdin*, 982 A.2d at 762-63 (cleaned up). The phrase "persistent course of conduct" in subsection (a)(4) requires "connections considerably less substantial than those required to establish general, 'all purpose' jurisdiction." *Steinberg*, 672 F.2d at 931. And it can be satisfied with D.C.-based conduct that has nothing to do with the plaintiff's current injury or claim. *See id.* ("[T]he 'persistent course of conduct' need not be related to the act that caused the injury"); *Etchebarne-Bourdin*, 982 A.2d at 763 (agreeing that "the 'persistent course of conduct' … required by subsection (a)(4) … need not be related to the claim").

The President, even without the benefit of jurisdictional discovery, has made a prima facie showing that the Attorney General engaged in a "persistent course of conduct" in D.C. As explained, the Attorney General is engaged in at least nine active cases here. *See* Am. Compl. ¶16. The President and his administration are defendants in almost all of them. Litigation is certainly covered by the broad phrase "any other … course of conduct," and nine ongoing cases can fairly be described as "persistent." *Cf. Turner v. Abbott*, 53 F. Supp. 3d 61, 68 (D.D.C. 2014) (concluding that "one" "entirely unrelated" lawsuit did not establish minimum contacts with D.C.). In fact, the Attorney General's frequent use of courts in D.C. is a particularly strong "plus factor," since the "'essential'" concern of the Due Process Clause is that "'the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws.'" *Burger King*, 471 U.S. at 475. It would be quite *un*reasonable to hold that the Attorney General can use the D.C. courts against the President, but the President cannot use the D.C. courts against the Attorney General. The Attorney General's ongoing litigation against the President, combined with the injury that disclosure of his tax returns will cause here, thus provides the "'reasonable connection'" needed to establish personal jurisdiction under subsection (a)(4). *Etchebarne-Bourdin*, 982 A.2d at 762.

In sum, under any or all of these bases for personal jurisdiction, the New York Defendants can be part of this case without violating the D.C. long-arm statute or the Due Process Clause. Notably, the New York Defendants contest only their "minimum contacts" with the District. They do not argue that, if they have minimum contacts, then requiring them to litigate here would offend "traditional notions of fair play and substantial justice"—an issue *they* have the burden to argue and prove. *See* 5B Fed. Prac. & Proc. Civ. §1351 & n.27 (collecting cases holding that "the burden is on the defendant" to disprove "the constitutional fairness and reasonableness of the chosen forum"); *Burger King*, 471 U.S. at 477 (explaining that the "defendant … must present a compelling case" to defeat jurisdiction on grounds of "fair play and substantial justice"). Even if the New York Defendants had raised this argument, it would fail. Personal jurisdiction "'must be seen as ultimately a function of the individual liberty interest preserved by the Due Process Clause' rather than as a function 'of federalism concerns.'" *Burger King*, 471 U.S. at 472 n.13. It hardly violates the New York Defendants' liberty to have them litigate in a court they frequently use, in a district where they have lived and worked, about "interstate obligations that [they] voluntarily assumed" by injecting themselves into a dispute between the President and Congress in D.C. *Id.* at 474; *accord Shoppers Food Warehouse v. Moreno*, 746 A.2d 320, 331-32 (D.C. 2000). This Court should reject the New York Defendants' personal-jurisdiction defense.

## B. This district is a proper venue.

For many of the same reasons this Court has personal jurisdiction over the New York Defendants, venue is proper here as well. *See* Wright & Miller, 14D Fed. Prac. & Proc. Juris. §3806 (4th ed.) (explaining that "factors relevant to the venue assessment will overlap with those relevant to personal jurisdiction"). As with personal jurisdiction, the President must "make only a prima facie showing of proper venue in order to survive a motion to dismiss." *Aggarao v. MOL Ship Mgmt. Co.*, 675 F.3d 355, 366 (4th Cir. 2012); *accord Gulf Ins. Co. v. Glasbrenner*, 417 F.3d 353, 355 (2d Cir. 2005)

("If the court chooses to rely on pleadings and affidavits" and holds no "evidentiary hearing," then the plaintiff "need only make a prima facie showing of venue." (cleaned up)). Because the New York Defendants submitted no "evidence" on venue, "the court may resolve the motion on the basis of the complaint." 14D Fed. Prac. & Proc. Juris. §3826. The Court "'accepts the plaintiffs' well-pled factual allegations regarding venue as true, draws all reasonable inferences from those allegations in the plaintiffs' favor, and resolves any factual conflicts in the plaintiffs' favor." *Quarles v. Gen. Inv. & Dev. Co.*, 260 F. Supp. 2d 1, 8 (D.D.C. 2003) (cleaned up); *see also* 14D Fed. Prac. & Proc. Juris. §3826 ("[T]he court will consider to be true any well-pleaded allegations of the complaint that bear on venue, unless contradicted by defendant's affidavit evidence," and will "draw reasonable inferences in favor of the plaintiff.").

Under subsection (b)(2) of the general venue statute, venue is proper wherever "a substantial part of the events … giving rise to the claim occurred." 28 U.S.C. §1391(b)(2). Subsection (b)(2)—known as "transactional venue"—was enacted to plug a "gap[] in the venue laws" by easing the requirements for "cases involving multiple … defendants." *Brunette Mach. Works, Ltd. v. Kockum Indus., Inc.*, 406 U.S. 706, 710 n.8 (1972). Because this provision asks where "a substantial part" of the events occurred—not "all" of the events or even "most" of the events—venue can be proper under subsection (b)(2) in "more than one district." *Treppel v. Reason*, 793 F. Supp. 2d 429, 435 (D.D.C. 2011). When that's the case, the plaintiff "'will have a choice among multiple districts where a substantial portion of the underlying events occurred'"; he does not have to choose "'the district where the *most substantial* portion of the relevant events occurred'" or where the "'greater'" contacts exist. *Douglas v. Chariots for Hire*, 918 F. Supp. 2d 24, 28-29 (D.D.C. 2013).

To determine whether events are "substantial," courts make "'a commonsense appraisal'" to determine "'if the activities that transpired in the forum district were not insubstantial in relation to the totality of events giving rise to the plaintiff's grievance and if the forum is generally convenient for

all litigants.'" *Sharp Elecs.*, 655 F.2d at 1229. And in an action "seeking injunctive or declaratory relief alleging potential future harm," like this one, "proper venue under Section 1391(b)(2) lies in a district where the future harm will occur." *League of Women Voters of Fla. v. Browning*, 2008 WL 11332046, at *2 (S.D. Fla. May 29, 2008); *see also Ervin & Assocs., Inc. v. Cisneros*, 939 F. Supp. 793, 797 (D. Colo. 1996) (asking where a substantial part of the events "occurred or will occur").

Applying subsection (b)(2) to this case, "a substantial part of the events … giving rise to" the President's claim against the New York Defendants "occurred" in D.C. 28 U.S.C. §1391(b)(2). The *most* significant event in this case is New York's disclosure of the President's tax information to Congress; that is the President's injury, the reason he has standing to sue New York, and the concern driving this entire lawsuit. That event will occur in D.C., and the fact that it will harm the President there will be the entire point. *See Jericho Baptist Church Ministries, Inc. (D.C.) v. Jericho Baptist Church Ministries, Inc. (Md.)*, 223 F. Supp. 3d 1, 6 (D.D.C. 2016) (affirming venue under subsection (b)(2) because the defendant injured the plaintiff by "fil[ing] papers with an agency of the District of Columbia"). Courts recognize that venue is proper in the district where the defendant intentionally directs his conduct and injures the plaintiff. "When conduct 'occurs in one district but has intended effects elsewhere, the act 'occurs' in the jurisdiction where its effects are directed.'" *Patel v. Phillips*, 933 F. Supp. 2d 153, 165 (D.D.C. 2013); *accord Attkisson v. Holder*, 241 F. Supp. 3d 207, 213 (D.D.C. 2017).[9] This basis for venue is similar to the basis for personal jurisdiction discussed in *Calder*, and it is satisfied here for the same reasons that the President discussed above. *Supra* 18-19.

---

[9] These cases apply the venue provision of the Federal Tort Claims Act, which is functionally indistinguishable from subsection (b)(2) of the general venue statute. *See* 28 U.S.C. §1402(b) (creating venue where "the act or omission complained of occurred"); *Patel*, 933 F. Supp. 2d at 165 ("'Under the prevailing interpretation of section 1402(b), venue is proper in the District of Columbia if sufficient activities giving rise to plaintiff's cause of action took place here.'").

This basis for venue has special force for First Amendment claims like the one the President raises here. As one court recently explained:

> [C]ourts have drawn a parallel between §1983 claims based on constitutional violations and tort common law…. In tort cases, courts tend to focus on where the allegedly tortious actions took place *and* where the harms were felt when considering whether a substantial part of the events or omissions giving rise to the claim did or did not occur in the forum district…. [I]n some cases, the place of impact is more important than the place of decisionmaking for purposes of §1391: In a case brought on First Amendment grounds, impact becomes the most important part of the case and minimizing the impact of the statute, compared to its adoption or administration, would marginalize the Plaintiff's substantive First Amendment claims under the guise of a venue statute.

*Serv. Women's Action Network v. Mattis*, 320 F. Supp. 3d 1082, 1087-88 (N.D. Cal. 2018) (cleaned up).

Further, other "events" giving rise to the President's claim against the New York Defendants occurred in D.C. 28 U.S.C. §1391(b)(2). The TRUST Act was enacted to facilitate the Committee's quest to obtain the President's federal tax returns—an ongoing proceeding in D.C. that will serve as a trigger for releasing the President's state tax returns under the Act. And the New York Defendants cannot do anything of substance under the TRUST Act until Chairman Neal requests the President's state tax returns (from D.C.), makes the necessary certifications under the statute (from D.C.), and arranges for the tax returns' delivery (from D.C.). Under "'a commonsense appraisal'" of "'the totality of events giving rise to the plaintiff's grievance,'" *Sharp Elecs.*, 655 F.2d at 1229, these D.C.-centric events bolster a finding of venue here.

The New York Defendants stress that the TRUST Act was enacted in New York and that they would assemble the President's tax information there. *See* Mot. 27-28 (citing *Leroy v. Great Western United Corp.*, 443 U.S. 173, 185-86 (1979)). Fair enough—maybe venue is *also* proper in New York (though not in the Southern District, *infra* 30). But "'[n]othing in section 1391(b)(2) mandates that a plaintiff bring suit in the district where the *most substantial* portion of the relevant events occurred, nor does it require a plaintiff to establish that every event that supports an element of a claim occurred in the district where venue is sought." *Douglas*, 918 F. Supp. 2d at 28-29. The New York Defendants'

"reliance on *Leroy* is misplaced." *Exelon Generation Co., LLC v. Grumbles*, 380 F. Supp. 3d 1, 12 (D.D.C. 2019). That decision "was decided under a previous version of the venue statute, … which provided for venue in the district 'in which the claim arose.'" *Id.* at 13. By amending the statute in 1990 to create venue wherever "a substantial part" of the events occurred, Congress made *Leroy* "'largely academic'" by clarifying that venue can arise "in multiple districts and a plaintiff is not obligated to choose the *best* venue." *Id.*

But even if venue were somehow improper for the President's claim against the New York Defendants, this Court should not transfer the entire case to the Southern District of New York. The New York Defendants request a transfer only under section 1406, *see* Mot. 28, 2, which allows courts "in the interest of justice" to transfer a "case" from "the wrong …district" to a "district … in which it could have been brought," 28 U.S.C. §1406(a).[10] Transferring this case under section 1406 would be inappropriate for three main reasons.

**First**, there is no basis to transfer this entire "case" to the Southern District of New York. The New York Defendants concede that, with respect to the President's claim against the Congressional Defendants, venue is proper in D.C. *See* Mot. 27. And a transfer is not appropriate unless the new district is one where "venue would be proper for all parties" and where "all defendants would be subject to personal jurisdiction." 14D Fed. Prac. & Proc. Juris. §3807; *accord Sharp Elecs.*, 655 F.2d at 1230. There are no grounds to believe this is true for the Congressional Defendants in the Southern District of New York.[11] Thus, if this Court agrees that venue is improper for the New York

---

[10] The New York Defendants do not invoke section 1404, which allows courts to transfer cases that are filed in a *proper* district. *See* 28 U.S.C. §1404(a). Thus, to get a transfer, the New York Defendants must prove that venue is *improper* in D.C. *See id.* §1406(a). They cannot do so, for the reasons given above.

[11] The New York Defendants assume that the Congressional Defendants are "officer[s] or employee[s] of the United States," 28 U.S.C. §1391(e), covered by subsection (e) of the general venue statute. *See* Mot. 24-27. Second Circuit precedent, which binds the Southern District of New York, holds otherwise. *See Liberation News Serv. v. Eastland*, 426 F.2d 1379, 1384 (2d Cir. 1970).

Defendants, it has only two options: either "sever[]" the case, "allowing plaintiff to proceed against the local defendants in this district" but "transferring" the claim against the New York defendants to New York; or "dismiss" the claim against the New York Defendants and allow this litigation to "continue with" the Congressional Defendants alone. *Sharp Elecs.*, 655 F.2d at 1230; 14D Fed. Prac. & Proc. Juris. §3807. Between these two options, the President would prefer the Court to simply dismiss the New York Defendants, since he has no plans to litigate this case anywhere but D.C.

**Second**, a transfer to the Southern District of New York would not be "in the interest of justice." 28 U.S.C. §1406(a). To begin, "[t]he court must afford substantial deference to the plaintiffs' choice of forum." *Greater Yellowstone Coal. v. Bosworth*, 180 F. Supp. 2d 124, 128 (D.D.C. 2001). A "transfer that merely shifts the inconvenience from one party to the other" is inappropriate. *Douglas*, 918 F. Supp. 2d at 31 (cleaned up); *see also Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 508 (1947) ("[U]nless the balance is strongly in favor of the defendant, the plaintiff's choice of forum should rarely be disturbed"). Further, D.C. is a superior venue because the President's claims "arose" here: "all the plaintiffs are in [D.C.]," "the effects [of the TRUST Act] will be felt in [D.C.]," and "[t]he only event at issue in this suit to have happened in [New York] is the [enactment] of the [TRUST Act] itself." *M&N Plastics, Inc. v. Sebelius*, 997 F. Supp. 2d 19, 24 (D.D.C. 2013). "[W]hile the bulk of [the New York] Defendants' records may be in [New York], 'technological advances have significantly reduced the weight'" of such concerns. *Douglas*, 918 F. Supp. 2d at 31. And in terms of "relative docket congestion," *id.* at 33, the New York Defendants are asking this Court to transfer the case to the district with "the highest civil caseload in the country." *Judges of the Southern District of New York*, nysd.uscourts.gov/judges.php (last visited Sept. 9, 2019); *see also United States District Courts—National Judicial Caseload Profile* (June 30, 2019), bit.ly/33CJOL2 (reporting that this Court has 279 filings per judge, while the Southern District of New York has 587 filings per judge). Justice favors staying put.

29

**Third**, the Southern District of New York is not a district where this case "could have been brought" initially. 28 U.S.C. §1406(a). While the Southern District has personal jurisdiction over the New York Defendants, venue would not be proper there. The passage of the TRUST Act and the processing of the President's tax returns—the two "events" that the New York Defendants believe are relevant under subsection (b)(2) of the general venue statute, *see* Mot. 25-26—either did occur or will occur in Albany, where the New York State Legislature and State Department of Taxation and Finance are located. (And subsection (b)(1) would not apply because the Congressional Defendants do not reside in New York. *See* 28 U.S.C. §1391(b)(1).) But Albany is in the Northern District of New York, not the Southern. This Court should therefore reject the New York Defendants' request for a transfer—not least because venue is proper in D.C.

## III.   The motion serves no real purpose.

The New York Defendants' motion is not just premature and meritless; granting it would not meaningfully change this litigation. If the New York Defendants are dismissed for lack of personal jurisdiction or venue, the President intends to proceed in this District against the Congressional Defendants alone. His claims won't change, his ability to obtain relief from the New York Defendants won't change, and even the *parties* might not change. The fact that dismissal will change virtually nothing about this case only confirms that the New York Defendants' motion should be denied as premature or outright.

If the New York Defendants are dismissed from this case, the President will still have a claim against the Congressional Defendants under Article I of the Constitution, *see* Am. Compl. 22-23, which if proven would be a sufficient means to stop the disclosure of his state tax returns. The President will also continue to challenge the constitutionality of the TRUST Act against the Congressional Defendants. *See* Am. Compl. 23-24, 20 ¶63. He has standing to do so. Before the TRUST Act, New York law forbid state officials from disclosing the President's tax returns to the Committee. Am.

Compl. 20 ¶63. The law broadly prohibited disclosure, *e.g.*, N.Y. Tax Law §697(e)(1) (2016 version); punished violations via criminal penalties and removal from office, *e.g.*, *id.* §697(e)(4); and created an exception for disclosures to the Treasury Department, but not to Congress, *e.g.*, *id.* §697(f). That is precisely why the TRUST Act was enacted; without it, the legislative history explains, "New York law provides no legal mechanism for the state to cooperate with a Congressional committee." S5072 Sponsor Memo., bit.ly/2k50IQB. Thus, if the TRUST Act is enjoined or declared unconstitutional, the law will again forbid the disclosure of the President's state tax returns to the Committee.

Put differently, if the Congressional Defendants invoke the TRUST Act to obtain the President's state tax returns, the President will face an *injury* (by having his private tax information disclosed), that injury will be *caused* by the TRUST Act (by giving Congress an avenue and legal right to obtain the information), and his injury will be *redressed* by invalidating the TRUST Act (by making disclosure to Congress illegal again). Because all three elements of Article III standing are satisfied, the President can sue the Congressional Defendants for the unconstitutionality of the TRUST Act. *See Higginson v. Becerra*, 733 F. App'x 402, 403 (9th Cir. 2018) (holding that the plaintiff had standing to challenge a state statute by suing a city, since the statute had caused the city to adopt the policy that injured him); *Autolog Corp. v. Regan*, 731 F.2d 25, 31 (D.C. Cir. 1984) ("It is well settled that a plaintiff has standing to challenge conduct that indirectly results in injury … as long as the injury is fairly traceable to the challenged conduct."); *Quincy Cable TV, Inc. v. FCC*, 768 F.2d 1434, 1445 (D.C. Cir. 1985) ("While, of course, it cannot be said with absolute certainty that invalidation of the [challenged law] would redress [the plaintiff's] injury … certainty is not a constitutional prerequisite…. [T]he likelihood that the injury would be redressed by a favorable decision is sufficiently high to confer standing.").

But if the President can challenge the TRUST Act with or without the New York Defendants, then dismissing them from the case will accomplish nothing. After they are dismissed, one or both of

the New York Defendants will surely intervene in this case to defend the constitutionality of their statute. As the Attorney General announced when this lawsuit was filed, "The TRUST Act will shine a light on the president's finances and finally offer transparency to millions of Americans yearning to know the truth. We have all the confidence that this law is legal and we will vigorously defend it against *any* court challenge." *Attorney General James Responds to President Trump's Lawsuit*, Att'y Gen. Press Office (Jul. 23, 2019), on.ny.gov/2ka6l04 (emphasis added). By intervening, however, the New York Defendants will waive their objections to personal jurisdiction and venue. *See Pharm. Research & Mfrs. of Am. v. Thompson*, 259 F. Supp. 2d 39, 59 (D.D.C. 2003), *aff'd*, 362 F.3d 817 (D.C. Cir. 2004). We will be right back where we started.

Even if the New York Defendants are dismissed and never rejoin this litigation, the President can still get the primary relief he wants from them—an order under the All Writs Act barring them from disclosing his state tax returns until he gets notice and an opportunity to litigate. The All Writs Act "grants the district courts the power to issue injunctions" against "nonparties" who are "in a position to frustrate … the proper administration of justice," even if the nonparties are not "engaged in wrongdoing" and "have not taken any affirmative action." *NAACP, Jefferson Cty. Branch v. Brock*, 619 F. Supp. 846, 852 (D.D.C. 1985); *United States v. N.Y. Tel. Co.*, 434 U.S. 159, 174 (1977). Nonparties cannot complain about venue, *see Pinson v. Samuels*, 761 F.3d 1, 6 (D.C. Cir. 2014) ("'non-parties usually lack standing to challenge venue'"), or the long-arm statute, which governs jurisdiction only with respect to "claim[s] for relief," D.C. Code §§13-422, 13-423. And due process is satisfied for nonparties so long as they receive "actual notice" of the injunction, which the New York Defendants already have. *NAACP*, 619 F. Supp. at 852; *Envtl. Def. Fund, Inc. v. EPA*, 485 F.2d 780, 784 (D.C. Cir. 1973); *see also United States v. Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers of Am., AFL-CIO*,

776 F. Supp. 144, 150 (S.D.N.Y. 1991) ("Personal jurisdiction is not required to bind non-parties under the All Writs Act."), *aff'd*, 954 F.2d 801 (2d Cir. 1992).[12]

One final observation. Even if the Court dismissed the New York Defendants, they did not rejoin the case as intervenors, and the Court did not enjoin them as nonparties under the All Writs Act, things would still proceed largely the same way. The next order of business would be the President's outstanding request for All Writs Act relief against the Congressional Defendants (and, if that relief is granted, a motion to stay this litigation until Chairman Neal requests the President's state tax returns). All Writs Act relief against the Congressional Defendants should be granted immediately. The Congressional Defendants "agree that but for [their asserted legislative] immunity, the President has satisfied the traditional requirements under All Writs Acts jurisprudence to be able to enter injunctive relief." 7/29/2019 Tr. at 17:7-13. And their asserted immunity is meritless (or at least cannot be assessed until they actually request the President's returns). *See id.* at 20:15-21, 23:2-4, 32:19–33:1; Reply i.s.o. Emergency Writ App. (Doc. 17) 4-8. If doubts remain, this Court could grant All Writs Act relief against Grossman alone. Any concerns with enjoining Congress are "less[ened] … when applied to officers or employees of a legislative body, rather than to legislators themselves." *Dombrowski v. Eastland*, 387 U.S. 82, 84-85 (1967); *accord Dombrowski v. Eastland*, 387 U.S. 82, 84-85 (1967) (similar); *U.S. Servicemen's Fund v. Eastland*, 488 F.2d 1252, 1256 (D.C. Cir. 1973) (emphasizing that the district court had jurisdiction to temporarily enjoin "the cognizant counsel of a committee").

---

[12] Or, if the New York Defendants are correct that they should be treated as the "'State itself,'" *see* Mot. 22-23, 12, 20 n.8, due process is no concern at all. States are not "persons" entitled to the protections of the Due Process Clause. *South Carolina v. Katzenbach*, 383 U.S. 301, 323-24 (1966).

**CONCLUSION**

For all these reasons, the Court should either deny the New York Defendants' motion to dismiss for lack of personal jurisdiction and improper venue, or reserve decision on it until Chairman Neal requests the President's state tax returns.

Dated: September 9, 2019

Respectfully submitted,

*s/ William S. Consovoy*

William S. Consovoy (D.C. Bar #493423)
Thomas R. McCarthy (D.C. Bar #489651)
Cameron T. Norris
CONSOVOY MCCARTHY PLLC
1600 Wilson Blvd., Ste. 700
Arlington, VA 22209
(703) 243-9423
will@consovoymccarthy.com
tom@consovoymccarthy.com
cam@consovoymccarthy.com

Patrick Strawbridge
CONSOVOY MCCARTHY PLLC
Ten Post Office Square
8th Floor South PMB #706
Boston, MA 02109
patrick@consovoymccarthy.com

*Counsel for President Donald J. Trump*

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| DONALD J. TRUMP, | |
| Plaintiff, | |
| v. | Case No. 1:19-cv-2173-CJN |
| COMMITTEE ON WAYS AND MEANS, UNITED STATES HOUSE OF REPRESENTATIVES; RICHARD NEAL, in his official capacity as Chairman of the House Ways and Means Committee; ANDREW GROSSMAN, in his official capacity as Chief Tax Counsel of the House Ways and Means Committee; LETITIA JAMES, in her official capacity as Attorney General of New York State; and MICHAEL R. SCHMIDT, in his official capacity as Commissioner of the New York State Department of Taxation and Finance, | |
| Defendants. | |

## [PROPOSED] ORDER DENYING THE NEW YORK DEFENDANTS' MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION AND IMPROPER VENUE

Having considered the New York Defendants' renewed motion to dismiss for lack of personal jurisdiction and improper venue (Doc. 36) and the parties' briefs and arguments on it, the motion is hereby **DENIED**.

_____
Date

_____
**CARL J. NICHOLS**
United States District Judge