# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF COLUMBIA

DONALD J. TRUMP,

*Plaintiff*,

v.

COMMITTEE ON WAYS AND MEANS,
UNITED STATES HOUSE OF
REPRESENTATIVES, *et al.*,

*Defendants*.

Case No. 1:19-cv-02173-CJN

## NEW YORK DEFENDANTS' REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF THEIR MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION AND IMPROPER VENUE

LETITIA JAMES
*Attorney General*
*State of New York*
28 Liberty Street
New York, NY  10005

*Attorney for Defendants Letitia James, in*
*her official capacity, and Michael R.*
*Schmidt, in his official capacity*

Andrew Amer
 Special Litigation Counsel

*of Counsel*

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ............................................................................................ 1

ARGUMENT ..................................................................................................................... 4

I.   THE COURT HAS NO LONG-ARM JURISDICTION OVER THE NEW
YORK DEFENDANTS .......................................................................................... 4

    A.   Hypothetical Future Contacts That A Defendant May Have With A Forum
Cannot Serve As A Basis For Exercising Long-Arm Jurisdiction .............................. 5

    B.   Long-Arm Jurisdiction Cannot Be Predicated On The New York
Defendants' Contacts With The Federal Government .................................................. 6

    C.   There Is No Long-Arm Jurisdiction Over State Officials Sued In Their
Official Capacities ...................................................................................................... 7

    D.   Plaintiff's Facial Challenge To The TRUST Act Does Not Arise From Any
Business Transacted By The New York Defendants In D.C. (§ 13-
423(a)(1)) ................................................................................................................... 8

    E.   The New York Defendants Have Not Caused Any "Tortious Injury" To
Mr. Trump In D.C. (§ 13-423(a)(3) and (a)(4)) ......................................................... 11

    F.   The New York Defendants Have Not Engaged In Any "Persistent Course
Of Conduct" (§ 13-423(a)(4)) ................................................................................... 13

II.   VENUE IS NOT PROPER IN THE DISTRICT OF COLUMBIA .............................. 14

III.  THE COURT SHOULD DECIDE THIS THRESHOLD MOTION ON
THE MERITS WITHOUT DELAY ....................................................................... 17

    A.   Mr. Trump Must File Suit In New York If He Wants To Invalidate New
York's TRUST Act And Seek Injunctive Relief Against The New York
Defendants ................................................................................................................ 17

    B.   Mr. Trump Has No Good Faith Basis For Seeking Jurisdictional Discovery .......... 19

       1.   The New York Defendants' Official Conduct Is Irrelevant Under D.C.'s
Long-Arm Statute .............................................................................................. 20

       2.   Mr. Trump Cannot Obtain Jurisdictional Discovery Based On A
Conspiracy Theory He Has Not Alleged .............................................................. 21

       3.   Mr. Trump Has Failed To Make The Necessary Showing To Obtain
Jurisdictional Discovery ..................................................................................... 23

C.    The Court Should Summarily Reject Mr. Trump's Invitation To Hold This
      Motion In Abeyance.............................................................................................24

CONCLUSION...............................................................................................................................25

TABLE OF AUTHORITIES

**Cases**

*Acorda Therapeutics Inc. v. Mylan Pharm. Inc.*, 817 F.3d 755 (Fed. Cir. 2016) ........................... 5, 6

*Akers v. Watts*, 740 F. Supp. 2d 83 (D.D.C. 2010) ............................................................. 13, 20

*Atlantigas Corp. v. Nisource, Inc.*, 290 F. Supp. 2d 34 (D.D.C. 2003)............................................23

*Autolog Corp. v. Regan*, 731 F.2d 25 (D.C. Cir. 1984)...................................................................18

*Bastin v. Fed. Nat'l Mtg. Ass'n*, 104 F. 3d 1392 (D.C. Cir. 1997)....................................................19

*Bigelow v. Garrett*, 299 F. Supp. 3d 34 (D.D.C. 2018) ................................................................23

*Brown v. Gilmore*, 533 U.S. 1301 (2001) ............................................................................. 18, 19

*Burger King Corp. v. Rudzewicz*, 417 U.S. 462 (1985) ...................................................................9

*Calder v. Jones*, 465 U.S. 783 (1984)................................................................................. 9, 10

*Capel v. Capel*, 272 F. Supp. 3d 33 (D.D.C. 2017) .....................................................................20

*Clinton v. Goldsmith*, 526 U.S. 529 (1999) .............................................................................18

*Cockrum v. Donald J. Trump for President, Inc.*, 319 F. Supp. 3d 158 (D.D.C. 2018)..................................22

*Companhia Brasileira Carbureto De Calcio v. Applied Indus. Materials Corp.*, 35 A.3d 1127 (D.C. 2012).............................................................................................................7

*Day v. Corner Bank (Overseas) Ltd.*, 789 F. Supp. 2d 150 (D.D.C. 2011)....................................................21

*District No. 1 Pacific Coast Dist., M.E.B.A. v. State of Alaska*, 682 F.2d 797 (9th Cir. 1982)....................16

*Edmond v. U.S. Postal Serv. Gen. Counsel*, 949 F. 2d 415 (D.C. Cir. 1991) ....................................................23

*EIG Energy Fund XIV, L.P. v. Petroleo Brasileiro S.A.*, 246 F. Supp. 3d 52 (D.D.C. 2017) ............. 22, 23

*Energy Conversion Devices, Inc. v. Manbeck*, 741 F. Supp. 965 (D.D.C. 1990) ..............................................18

*Environmental Research Int'l Inc. v. Lockwood Greene Eng'rs., Inc.*, 355 A.2d 808 (D.C. 1976) (en banc)..............................................................................................................7

*Erwin-Simpson v. AirAsia Berhad*, 375 F. Supp. 3d 8 (D.D.C. 2019) ..........................................................19

*Estate of Klieman ex. rel. Kesner v. Palestinian Auth.*, 923 F.3d 1115 (D.C. Cir. 2019) .................................19

*FC Inv. Group, LC v. IFX Markets, Ltd.*, 529 F.3d 1087 (D.C. Cir. 2008) ................................19, 21, 22

*Higginson v. Becerra*, 733 F. App'x 402 (9th Cir. 2018)...............................................................17

*Holder v. Haarmann & Reimer Corp.*, 779 A.2d 264 (D.C. 2001) ..............................................11

*IMAPizza, LLC v. At Pizza Limited*, 334 F. Supp. 3d 95 (D.D.C. 2018) .................................11

*Kwok Sze v. Johnson*, 172 F. Supp. 3d 112 (D.D.C. 2016) .........................................................21

*League of Women Voters of Florida v. Browning*, No. 08-cv-21243, 2008 WL 11332046 (S.D. Fla. May 29, 2008).........................................................................................................................16

*Leroy v. Great Western United Corp.*, 443 U.S. 173 (1979) .............................................*passim*

*Lex Tex Ltd., Inc. v. Skillman*, 579 A.2d 244 (D.C. 1990) ........................................................ 6, 7

*LG Display Co. Ltd v. Obayashi Seikou Co., Ltd.*, 919 F. Supp. 2d 17 (D.D.C. 2013) ...............21

*Morgan v. Richmond School of Health and Technology, Inc.*, 857 F. Supp. 2d 104 (D.D.C. 2012) ...................7

*NBC-USA Hous., Inc. Twenty-Six v. Donovan*, 741 F. Supp. 2d 55 (D.D.C. 2010)......................20, 21, 23

*Nuevos Destinos, LLC v. Peck*, No. 15 Civ. 1846, 2019 WL 78780 (D.D.C. Jan. 2, 2019) ......................23

*Ohio Citizens for Responsible Energy, Inc. v. NRC*, 479 U.S. 1312 (1986)........................................19

*Pollack v. Meese*, 737 F. Supp. 663 (D.D.C. 1990)...............................................................13, 20

*Quincy Cable TV, Inc. v. Federal Communications Comm'n*, 768 F.2d 1434 (D.C. Cir. 1985) ......................18

*Richards v. Duke Univ.*, 480 F. Supp. 2d 222 (D.D.C. 2007) ......................................................23

*Robo-Team NA, Inc. v. Endeavor Robotics*, 313 F. Supp. 3d 19 (D.D.C. 2018)...............................19

*Rochon v. FBI*, 691 F. Supp. 1548 (D.D.C. 1988) ....................................................................11

*Rose v. Silver*, 394 A.2d 1368 (D.C. 1978) ................................................................................6

*Savage v. Bioport, Inc.*, 460 F. Supp. 2d 55 (D.D.C. 2006) ......................................................20

*Slack v. Wash. Metro. Area Trans. Auth.*, 325 F. Supp. 3d 146 (D.D.C. 2018)..............................19

*Trump for President, Inc.*, 319 F. Supp. 3d 158 (D.D.C. 2018) .................................................19

*United States v. Edmond*, 924 F.2d 261 (D.C. Cir. 1991) ..........................................................11

*United States v. Ferrara*, 54 F.3d 825 (D.C. Cir. 1995) ..............................................................8

*Williams v. Johnson*, 776 F.3d 865 (D.C. Cir. 2015) ................................................................11

*World Wide Minerals v. Republic of Kazakhstan*, 296 F.3d 1154 (D.C. Cir. 2002) .......................22

*World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286 (1980) ............................................................ 10, 13

**Statutes**

28 U.S.C. § 1391 ............................................................................................................................14

28 U.S.C. § 1391(b)(2) ....................................................................................................................14

28 U.S.C. § 1651 ............................................................................................................................18

42 U.S.C. § 1985 ............................................................................................................................21

D.C. Code § 13-423(a)(1) ............................................................................................................ 1, 5

D.C. Code § 13-423(a)(3) ............................................................................................................ 2, 5

D.C. Code § 13-423(a)(4) ....................................................................................................... 2, 5, 20

N.Y. Tax Law § 697(f) (effective Aug. 8, 1999) ....................................................................... 10, 12, 13

N.Y. Tax Law § 697(f-1)(2)(2019) ....................................................................................................10

## PRELIMINARY STATEMENT

The question before this Court is simple and straightforward, and the answer is self-evident. Is a federal court sitting in the District of Columbia the appropriate forum to decide a facial constitutional challenge to a New York statute in an action commenced against New York officials sued in their official capacities?  The answer is obviously "no" because New York officials will never be "at home" in D.C. for purposes of satisfying due process or D.C.'s general jurisdiction statute and there can be no specific jurisdiction because: (i) an official capacity suit against state officials is a suit against a "state" that falls outside the scope of D.C.'s long-arm statute; and (ii) considerations of state sovereignty and federalism preclude judges sitting in D.C. from exercising jurisdiction over New York officials to decide a facial constitutional challenge to a New York statute.  Tellingly, Mr. Trump has not pointed to a single case where a federal court sitting in one state has decided a facial constitutional challenge to another state's laws.

Mr. Trump concedes the Court has no general jurisdiction.  He relies instead on D.C.'s long-arm statute, which requires that any predicate contacts bear a discernible relationship to his *only* count against the New York Defendants – a First Amendment claim based on alleged acts of retaliation by New York legislators that have nothing to do with conduct of the Commissioner or the Attorney General.  Mr. Trump's reliance on D.C.'s long-arm statute fails for the reasons stated above.  But they also fail under a traditional jurisdictional analysis, which requires some nexus between his First Amendment claim and conduct by the New York Defendants in D.C., which is non-existent.

First, relying on § 13-423(a)(1), he claims that future conduct by the New York Defendants in responding to a hypothetical request from the Committee under the TRUST Act will constitute "transacting any business."  This argument fails, even putting aside serious ripeness concerns, because the hypothetical future conduct of the Commissioner and Attorney General bears no discernible relationship to Mr. Trump's First Amendment claim, which is premised instead on the motivations of

legislators when enacting the TRUST Act. In addition, such conduct cannot create personal jurisdiction under the "government contacts" doctrine, is far too speculative to serve as the basis for specific jurisdiction, and in any event, would not be commercial in nature.

Second, relying on § 13-423(a)(3), Mr. Trump asserts that the New York Defendants will cause "tortious injury" in D.C. by the potential future disclosure of his tax return information to Congress under the TRUST Act. This conduct too would be excluded under the "government contacts" doctrine, and otherwise cannot satisfy subsection (a)(3) because it is purely speculative future conduct and bears no discernible relationship to his First Amendment claim arising from alleged discriminatory and retaliatory conduct of other New York officials, not the Commissioner or Attorney General. Moreover, beyond the disconnect between his First Amendment claim and any conduct by the New York Defendants, Mr. Trump fails to explain how he will suffer "tortious injury" merely from the Commissioner's hypothetical delivery of tax returns to Chairman Neal. Any alleged injury would arise from what Chairman Neal chooses to do with the returns after he receives them (assuming he even requests them), which has nothing to do with the New York Defendants' conduct or the enactment of the TRUST Act. Mr. Trump also contends that he can impute to the New York Defendants the D.C. conduct by the House Defendants under a conspiracy theory because the TRUST Act requires that Chairman Neal and the Commissioner interact with each other. This contention is preposterous. To assert "conspiracy jurisdiction," a plaintiff must allege a civil conspiracy claim in the complaint, which Mr. Trump does not do. In any event, his allegations concerning the Attorney General and members of the House of Representatives (but not the House Defendants) separately pursuing potential financial malfeasance in accordance with their respective investigative prerogatives (wholly unrelated to the TRUST Act) and future hypothetical communication between Chairman Neal and the Commissioner to implement the TRUST Act cannot rationally be viewed as conspiratorial acts.

Third, relying on § 13-423(a)(4), Mr. Trump argues the New York Defendants will cause

"tortious injury" in D.C. based on their New York conduct coupled with their "persistent course of conduct" in D.C., premised on the Attorney General's participation as a litigant in D.C. courts and her attendance at conferences, seminars, and other events in D.C.  This argument fails not only because there is no "tortious injury" in D.C. for the reasons stated above, but also because the law is clear that "persistent course of conduct" does not include any conduct undertaken by a defendant in an official capacity.  In other words, none of the alleged D.C. conduct by the Attorney General qualifies for purposes of establishing the requisite "persistent course of conduct" under subsection (a)(4).  In any event, Mr. Trump makes no argument that the Commissioner has engaged in any "persistent course of conduct" in D.C., and it is the Commissioner, not the Attorney General, who will enforce the TRUST Act and respond to any future request from Chairman Neal.  Mr. Trump cannot satisfy subsection (a)(4) by asserting "tortious injury" from the *Commissioner's* conduct coupled with allegations of a "persistent course of conduct" in D.C. by the *Attorney General.*

Similarly, Mr. Trump's argument that venue is proper here because a substantial part of the events giving rise to his First Amendment claim occurred in D.C. lacks merit.  The sole event giving rise to his constitutional challenge is the enactment of the TRUST Act, which occurred outside D.C.  Moreover, Mr. Trump's venue argument runs afoul of the Supreme Court's admonition in *Leroy v. Great Western United Corp.*, 443 U.S. 173, 186 (1979), that it would be improper for a judge sitting in one state to determine the constitutionality of another state's laws.

Desperate to avoid any merits consideration of this motion, Mr. Trump seeks delay by requesting jurisdictional discovery.  For the reasons stated above, he has no good faith basis to request discovery.  It is the very nature of his claim against the New York Defendants – a facial constitutional challenge to a New York statute brought against New York officials sued in their official capacities – that predetermines the outcome of this motion against Mr. Trump.  No amount of discovery can alter the nature of his claim, so no amount of discovery can alter the result.

Nor is there any justification to otherwise delay resolution of this motion. It is certainly not "premature" for the New York Defendants to ask the Court to determine whether it has the authority to entertain Mr. Trump's constitutional claim when Mr. Trump has already asked the Court to grant him extraordinary injunctive relief against all the defendants. If anything is "premature," it is Mr. Trump's demand for injunctive relief against out-of-state defendants where he admits that there has not yet even been a request for his tax returns. And the motion does not lack "real purpose." It is axiomatic that before a court can issue orders that will bind the parties, the court must first determine whether it has the jurisdiction to do so. The suggestion by Mr. Trump that the Court can enjoin the New York Defendants and invalidate the TRUST Act even if the Court has no jurisdiction over them and venue here is improper is baseless. The All Writs Act does not confer such extraordinarily broad authority where there is no jurisdiction to begin with and there exists an alternative available remedy – namely Mr. Trump's option to bring his constitutional challenge in a New York court.

Finally, the Court should soundly reject Mr. Trump's invitation to hold this motion in abeyance for no purpose other than to artificially extend the temporary injunctions. This Court granted those temporary injunctions as an integral part of implementing the New York Defendants' good faith proposal to present this motion *on an expedited basis*. Adopting Mr. Trump's proposal would deprive the New York Defendants of the sole consideration they received from the Court for consenting to a stay of very limited duration. The Court should decide this motion on the merits now, and should reach the obvious conclusion that a D.C. court is not the proper forum to decide a facial constitutional challenge to a New York statute brought against New York officials sued in their official capacities.

## ARGUMENT

## I.   THE COURT HAS NO LONG-ARM JURISDICTION OVER THE NEW YORK DEFENDANTS

Mr. Trump abandons any attempt to argue that the Court has general jurisdiction over the New York Defendants and instead focuses solely on specific jurisdiction under three provisions of

D.C.'s long-arm statute, §§ 13-423(a)(1), (a)(3), and (a)(4).  Plaintiff fails to allege facts that could support a finding of specific jurisdiction under any of these provisions.

### A. The Hypothetical Future Contacts With D.C. Cannot Serve As A Basis For Exercising Long-Arm Jurisdiction

As discussed in the New York Defendants' opening brief, courts do not consider speculative future contacts that a defendant may have with a forum when analyzing personal jurisdiction.  New York Defendants' Opening Brief (Dkt No. 36-1) ("Opening. Br.") at 9-10.  Plaintiff bases his contention that minimum contacts can include future activities on a single decision from the Federal Circuit, *Acorda Therapeutics Inc. v. Mylan Pharm. Inc.*, 817 F.3d 755 (Fed. Cir. 2016).  *Acorda* does not support Plaintiff's position.  In *Acorda*, Mylan Pharmaceuticals filed two Abbreviated New Drug Applications ("ANDAs") seeking to market generic versions of drugs patented by others, certifying in both ANDAs that the patents were invalid and would not be infringed by Mylan.  *Id.* at 757.  It was undisputed that Mylan planned "to direct sales of its generic drugs into Delaware."  *Id.* at 763.  The patent owners sued Mylan in the District of Delaware for patent infringement under federal law deeming Mylan's certification sufficient to constitute an act of infringement.  *Id.* at 757-58.  On appeal, the Federal Circuit held that "the minimum-contacts standard is satisfied by the particular actions Mylan has already taken – its ANDA filings – for the purpose of engaging in . . . marketing conduct in Delaware."  *Id.* at 760.  Key to the court's decision was its finding that Mylan's *past conduct* in filing the ANDAs "confirmed its plan to commit real-world acts that would make it liable for infringement" of the patents, "activities [that] will unquestionably take place in Delaware (at least)."  *Id.* at 761-62.

*Acorda* is easily distinguishable because the New York Defendants have done nothing to suggest that they "plan to commit real-world acts" under the TRUST Act that "will unquestionably take place" in D.C.  *Id.* at 761-62.  To the contrary, the Attorney General will play no role whatsoever in responding to a request under the TRUST Act, and all of the activities the Commissioner would undertake in response to a future hypothetical request – gathering the relevant tax return information,

redacting the information, and sending the information to Chairman Neal – will occur in New York pursuant to the Commissioner's state-law authority over tax information.  There is no language in the TRUST Act that would *require* the Commissioner to engage in any activities in D.C. in order to respond to a future request from Chairman Neal.  Mr. Trump's speculation about what future contacts the Commissioner might potentially have with D.C. depending on how he responds to a request under the TRUST Act that has not yet materialized does not equate to the firmly committed course of conduct by Mylan to enter Delaware that satisfied the minimum-contacts standard in *Acorda*.  *Id.* at 761 (finding the ANDA filings "realistically establishe[d] a plan to market" in Delaware).  Speculative future contacts with D.C. that may or may not occur cannot satisfy D.C.'s long-arm statute.

### B.  Long-Arm Jurisdiction Cannot Be Predicated On The New York Defendants' Contacts With The Federal Government

Under the "government contacts" doctrine, a defendant's contacts with the federal government cannot serve as a basis for a court's exercise of personal jurisdiction.  Opening Br. at 17.  Mr. Trump cites *Rose v. Silver*, 394 A.2d 1368 (D.C. 1978), and *Lex Tex Ltd., Inc. v. Skillman*, 579 A.2d 244 (D.C. 1990), for the proposition that "the government-contacts doctrine is no longer a limitation on the scope of the long-arm statute."  Plaintiff's Opposition Brief (Dkt No. 37) ("Opp. Br.") at 21.  Neither case supports Mr. Trump's purported demise of the "government contacts" doctrine.  In *Rose*, the court affirmed that the 1970 amendment to the long-arm statute did "not eras[e] the government contacts principle," but merely "shifted its premise solely to the First Amendment."  394 A.2d at 1374.  Similarly in *Lex Tex*, the court reaffirmed that First Amendment considerations support the continued application of the government contacts principle where permitting litigation in the District of Columbia would "threaten any rights of the plaintiff to . . . engage in First Amendment activity."  579 A.2d at 249.  More recently, the District of Columbia Court of Appeals has observed that "[t]he unique concerns underlying the government contacts principle are as compelling today as they were when this court decided *Environmental Research* [in 1979]."  *Companhia Brasileira Carbureto De Calcio v. Applied*

6

*Indus. Materials Corp.*, 35 A.3d 1127, 1132 (D.C. 2012) (emphasis in original).

The "government contacts" doctrine is alive and well, and precludes the exercise of specific jurisdiction over the New York Defendants under D.C.'s long-arm statute based on whatever activities they have conducted or may conduct in connection with responding to a request from Chairman Neal under the TRUST Act – including communications Mr. Trump speculates the Commissioner may have with the House Defendants when gathering, redacting, and delivering any requested state tax return information.  Mr. Trump's contention that invoking the doctrine here would not further the First Amendment considerations that support its continued application is wrong.  Opp. Br. at 21. Those considerations include the "need for unfettered access to federal departments and agencies for the entire national citizenry." *Environmental Research Int'l Inc. v. Lockwood Greene Eng'rs., Inc.*, 355 A.2d 808, 813 (D.C. 1976) (en banc).  Subjecting the Commissioner to personal jurisdiction in D.C. based on nothing more than contacts he has with the federal government in furtherance of his statutory duties under the TRUST Act would surely run afoul of the First Amendment considerations that underlie the doctrine.  *See Morgan v. Richmond School of Health and Technology, Inc.*, 857 F. Supp. 2d 104, 108 (D.D.C. 2012) (listing "uniquely governmental activities" covered by the government contacts doctrine and collecting cases).[1]  Accordingly, those activities, as well as the Attorney General's contacts with the federal government bearing no relationship to the TRUST Act (*e.g.*, litigating in this Court), cannot serve as a basis for the exercise of long-arm jurisdiction.

### C.  There Is No Long-Arm Jurisdiction Over State Officials Sued In Their Official Capacities

The D.C. Circuit has recognized that state officials sued in their official capacities would fall

---

[1] This case is clearly distinguishable from those cases where an out-of-state principal retains an agent to conduct business on its behalf in D.C. before a federal agency and then sues the agent in D.C. on a claim that arises from that business relationship. *See, e.g., Lex Tex*, 579 A.2d at 249.  .

outside the reach of D.C.'s long-arm statute if official capacity suits are deemed suits against a state for purposes of jurisdiction, although the Circuit has not yet decided this issue.  *United States v. Ferrara*, 54 F.3d 825, 832 (D.C. Cir. 1995); Opening Br. at 22-23.  Mr. Trump's contention that official capacity suits should not be deemed suits against a state for jurisdictional purposes is unpersuasive.

All of the considerations that come into play when analyzing personal jurisdiction in an official capacity suit to challenge the constitutionality of a state statute – official capacity conduct is neither transacting commercial business nor persistent course of conduct (*see, infra*, at 11, 13); no in-state tortious injury arises from the out-of-state enactment of a statute (*see, infra*, at 11-13); state sovereignty and federalism preclude a court sitting in one state from determining the constitutionality of another state's laws (*see, infra*, at 15; Opening Br. at 20-22) – compel holding that an official capacity suit should be deemed a suit against the "state" for jurisdictional purposes.  Indeed, adopting such a rule creates a shorter and more direct path to the same end result reached by a court's consideration under a traditional long-arm analysis: that a facial constitutional challenge to a state statute against the state official with responsibility for enforcement should be brought only in a court within that state.

By excluding "states" from the definition of "persons" under its long-arm statute, the District of Columbia confirmed its legislative intent is to deprive D.C. courts of personal jurisdiction over any suit against another state, no doubt for reasons of state sovereignty and federalism and based on the admonition in *Leroy v. Great Western United Corp.*, 443 U.S. 173, 186 (1979), that judges sitting in one state should not be deciding the constitutionality of another state's laws (*see, infra*, at Point II).  There is no reason why the D.C. long-arm statute should apply differently to identical facial constitutional challenges to state law based on whether the claim is advanced in a suit that names the state as a party or names instead a state official in her official capacity.

**D.  Plaintiff's Facial Challenge To The TRUST Act Does Not Arise From Any Business Transacted By The New York Defendants In D.C. (§ 13-423(a)(1))**

Even if speculative future activity interacting with the federal government could satisfy D.C.'s

long-arm statute (contrary to law), the acts of gathering, redacting, and disclosing tax information in response to a request under the TRUST Act (1) lack a discernible relationship to Mr. Trump's actual and only claim against the New York Defendants—a facial First Amendment challenge to an already enacted New York statute and (2) are not tantamount to "transacting any business" in this District.

As the New York Defendants have explained (Opening Br. at 14-16) and Plaintiff acknowledges (Opp. Br. at 18), a plaintiff's underlying *claim* must have a "discernable relationship" to the defendant's alleged activities in D.C. to assert personal jurisdiction over that defendant.  *See Burger King Corp. v. Rudzewicz*, 417 U.S. 462, 472-73 (1985) (defendant must purposefully direct "activities at residents of the forum" and plaintiff's claim must "arise out of or relate to *those activities*" (emphasis added) (quotation marks omitted)).  Here, Plaintiff's First Amendment claim and any asserted injury from that claim arise solely from a New York statute that Plaintiff alleges New York legislators enacted to discriminate against him for his policy views.  That claim and any injury are based entirely on conduct purportedly by state legislators in New York.  The Commissioner's hypothetical future actions to implement the TRUST Act—if a request for Plaintiff's tax return is ever made—are thus irrelevant to Mr. Trump's facial challenge to the statute and cannot form the basis of personal jurisdiction over the New York Defendants to pursue that claim.  Indeed, Plaintiff has sued the Commissioner in his capacity as the official tasked with implementing the TRUST Act as a procedural mechanism to challenge the underlying constitutionality of the statute, not to challenge any particular activity of the Commissioner as violative of the First Amendment.

Plaintiff thus misplaces his reliance on *Calder v. Jones*, 465 U.S. 783 (1984).  In *Calder*, an actress living and working in California brought a libel suit in California state court against the *National Enquirer* and the Florida-based publisher and author of the offending article, which "alleged [she] drank so heavily as to prevent her from fulfilling her professional obligations."  *Id.* at 784 and n.9.  Noting that the publication in which the article appeared had "a large circulation in California" (*id.* at

784), the Court held that there were sufficient minimum contacts because the California-based plaintiff was "the focus of the activities of the defendants *out of which the suit arose*." *Id.* at 788 (emphasis added). As the court explained, California was "the focal point both of the story and of the harm suffered" from defendants' libelous conduct—writing and editing a hit piece for publication in a magazine with a large circulation in the forum where the plaintiff works and resides, knowing that it "would have a potentially devastating impact" on the plaintiff in that forum. *Id.* at 789 (quoting *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297-98 (1980)). Here, by contrast, Mr. Trump's facial First Amendment challenge to an already enacted state statute does not relate to the Commissioner's future activities in fulfilling his responsibility under that statute.

Indeed, the Commissioner's hypothetical future implementation of the statute is even more removed from Mr. Trump's First Amendment claim because that conduct would not even directly injure Mr. Trump. To the contrary, any injury would result solely from the actions of Chairman Neal or others rather than from the New York Defendants. Mr. Trump complains that the Commissioner can disclose his state tax returns "immediately" and without notice (Am. Compl. at ¶ 71), but any disclosure under the TRUST Act would be to only one of three congressional committee chairs with oversight responsibility for tax matters and would be subject to existing confidentiality restrictions "in a manner consistent with federal law as informed by the requirements and procedures established in 26 U.S.C. Section 6103(f)." N.Y. Tax Law § 697(f-1)(2)(2019).

Mr. Trump fails to articulate how simply delivering any requested state tax return information to Chairman Neal in and of itself results in harm, given that New York tax law has long permitted its tax commissioner to share state tax returns (including Mr. Trump's returns) with various federal and state officials throughout the country. *See, infra*, at 12; N.Y. Tax Law § 697(f) (effective Aug. 8, 1999). Assuming Chairman Neal even makes a request, he may do nothing more than review what he gets.

Finally, in addition to bearing no relationship to the enactment of the TRUST Act that is the

sole basis for Mr. Trump's only claim against the New York Defendants, any future contacts the Commissioner may have with Chairman Neal in responding to a request under the TRUST Act are not the type of "commercial or business-related activity" required to satisfy the "transacting any business" prong of subsection (a)(1).  Opening Br. at 16 (quoting *Holder v. Haarmann & Reimer Corp.*, 779 A.2d 264, 270-71 (D.C. 2001)).  Relying on this Court's 1988 decision in *Rochon v. FBI*, 691 F. Supp. 1548 (D.D.C. 1988), Plaintiff asserts that business contacts under subsection (a)(1) need not be commercial in nature.  Opp. Br. at 19.  To the extent *Rochon* stands for that principle, it is no longer good law having been superseded by the D.C. Court of Appeals decision in *Holder* interpreting subsection (a)(1).[2]  *Williams v. Johnson*, 776 F.3d 865, 869 (D.C. Cir. 2015) ("we defer to the District of Columbia Court of Appeals' interpretation of the D.C. Code") (citing *United States v. Edmond*, 924 F.2d 261, 264 (D.C. Cir. 1991)).  Applying *Holder*, this Court has recently held that "transacting any business" within the meaning of subsection (a)(1) covers "the everyday sense of commercial deal-making activities like negotiating or performing contracts," which includes activities such as advertising, operating an office, and holding a board meeting.  *IMAPizza, LLC v. At Pizza Limited*, 334 F. Supp. 3d 95, 111 (D.D.C. 2018).

Sending state tax return information to a congressional committee pursuant to an information-sharing statute cannot plausibly be viewed as "commercial deal-making" activity that would satisfy the "transacting any business" requirement of subsection (a)(1).  *IMAPizza*, 334 F. Supp. 3d at 111.

### E.  The New York Defendants Have Not Caused Any "Tortious Injury" To Mr. Trump In D.C. (§ 13-423(a)(3) and (a)(4))

The "tortious injury" Mr. Trump alleges that he will suffer under the TRUST Act is not connected to his First Amendment claim, is exaggerated and purely speculative, and is based on future

---

[2] Plaintiff's reliance on other state long-arm statutes (Opp. Br. at 20) is without relevance.  The Court must apply the D.C. long-arm statute as interpreted by the District of Columbia Court of Appeals.

conduct of others, not the New York Defendants.  For the reasons explained above, Mr. Trump's

reliance on a purported "tortious injury" fundamentally misses the mark because the purported

injury—"disclosure of his private financial information" (Opp. Br. at 21)—is unrelated to his actual

First Amendment claim, which is not based on any purported violation of privacy.  Indeed, the only

purported First Amendment injury he claims to have suffered stems from state legislators' enactment

of the TRUST Act for purportedly discriminatory and retaliatory reasons.

In any event, the disclosure of his tax return information is not a tortious injury.  For decades,

New York (like many other states) has had on its books a law permitting the IRS, the Treasury

Secretary, and state government taxing authorities to request state tax return information from the

Commissioner for *any* state tax filer, including Mr. Trump, for any "tax purposes."  *See* N.Y. Tax Law

§ 697(f) (effective Aug. 8, 1999); Opening Br. at 21.  As is typical with this type of statute in aid of

ongoing investigations, New York's tax information-sharing law has never required that notice be

given to the individual whose information is requested, to avoid tipping off the target of the request

that authorities are looking into his affairs.  What Mr. Trump complains about vociferously in this

action is merely New York's decision to expand the already large group of entities authorized to request

New York tax return information to include the chairs of three Congressional committees, who are

not part of the Executive Branch under his control, with respect to a subset of New York filers that

includes many elected and appointed federal and state officials, including the president.

As discussed above, Mr. Trump fails to articulate how simply delivering any requested state

tax return information to one of the congressional committee chairs authorized by New York law to

make such a request in and of itself results in tortious injury, especially considering it has been the

case for over 20 years that the individual serving as the New York Tax Commissioner has had the

authority to share state tax returns (including Mr. Trump's returns) with the U.S. Treasury Secretary,

the IRS Commissioner, or "the proper tax officer of any state imposing an income tax upon the

incomes of individuals," provided there is a reciprocal information-sharing statute that permits the Commissioner to make a similar request of them, and to do so *without any notice to the tax filer.* N.Y. Tax Law § 697 (f) (effective Aug. 8, 1999).

Nor can Mr. Trump plausibly claim injury based purely on lack of notice because the target of a request for state tax returns from a government official authorized to make such a request under an information-sharing statute has no constitutional right to be tipped off to the request. And in any event, Mr. Trump has not brought any due process challenge based on lack of notice. Whatever harm Mr. Trump might speculate will be visited upon him based on what Chairman Neal may do with his state tax return information is not the "effects" of the TRUST Act or any conduct by the New York Defendants. *Worldwide Volkswagen*, 444 U.S. at 297-98.

**F.   The New York Defendants Have Not Engaged In Any "Persistent Course Of Conduct" (§ 13-423(a)(4))**

Mr. Trump cannot satisfy subsection (a)(4) for the additional reason that the New York Defendants cannot be found to have engaged in any "persistent course of conduct." "The law is clear that a persistent course of conduct may be deemed to constitute the transaction of business . . . only if that persistent conduct is undertaken in that person's individual capacity rather than an official capacity conducting business for his employer." *Pollack v. Meese*, 737 F. Supp. 663, 666 (D.D.C. 1990) (quoted by *Akers v. Watts*, 740 F. Supp. 2d 83, 92 (D.D.C. 2010)).

Application of this clear law easily defeats Mr. Trump's argument that he "has made a prima facie showing that the Attorney General engaged in a 'persistent course of conduct' in D.C." based on her engagement "in at least nine active cases here." Opp. Br. at 23. All of the activities Mr. Trump alleges the Attorney General has engaged in here (Am. Compl. at ¶ 16), including her "frequent use of courts in D.C." (Opp. Br. at 23), were undertaken in the Attorney General's "official capacity conducting business for [her] employer," the State of New York. *Pollack*, 737 F. Supp. at 666. Rather than being "a particularly strong 'plus factor'" under subsection (b)(4) (Opp. Brief at 23), the Attorney

General's participation in D.C. litigation is not a factor at all.

In addition, there is a fatal mismatch in Mr. Trump's arguments here. His assertions about a "persistent course of conduct" entirely concern the Attorney General. But the conduct that he asserts will cause him tortious injury—the delivery of his tax returns—would be effected by the *Commissioner*. Subsection (a)(4) does not allow a plaintiff to jerry-rig personal jurisdiction by combining the distinct official activities of different state officials.

## II.   VENUE IS NOT PROPER IN THE DISTRICT OF COLUMBIA

Mr. Trump argues that venue is proper in D.C. under subsection (b)(2) of the general venue statute, 28 U.S.C. § 1391, because "a substantial part of the events . . . giving rise to the claim occurred" in D.C. Opp. Br. at 25. This argument rests on the false premise that the "events" considered under this provision can include the alleged future harm he will suffer in D.C. should the Commissioner provide his state tax return information to Chairman Neal in response to a future request under the TRUST Act. Mr. Trump cannot base venue in D.C. on pure speculation about potential future harm; rather, venue under subsection (b)(2) must be based on where a substantial part of the events "giving rise to the claim occurred" (past tense). 28 U.S.C. § 1391(b)(2). No part of the events giving rise to Mr. Trump's First Amendment claim against the New York Defendants occurred in D.C., much less a substantial part of the events. The events giving rise to Mr. Trump's facial challenge to the TRUST Act are limited to allegations of "retaliation" and "discrimination" by members of the New York Legislature in enacting the TRUST Act, all occurring in New York. Am. Compl. at ¶¶ 37-62.

Plaintiff relies on a district court case from Florida in support of his contention that a court may consider the location of future harm in a case seeking injunctive or declaratory relief. Opp. Br. at 26. Plaintiff misconstrues the holding in that case, and in any event, teasing from that case a "future harm" factor under a subsection (b)(2) analysis is contrary to precedent in this Circuit and, more importantly, would directly conflict with the Supreme Court's decision in *Leroy v. Great Western United*

*Corp.*, 443 U.S. 173 (1979).  In *Leroy*, a would-be tender offeror headquartered in Texas sued Idaho state officials responsible for enforcing the Idaho Corporate Takeover Act in a Texas federal court challenging the constitutionality of the Idaho statute.  *Id.* at 175-77.  Although the Court was interpreting the earlier version of subsection (b)(2) permitting venue only where "the claim arose" as opposed to where "a substantial part of the events . . . giving rise to the claim occurred," the Court's discussion of the "one obvious locus" (*id.* at 185) for venue based on facts nearly identical to those presented here is instructive and controlling.  The Court noted that the basis for the plaintiff's constitutional challenge was the action taken in Idaho by the Idaho officials, including the "enactment of the statute by the legislature" and actions implementing the provisions of the statute.  *Id.* at 185-86.  The Court held that venue was appropriate in Idaho based on the nature of the action:

> [T]he nature of this action challenging the constitutionality of a state statute makes venue in the District of Idaho appropriate.  The merits of [plaintiff's] claims may well depend on a proper interpretation of the State's statute, and *federal judges sitting in Idaho are better qualified to construe Idaho law, and to assess the character of Idaho's probable enforcement of that law, than are judges sitting elsewhere.*

*Id.* at 186 (emphasis added).  Importantly, the Court expressly rejected the reasoning of the Ninth Circuit that the claim arose in Dallas because that is where the plaintiff would be harmed by the statute, finding such harm fell "far short" of the contacts with Idaho.  *Id.* at 186.  The Court's adoption of this home-court rationale in determining the proper venue for an action raising a constitutional challenge to a state statute remains unaffected by the later amendment to § 1391 and therefore controls.

As in *Leroy*, the merits of Mr. Trump's First Amendment challenge "may well depend on a proper interpretation of" the TRUST Act, and therefore "federal judges sitting in [New York] are better qualified to construe [New York] law, and to assess the character of [New York's] probable enforcement of that law, than are judges sitting elsewhere."  *Id.* at 186.  Moreover, the potential future harm to Mr. Trump – assuming any conduct by the Commissioner in delivering state tax information to Chairman Neal can be deemed to cause any harm at all (*see*, *supra*, at 12) – pales in comparison to

15

the acts of alleged "retaliation" and "discrimination" that purportedly occurred in New York and serve as the basis for the claim. *Id.* at 186.

In the Florida district court case relied on by Mr. Trump, the plaintiffs brought an action in the Southern District of Florida challenging the constitutionality of a Florida voter registration statute; they brought their suit against the Florida Secretary of State, the "state's chief elections officer" responsible "for implementing and enforcing" the challenged statute. *League of Women Voters of Florida v. Browning*, No. 08-cv-21243, 2008 WL 11332046, at *1 (S.D. Fla. May 29, 2008). The issue in *Browning* concerned proper venue as between the Southern and Northern Districts of Florida, *i.e.*, two federal districts within the same state. *Id.* at *3 (noting defendants seek transfer to the Northern District of Florida). Accordingly, the home-court rationale in *Leroy* that federal judges in a particular state are "better qualified" to decide the constitutionality of that state's laws than judges sitting elsewhere was inapplicable to *Browning*. *See District No. 1 Pacific Coast Dist., M.E.B.A. v. State of Alaska*, 682 F.2d 797, 799 (9th Cir. 1982) (noting that courts holding in actions challenging the constitutionality of state statutes that venue is proper "where the effect of the statutes were felt" involved venue as between different districts within only one state and therefore did not raise the concern addressed in *Leroy*).

Finally, there are no reported cases in this Circuit that adopt Plaintiff's proposed "future harm" factor when applying subsection (b)(2). To the extent *Browning* can be construed as equating future harm with events that have already occurred, that decision is not followed in D.C. Under the controlling home-court rationale of *Leroy*, the only proper venue for a case facially challenging the constitutionality of a New York statute is a New York court. *Leroy*, 443 U.S. at 186; *District No. 1*, 682 F.2d at 799 ("under the analysis of *Leroy*, venue in this case, involving a constitutional challenge to an Alaska statute, lies only in Alaska").

With respect to whether to transfer the case, the Court no longer needs to address the issue. If the Court concludes, as the New York Defendants urge, that venue is not proper in the District of

Columbia, Mr. Trump has stated his preference that his claim against the New York Defendants be severed and dismissed rather than transferred. Opp. Br. at 29. That is certainly the outcome that the New York Defendants prefer as well.

## III.   THE COURT SHOULD DECIDE THIS MOTION WITHOUT DELAY

It is clear from Mr. Trump's opposition and prior emergency application that his overriding objective in bringing this action in D.C. is to amend by judicial fiat New York's new tax information-sharing law to include a notice provision, temporarily enjoin any request for his state returns under that law, and then to delay, delay, delay. Mr. Trump offers two justifications for why the Court should delay any resolution of this motion. First, he claims resolving the motion now "serves no real purpose" (Opp. Br. at 30) because the Court can bind the New York Defendants and grant him full injunctive relief even if the New York Defendants are dismissed. Second, he claims that he must be afforded an opportunity to conduct jurisdictional discovery. Neither purported justification has any merit.

### A.   Mr. Trump Must File Suit In New York If He Wants To Invalidate New York's TRUST Act And Seek Injunctive Relief Against The New York Defendants

To read Mr. Trump's opposition is to wonder whether this country actually has an adversarial system of justice. After all, he claims that even if the Court has no jurisdiction over the New York Defendants or venue for his constitutional challenge does not lie here, he can still challenge the constitutionality of the TRUST Act in this Court without naming the New York official responsible for implementing the law, and through the All Writs Act can obtain injunctive relief against the New York Defendants as non-parties. Mr. Trump's view of the Court's power to grant any of this relief if he loses this motion and the New York Defendants are dismissed is unprecedented and dead wrong.[3]

---

[3] The cases Mr. Trump cites on page 31 of his opposition brief do not support his assertion that he can invalidate the TRUST Act by proceeding in this Court against only the House Defendants. In each cited case, the plaintiff sued the government officials responsible for enforcing the law or agency determination being challenged. *Higginson v. Becerra*, 733 F. App'x 402, 403 (9th Cir. 2018) (involving a California action against California state and city officials responsible for enforcing the challenged

As a threshold matter, the All Writs Act, 28 U.S.C. § 1651, is used by federal courts sparingly to preserve their own jurisdiction, not to indulge the preferences of litigants to obtain relief against parties that are properly and readily sued elsewhere.  *See Clinton v. Goldsmith*, 526 U.S. 529, 537 (1999) (finding that "resort to the All Writs Act [was] out of bounds, being unjustifiable either as 'necessary' or as 'appropriate' in light of alternative remedies available," including "recourse to the federal courts").[4]  The All Writs Act is a tool for courts to *preserve* their jurisdiction—not an invitation to create jurisdiction that would not otherwise exist.   Because Mr. Trump can readily challenge the constitutionality of the TRUST Act and seek all of the injunctive relief he desires to fully protect his interests in an action brought in a New York court, an All Writs Act injunction would be manifestly improper.  *See, e.g., Energy Conversion Devices, Inc. v. Manbeck*, 741 F. Supp. 965, 968 (D.D.C. 1990) (denying motion under All Writs Act where "petitioner has not shown an absence of other available remedies" and a subsequent federal action was available).

Even if All Writs Act relief were not foreclosed altogether, it would still be inappropriate as a vehicle to enjoin the New York Defendants as non-parties.  The standard under the All Writs Act is extraordinarily high, particularly when seeking "an injunction against the enforcement of a presumptively valid state statute."  *Brown v. Gilmore*, 533 U.S. 1301, 1303 (2001) (Rehnquist, Circuit Justice) (denying injunction motion).   "[I]njunctive relief under the All Writs Act is to be used 'sparingly and only in the most critical and exigent circumstances.'  Such an injunction is appropriate

---

California city election map); *Autolog Corp. v. Regan*, 731 F.2d 25, 28 (D.C. Cir. 1984) (involving an action against the U.S. Secretary of the Treasury to enforce federal coastwise laws over which the Secretary has enforcement authority); *Quincy Cable TV, Inc. v. Federal Communications Comm'n*, 768 F.2d 1434, 1437-38 (D.C. Cir. 1985) (involving an action against the Federal Communications Commission ("FCC") to invalidate an FCC regulation on First Amendment grounds).

[4] *Cf. Canadian St. Regis Band of Mohawk Indians ex rel. Francis v. Town of Bombay, NY*, 484 F. App'x 586, 588 (2d Cir. 2012) (summary order) (noting that "there existed alternative, state law remedies . . . the existence of which generally precludes use of the All Writs Act to effectuate the same relief.").

only if 'the legal rights at issue are indisputably clear.'"  *Id.* (quoting *Ohio Citizens for Responsible Energy, Inc. v. NRC*, 479 U.S. 1312, 1313 (1986) (Scalia, Circuit Justice)).  Even Plaintiff acknowledges that the legal rights at issue in this case are not "indisputably clear."  *See* Opp. Br. at 15 (conceding that the merits of this case involve "arguments about sovereign immunity, the First Amendment, the Speech or Debate Clause, and other issues.").  Granting an All Writs Act injunction against non-party state officials in such circumstances, when the only reason Mr. Trump offers for why he cannot seek relief in another available forum is that he "has no plans to litigate this case anywhere but D.C.," Opp. Br. at 29, would be a gross abuse of discretion.

### B.  Mr. Trump Has No Good Faith Basis For Seeking Jurisdictional Discovery

A plaintiff seeking jurisdictional discovery has a very real burden to carry.  "Just as a plaintiff's personal jurisdiction theory must clear the speculative level, a request for jurisdictional discovery cannot be based on mere conjecture or speculation."  *Estate of Klieman ex. rel. Kesner v. Palestinian Auth.*, 923 F.3d 1115, 1126 (D.C. Cir. 2019); *accord Erwin-Simpson v. AirAsia Berhad*, 375 F. Supp. 3d 8, 21 (D.D.C. 2019) ("Granting Plaintiffs' request is justified only if they reasonably demonstrate that they can supplement their jurisdictional allegations through discovery.").  Courts in this Circuit regularly deny motions for jurisdictional discovery on this ground.  *See, e.g., Erwin-Simpson*, 375 F. Supp. 3d at 21, *Robo-Team NA, Inc. v. Endeavor Robotics*, 313 F. Supp. 3d 19, 26-27 (D.D.C. 2018); *Slack v. Wash. Metro. Area Trans. Auth.*, 325 F. Supp. 3d 146, 155 (D.D.C. 2018); *Cockrum v. Donald J. Trump for President, Inc.*, 319 F. Supp. 3d 158, 189 (D.D.C. 2018) (denying an "overreaching and ill-defined jurisdictional-discovery motion" seeking information regarding Mr. Trump and others).  The decision is ultimately a matter of discretion for the district court, and "[t]he district court does not abuse its discretion when it denies a discovery request that would amount to nothing more than a fishing expedition."  *FC Inv. Group, LC v. IFX Markets, Ltd.*, 529 F.3d 1087, 1093 (D.C. Cir. 2008) (quoting *Bastin v. Fed. Nat'l Mtg. Ass'n*, 104 F. 3d 1392, 1396 (D.C. Cir. 1997)).

Mr. Trump purports to need jurisdictional discovery to explore the extent of the New York Defendants' direct contacts with D.C. and to prove a "conspiracy" that would purportedly allow him to impute to the New York Defendants certain D.C. conduct by the House Defendants.  Neither of these purported justifications holds any water.

### 1. The New York Defendants' Official Conduct Is Irrelevant Under D.C.'s Long-Arm Statute

In enumerating his "good faith basis" for needing jurisdictional discovery, Mr. Trump points to the fact that the Attorney General is a party to other cases in the District, that she attended Howard University School of Law, that the Commissioner "worked here" in 2011-12, and that they visit the District for "events, conferences, seminars, interviews, and the like."  Opp. Br. at 9.  These contacts, many of which occurred years ago (before the New York Defendants attained their current official positions), cannot possibly meet the specific jurisdictional standard because they bear no discernible relationship to Plaintiff's First Amendment claim (Opening Br. at 16, 19) and the "government contacts" doctrine renders many of them – including the Attorney General's litigation activity – irrelevant to the jurisdictional analysis (*id.* at 17).  *See Capel v. Capel*, 272 F. Supp. 3d 33, 42 (D.D.C. 2017) (denying jurisdictional discovery where the subject matter would be irrelevant under government contacts doctrine); *NBC-USA Hous., Inc. Twenty-Six v. Donovan*, 741 F. Supp. 2d 55, 60 (D.D.C. 2010) (same); *Savage v. Bioport, Inc.*, 460 F. Supp. 2d 55, 63 (D.D.C. 2006) (same).

Nor can Mr. Trump plausibly claim to need discovery in order to show a "persistent course of conduct" toward the District under D.C. Code § 13-423(a)(4) based on litigation in the federal courts and participation in conferences and other events.  The clear law in this District precludes a plaintiff from relying on any conduct undertaken by a defendant in her official capacity to meet the "persistent course of conduct" standard.  *Pollack v. Meese*, 737 F. Supp. 663, 666 (D.D.C. 1990) (cited in *Akers v. Watts*, 740 F. Supp. 2d 83, 92 (D.D.C. 2010)); *see, supra, at* 13.

The New York Defendants' status as state actors also renders jurisdictional discovery futile

because they do not fall within D.C.'s long-arm jurisdiction as a matter of law.  Opening Br. at Point I.C.; *see, supra*, at 8; *accord Kwok Sze v. Johnson*, 172 F. Supp. 3d 112, 123 (D.D.C. 2016) (dismissing New York official on this ground and denying jurisdictional discovery because "the Court cannot see what facts additional discovery could produce that would affect our jurisdictional analysis.").

Put simply, the Amended Complaint does not allege contacts that would support jurisdiction, and "to the extent Plaintiff's request seeks jurisdictional discovery of other, unalleged contacts between [the New York Defendants] and the District of Columbia, 'a request for jurisdictional discovery cannot be based on mere conjecture and speculation.'"  *NBC-USA Housing*, 741 F. Supp. 2d at 61 (quoting *FC Inv. Group*, 529 F.3d at 1093); *accord Capel*, 272 F. Supp. 3d at 42 ("This lack of specificity regarding what facts plaintiffs believe they will establish through jurisdictional discovery dooms their motion.").

### 2.  Mr. Trump Cannot Obtain Jurisdictional Discovery Based On A Conspiracy Theory He Has Not Alleged

Plaintiff's efforts to pin his need for jurisdictional discovery on the pursuit of a "conspiracy theory" (Opp. Br. at 10) fails because he has not alleged the elements of a conspiracy in his Amended Complaint.  *See LG Display Co. Ltd v. Obayashi Seikou Co., Ltd.*, 919 F. Supp. 2d 17, 27-28 (D.D.C. 2013) (rejecting conspiracy assertion where plaintiff "makes no mention of conspiracy in his complaint, and it is doubtful whether the facts alleged therein might support the inference that a conspiracy existed").  Mr. Trump has not alleged a cause of action for civil conspiracy, under 42 U.S.C. § 1985 or otherwise, nor has he alleged facts that would meet the standard for conspiracy jurisdiction under D.C. law.

"For conspiracy jurisdiction under the D.C. long-arm statute, the plaintiff must allege (1) the existence of a civil conspiracy, (2) the defendant's participation in the conspiracy, and (3) an overt act by a co-conspirator within the forum, subject to the long-arm statute, and in furtherance of the conspiracy."  *Day v. Corner Bank (Overseas) Ltd.*, 789 F. Supp. 2d 150, 159 n.10 (D.D.C. 2011) (quotation omitted); *accord LG Display Co.*, 919 F. Supp. 2d at 27-28 ("In order 'to establish jurisdiction under a

theory of civil conspiracy, the plaintiff must plead with particularity overt acts within the forum taken

in furtherance of the conspiracy.'") (quoting *World Wide Minerals v. Republic of Kazakhstan*, 296 F.3d

1154, 1168 (D.C. Cir. 2002)).   "Bald speculation or a conclusory statement that individuals are co-

conspirators is insufficient to establish personal jurisdiction under a conspiracy theory." *FC. Inv.*

*Group*, 529 F.3d at 1097; *see EIG Energy Fund XIV, L.P. v. Petroleo Brasileiro S.A.*, 246 F. Supp. 3d 52,

90 (D.D.C. 2017) ("Courts in this Circuit [] have applied the test for co-conspirator jurisdiction warily

in order to prevent a broad extension of long-arm jurisdiction.").

Bald speculation and conclusory statements are all Mr. Trump has to offer.   His Amended

Complaint contains only a single paragraph alleging any connection between the two sets of

defendants in this case.  Mr. Trump alleges, in conclusory fashion, that the Attorney General "is closely

coordinating with House Democrats in a joint effort to obtain and expose [Mr. Trump]'s financial

information." Am. Compl. at ¶ 39.   The only acts alleged are that the Attorney General and two

House committees have issued subpoenas focusing on potential financial improprieties by Mr. Trump

and allegations raised by Michael Cohen, Mr. Trump's former personal lawyer. *Id.*   Mr. Trump does

not allege any involvement by the Commissioner.

These allegations, even if credited, show at most that the Attorney General and members of

the House Intelligence and Financial Services Committees (not the House Defendants) have looked

into the same allegations of financial malfeasance, in accordance with their respective investigative

prerogatives.   This falls far short of "the requirement that the plaintiff plead with particularity the

conspiracy as well as the overt acts within the forum taken in furtherance of the conspiracy." *FC Inv.*

*Group*, 529 F.3d at 1098 (affirming dismissal and denial of jurisdictional discovery even where Plaintiffs

had alleged extensive meetings, correspondence, and transfers of money); *cf. Cockrum v. Donald J. Trump*

*for President, Inc.*, 319 F. Supp. 3d 158, 186 (D.D.C. 2018) (rejecting conspiracy jurisdiction argument

based on "amorphous allegations" that "have not met the exacting particularity requirement," and

denying jurisdictional discovery).   The Plaintiff's failure to plausibly plead the elements of a

hypothetical conspiracy defeats the Plaintiff's request for discovery.  *See EIG Energy*, 246 F. Supp. 3d

at 90-91 (granting motion to dismiss and denying jurisdictional discovery, noting that "[the]

particularity requirement is strictly enforced"); *see also Richards v. Duke Univ.*, 480 F. Supp. 2d 222, 229

(D.D.C. 2007) (quoting *Edmond v. U.S. Postal Serv. Gen. Counsel*, 949 F. 2d 415, 425 (D.C. Cir. 1991)).[5]

### 3.  Mr. Trump Has Failed To Make The Necessary Showing To Obtain Jurisdictional Discovery

Jurisdictional discovery is also inappropriate because Mr. Trump has not made any specific

representations about what evidence he would seek or how it would be reasonably likely to meet the

jurisdictional standard.  This was his burden – a plaintiff must "'make a detailed showing of what

discovery it wishes to conduct.'"  *Nuevos Destinos, LLC v. Peck*, No. 15 Civ. 1846, 2019 WL 78780, at

*14 (D.D.C. Jan. 2, 2019) (quoting *Atlantigas Corp. v. Nisource, Inc.*, 290 F. Supp. 2d 34, 53 (D.D.C.

2003)); *accord Bigelow v. Garrett*, 299 F. Supp. 3d 34, 47 (D.D.C. 2018).  Here, Plaintiff states only that

he wishes to conduct discovery "into [the New York Defendants'] contacts with D.C.," Opp. Br. at

10, and "on the nature, scope, and contours of this coordination between the Attorney General and

the House," *id.* at 11.  This offers no detail regarding what discovery he actually wants – what modes

of discovery he wishes to use, to whom he wishes to direct them, and what specific pieces of evidence

he wishes to obtain – falling far short of even the "vague and general list of the types of discovery

sought" that Judge Sullivan rejected in *Nuevos Destinos*.  "On this basis alone, Plaintiff's request for

jurisdictional discovery is insufficient."  *NBC-USA Housing*, 741 F. Supp. 2d at 61.

---

[5] *Edmond*, the primary case cited by Plaintiff in support of his "conspiracy theory," cuts against him. Although the *Edmond* court found jurisdictional discovery was warranted regarding allegations against three of the defendants based on "specific and nonspeculative allegations" of improper conduct, *id.* at 426, the court *affirmed* the denial of jurisdictional discovery of a fourth defendant because, like here, there were no "specific and nonspeculative allegations linking [him] to the conspiracy."  *Id.* at 426-27.

Furthermore, jurisdictional discovery, with its attendant delay, would be particularly inappropriate here because it would undermine the very basis for the New York Defendants' proposal that led the Court to schedule this threshold motion.  As discussed more fully below, when adopting the New York Defendants' proposal, the Court understood that consideration of this motion on an *expedited basis* was an integral part, and condition, of the proposal.  July 31, 2019 Transcript at 12:23-13:2 (The Court: "I would call it a condition or component of the New York proposal . . . [to have] New York's motion to dismiss for lack of personal jurisdiction or venue litigated on . . . [an] 'expedited' basis.").   Allowing jurisdictional discovery for purposes of a fishing expedition would undermine the assurance provided by the Court that this motion would be resolved on an expeditious basis.

### C.   The Court Should Summarily Reject Mr. Trump's Invitation To Hold This Motion In Abeyance

Apart from seeking delay based on purported futility and a baseless need for jurisdictional discovery, Mr. Trump seeks delay for the unabashed purpose of procedural gamesmanship.   Mr. Trump invites this Court to purposefully delay any decision on this motion without reason pending a request by Chairman Neal (Opp. Br. at 12), turning the New York Defendants' good faith proposal for the Court's *expedited* consideration of this threshold motion into a *de facto* capitulation by them to his request for emergency relief.  Plaintiff's invitation lacks good faith and should be flatly rejected.

After hearing argument on Plaintiff's emergency motion for temporary relief under the All Writs Act, the Court ordered the parties to meet and confer in an attempt to reach a compromise that would protect Mr. Trump's ability to be heard on the merits of his claims.  *See* July 29, 2019 Minute Order.  The New York Defendants stepped up to the plate and made a good faith proposal that both protected Mr. Trump's interests and provided the New York Defendants with the benefit of presenting a threshold motion raising personal jurisdiction and venue defenses *on an expedited basis*.  July 30, 2019 Joint Status Report (Dkt No. 22) at 4-6 (expressly stating that the Commissioner's willingness to voluntarily agree to defer acting on any request under the TRUST Act is premised on

the Court adopting the New York Defendants' proposal "to address the threshold personal jurisdiction and venue defenses now on an expedited schedule"). The Court agreed to this proposal and adopted an expedited briefing schedule. August 1, 2019 Order (Dkt No. 25); *see also* July 31, 2019 Transcript at 10:10-12 (The Court: ". . . I very much appreciate [New York] having made that proposal, which I do think in many ways forwards the three goals that I articulated on Monday.").

Mr. Trump then delayed that schedule once by invoking his right to file an amended complaint, which required the Court to adopt a revised schedule. August 14, 2019 Order (Dkt No. 29). Mr. Trump now urges the Court to delay deciding the New York Defendants' threshold motion for no reason, while insisting that the Commissioner be held to his good faith undertaking to defer acting on any request under the TRUST Act that was expressly premised on the expedited resolution of the motion. Plaintiff's suggestion to hold this motion in abeyance gives new meaning to the adage "no good deed goes unpunished." The Court should categorically reject Mr. Trump's invitation to undermine the New York Defendants' good faith proposal. The Commissioner agreed voluntarily to defer acting on any request under the TRUST Act pending a decision on this threshold motion and for one week thereafter with the express assurance from the Court that the motion would be resolved expeditiously. July 31, 2019 Transcript at 15:23-16:2 (confirming that the Court's order "would allow New York to argue to [the Court] that it should not be a defendant here, to do that on a reasonably expedited basis . . . ."). In fairness, that is how the Court should proceed.

## CONCLUSION

The Court should grant the New York Defendants' motion and issue an order: (i) dismissing Plaintiff's sole cause of action against them for lack of personal jurisdiction and/or improper venue; and (ii) granting such other and further relief as the Court deems appropriate.

Dated:   New York, New York
   September 13, 2019

             LETITIA JAMES
             Attorney General of the State of New York

             By: _____/s/ Andrew Amer___
                Andrew Amer
             Special Litigation Counsel
             28 Liberty Street, 17th Floor
             New York, New York 10005
             (212) 416-6127
             Andrew.amer@ag.ny.gov

             *Attorney for Defendants Letitia James, in her official*
             *capacity, and Michael R. Schmidt, in his official capacity*

**CERTIFICATE OF SERVICE**

I hereby certify that on September 13, 2019, I caused the foregoing document to be filed via

this Court's CM/ECF system, which I understand caused service on all counsel of record.


_/s/ Andrew Amer_____
Andrew Amer