```
 1              IN THE UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF COLUMBIA
 2     _____

 3     Donald J. Trump,              ) Civil Action
                                     ) No. 1:19-cv-02173-CJN
 4                   Plaintiff,      )
                                     )
 5     vs.                           )
                                     ) **Motion Hearing**
 6     Committee on Ways and Means,  )
       United States House of        )
 7     Representatives, et al.,      ) Washington, D.C.
                                     ) Date:  September 18, 2019
 8                   Defendants.     ) Time:  10:00 a.m.

 9     _____

10              Transcript of **Motion Hearing**
                        Held Before
11            The Honorable Carl J. Nichols
                United States District Judge
12     _____

                    A P P E A R A N C E S
13
       For the Plaintiff:      Patrick Strawbridge
14                             CONSOVOY MCCARTHY PLLC
                               Ten Post Office Square
15                             8th Floor South PMB #706
                               Boston, Massachusetts 02109
16
                               Cameron T. Norris
17                             CONSOVOY MCCARTHY PLLC
                               1600 Wilson Boulevard, Suite 700
18                             Arlington, Virginia 22209

19     For the Defendants U.S House of Representatives:
                               Douglas N. Letter
20                             Josephine T. Morse
                               Megan Barbero
21                             U.S. House of Representatives
                               Office of General Counsel
22                             219 Cannon House Office Building
                               Washington, D.C. 20515
23

24

25
```

1     For the Defendants Letitia James, in her official capacity, and
2     Michael R. Schmidt, in his official capacity:
                        Andrew Amer
                        Office of the Attorney General
3                         28 Liberty Street
                        New York, New York 10005
4 _____

5     Court Reporter:           Nancy J. Meyer, Official Court Reporter
                        Registered Merit Reporter
6                         Certified Realtime Reporter
                        United States Courthouse, Room 6509
7                         333 Constitution Avenue, Northwest
                        Washington, D.C. 20001
8 _____

9                   P R O C E E D I N G S

10         THE COURTROOM DEPUTY:  Civil Action 19-2173,

11 Donald J. Trump vs. Committee on Ways and Means, United States

12 House of Representatives, et al.

13         Counsel, please come forward and identify yourselves

14 for the record.

15         MR. STRAWBRIDGE:  Good morning, Your Honor.  Patrick

16 Strawbridge on behalf of President Trump, here with my

17 colleague, Mr. Norris.

18         THE COURT:  Good morning, Mr. Strawbridge.

19         MR. AMER:  Good morning, Your Honor.  Andrew Amer on

20 behalf of the New York Attorney General and the Commissioner

21 for the New York State Department of Taxation and Finance.

22         THE COURT:  Good morning, Mr. Amer.

23         MR. AMER:  Thank you.

24         MR. LETTER:  Hello, Your Honor.  Douglas Letter,

25 general counsel of the U.S. House of Representatives.  With me

1    are associate general counsel Megan Barbero and associate

2    general counsel Josephine Morse.

3                THE COURT:  Good morning.

4                MR. LETTER:  Thank you.

5                THE COURT:  So let's start with you, Mr. Amer.

6    Obviously we're here on your motion.  I have one question,

7    which I suspect you anticipated, which is a -- just make sure I

8    understand the current state of play question.  That's just

9    whether the Commissioner has received a request from Chairman

10   Neal or anyone else, for that matter, for Mr. Trump's tax

11   returns.

12               MR. AMER:  He has not, Your Honor.

13               THE COURT:  Okay.  Thank you.

14               So let's proceed on your motion.  And why don't you

15   start, and you can imagine I have some questions.

16               MR. AMER:  Thank you, Your Honor.

17               So the fundamental question on this motion is whether

18   a D.C. Federal Court is the appropriate forum to hear a claim

19   brought against New York officials sued in their official

20   capacity raising a facial constitutional challenge to a duly

21   enacted New York statute.  We say the answer is no; so that

22   count -- Count II of the complaint, the amended complaint,

23   against the New York defendants should be severed and

24   dismissed.  And we think, actually, Your Honor, the most

25   compelling argument in favor of granting our motion to dismiss

1    is simply a survey of the legal landscape.

2          Let me just quickly catalog the cases that are in our

3    favor.  The D.C. Circuit Court's decision in *U.S. v. Ferrara*.

4    That involved a New Mexico official sued in the District of

5    Columbia.  The Circuit Court said no personal jurisdiction.

6    The turn of the *Abbott* case in this Court involving a case

7    against the Texas Attorney General and other Texas officials

8    sued in this Court.  This Court said no to the exercise of

9    personal jurisdiction.  *Lemon v. Kramer* involving Maryland

10   officials, including the Maryland Attorney General, sued in

11   this District.  This Court said no personal jurisdiction.

12   *Moore v. Motz,* which is a case involving Maryland officials

13   sued in D.C.  This Court, again, said no based on personal

14   jurisdiction.

15         The Fifth Circuit case in *Stroman Realty* I would

16   commend the Court to read.  That case involved Arizona -- an

17   Arizona official sued in Texas for a constitutional violation,

18   and the Fifth Circuit said no in terms of personal

19   jurisdiction; and, finally, the Supreme Court's decision in the

20   *Leroy v. Great Western* case.  That case, in fact, on its facts

21   was probably the most similar to this case.  That case involved

22   Idaho officials who were responsible for enforcing an Idaho

23   statute being sued in Texas, and the Court -- that was on venue

24   grounds.  The Court said there's no venue here because the one

25   obvious locus for that case is in Idaho.  So all of those cases

1   answer the question I've posed in the negative.

2          THE COURT:  Maybe.  Maybe.  Yes.

3          MR. AMER:  And the -- go ahead, Your Honor.

4          THE COURT:  So I want to -- I want to break down your

5   argument a little bit, if I could, and I just want to

6   understand in some respects your positions.  Let's assume --

7   and your brief -- your briefs, I think, spent a lot of time

8   focusing on the nature of the challenges right now as you

9   portrayed as being facial.  Assuming this case had been brought

10  in New York Federal Court -- or at least the claims against

11  your clients -- who, in your view, would be a proper defendant

12  for a facial challenge to the TRUST Act?

13         MR. AMER:  There -- there's one person under standard

14  procedure who is the appropriate person for that action.  It is

15  the Commissioner.  He is the individual charged with the

16  responsibility for fulfilling the requirements under that

17  statute.  And what we're saying here is that the plaintiff

18  should have to do what every other litigant does when they want

19  to mount a facial challenge is you sue the elected official --

20  or appointed official who is responsible for enforcing the

21  statute in the state -- that is, the home state -- of that

22  official because --

23         THE COURT:  But is the Commissioner the elected

24  official charged with enforcing these provisions?  I thought

25  that the Attorney General at least had some enforcement role

1    with respect to the tax laws here.

2              MR. AMER:  He is the appointed official.

3              THE COURT:  Sorry.  The appointed official?

4              MR. AMER:  Yes.  And the Attorney General does not

5    have any enforcement role under this statute.  None whatsoever.

6    The request comes in to the Commissioner.  The Commissioner and

7    his staff review the request, gather the material, make the

8    necessary redactions, and then deliver the material.

9              What the plaintiff cites to in terms of laws that the

10   Attorney General has responsibility for have nothing to do with

11   the TRUST Act.  They're more general laws about enforcing the

12   obligations and duty in a general sense of elected officials

13   and appointed officials.  So, for example, any appointed

14   official who acts in derogation of his or her duty would

15   perhaps be subject to a proceeding brought by the Attorney

16   General to have that person removed from office, but that is

17   enforcement of a different statute.  That's enforcement of the

18   statute that requires appointed officials to perform their

19   official obligations.  It's not enforcement of the TRUST Act

20   per se.  So we would say here that only the Commissioner would

21   be the proper party.

22             THE COURT:  Okay.  Now, let's talk about whether you

23   were talking about the Commissioner or the Attorney General,

24   but your actual arguments about personal jurisdiction and -- is

25   your argument -- and it's a little unclear to me from the

1    papers -- limited to or based on, I guess, in the first

2    instance, the D.C. long-arm statute?  Or do you have a separate

3    argument it would violate the due process clause of the federal

4    constitution to hale your clients here to answer this

5    complaint?

6              MR. AMER:  We -- we make both arguments.  And

7    certainly the argument under the long-arm statute is the

8    easiest and perhaps the one that Courts should address first.

9              THE COURT:  You concede in your papers that at least

10   Section (a)(1) of the long-arm statute has been interpreted to

11   be coextensive with the Constitution.  So the questions merge

12   at least for purposes of (a)(1); correct?

13             MR. AMER:  That's correct.

14             THE COURT:  And the corollary to that, I believe --

15   but I just want to make sure I understand your argument, or at

16   least the -- the -- what's implicit is if the claims against

17   either the Attorney General or the Commissioner satisfy one or

18   more of the long-arm provisions, then there is, in fact,

19   personal jurisdiction over one or the other of the defendants?

20   You concede that; correct?

21             MR. AMER:  I don't if it's premised on (a)(3) or

22   (a)(4), because we believe under the *Stroman* rationale there

23   are other considerations of sovereign immunity and federalism

24   that would preclude the Court from exercising jurisdiction over

25   an elected official from another state in a facial

1    constitutional challenge.

2            THE COURT:  So the argument would be even if the

3    claims satisfy (a)(3) or (a)(4), it would be unconstitutional

4    for what reason to exercise jurisdiction over the clients, your

5    clients?

6            MR. AMER:  So under -- under principles of

7    federalism, as well as sovereign -- state sovereignty, it would

8    be improper for this Court sitting in D.C. to exercise

9    jurisdiction over elected officials sued only in their official

10   capacity, and that also involves the question that the *Ferrara*

11   court raised, but did not resolve, which is an action against a

12   state official in his or her official capacity under *Will v.*

13   *Michigan* is no different from an action against the State of

14   New York.

15           And we would say that this Court would not have

16   jurisdiction over the State of New York, both because, as

17   *Ferrara* noted, the definition of persons in the long-arm

18   statute doesn't extend to a state, but even if it did, it

19   wouldn't pass constitutional muster under the due process

20   clause.  It's simply inappropriate for a D.C. Federal Court to

21   be haling into its court the State of New York.  That would be

22   improper.

23           I did want to mention just before I go through the

24   long-arm provisions that in contrast to all of the cases that I

25   ticked off, I didn't see a single case that the plaintiff cited

1    to that involved upholding a decision by a federal court

2    sitting in one state passing on the constitutionality of

3    another state's statute through the device of a 1983 action

4    brought against that state's officials sued in their official

5    capacity.  I didn't see any case in their briefs like that, and

6    I would mention, not only didn't I see a facial challenge, but

7    I didn't see an as-applied challenge either.  And I would -- I

8    would suggest to Your Honor that here we have probably the

9    strongest case for granting a motion to dismiss, because it is

10   a facial challenge.

11            THE COURT:  So can we -- let's talk about that.  I

12   understand the distinction you're drawing between facial and

13   as-applied, but Mr. Trump certainly argues he would be injured

14   in the event that his private financial or tax information is

15   disclosed by New York to the House.  I get your point that that

16   may not be alleged right now, but at least for purposes of the

17   briefing, that's the injury that Mr. Trump claims he would

18   suffer.

19            And my question for you is for purposes of (a)(3) and

20   (a)(4) at least of the long-arm statute, do you agree that that

21   injury -- and I get your -- you have argued that that may not

22   be an injury, but, again, assuming it's an injury for the

23   purposes of the long-arm statute, is that injury one that

24   occurs in this District?

25            MR. AMER:  We say, first of all, that the problem

1   with focusing on that injury is that it has no discernible

2   relationship to the First Amendment claim that he's asserting,

3   and for long-arm jurisdiction, the fundamental requirement is

4   that the conduct that serves as the hook for jurisdiction has

5   to bear a discernible relationship to the injury, unlike when

6   you're asserting general jurisdiction.

7           THE COURT:  And I understand that point, and that's

8   what I was trying to assume away in my question, which is to

9   say I get your argument about facial and the claim that's

10  asserted here, but let's assume hypothetically we're in a world

11  where a request has been posed to your clients, which could

12  have happened last week -- I know it didn't -- and there was an

13  attempt to respond by producing information to Congress.

14          Mr. Trump says the injury that he would suffer in

15  those circumstances is the production of information to the

16  House, and my question is just do you concede -- and I --

17  granting all of the arguments you have about the hypothetical,

18  do you concede that that would be an injury that would be

19  suffered in this District?

20          MR. AMER:  No, because that's not injury.  The injury

21  occurs when the material is -- when something happens to that

22  material once it's in the committee's hands.  The mere act of

23  delivering state tax return information to another government

24  official is not injury.  In fact, New York has permitted that

25  very information sharing to go on for the better part of 20

1        years.

2                    THE COURT:  And is that an argument -- your argument

3        that that is not an injury, is that an argument that that's not

4        an injury under provisions (a)(3) and (a)(4) of the long-arm

5        statute, or is that an Article III injury-in-fact argument

6        you're making or both?

7                    MR. AMER:  That is a long-arm statute

8        no-tortious-injury argument.  I'm not addressing Article III

9        standing on this motion.

10                   THE COURT:  So -- and, again, I was trying to assume

11       that -- that answer away, but --

12                   MR. AMER:  You're just --

13                   THE COURT:  -- if Mr. Trump is right that he suffers

14       an injury under the long-arm statute or would suffer an injury

15       in the event that New York produces information to the House --

16       and I understand you don't agree with that, but let's assume

17       that he's right about that -- would that injury be suffered in

18       this District for purposes of (a)(3) and (a)(4) of the long-arm

19       statute?

20                   MR. AMER:  Making all of those assumptions --

21                   THE COURT:  Yes.

22                   MR. AMER:  -- he's clearly receiving the information

23       in D.C., and so we're not saying that whatever it is he suffers

24       doesn't happen in D.C.  We're simply saying for many reasons it

25       doesn't satisfy either (a)(3) or (a)(4).  There are a host of

1        them which I'm happy to go through.

2                    THE COURT:  Yes.  Sure.

3                    MR. AMER:  I did want to start out, though, with

4        the -- the initial point that there's no discernible

5        relationship between whatever he's claiming is this injury and

6        his First Amendment claim.  The -- the -- the claim is a facial

7        challenge, and the only conduct that gives rise to that claim

8        is the enactment of the TRUST Act, which Mr. Trump alleged was

9        motivated by some discriminatory or retaliatory animus on the

10       part of the New York Legislature in New York.  So there's

11       nothing about his claim that bears any relationship whatsoever

12       to conduct by either the New York Attorney General or the

13       New York Commissioner.  There's no allegation in the amended

14       complaint that either of the New York defendants had any

15       involvement with the enactment of the statute, and none of the

16       activities, which I'm going to go through in some detail, that

17       plaintiff recites as the hook for jurisdiction over New York

18       defendants, whether it's conduct by the Commissioner in the

19       future, responding to a request, or it's the Attorney General's

20       conduct attending conferences and events here or participating

21       as a litigant in D.C. litigation in her official capacity, none

22       of that has anything to do with the enactment of the TRUST Act.

23                   And so absent the critical nexus between plaintiff's

24       First Amendment claim, which is the only claim he's brought

25       against the New York defendants, and any past or future conduct

1     by the New York defendants, there's simply no basis for

2     invoking long-arm jurisdiction, and, quite frankly, that should

3     be the end of the analysis.

4             But in addition to the lack of this critical nexus, I

5     think if we look at the conduct that they're relying on, it's

6     easy to see how it simply doesn't satisfy the various -- or the

7     three provisions of the long-arm statute that Mr. Trump relies

8     on, and I think it's easiest to discuss the conduct just for

9     each defendant separately.

10            So for the Commissioner, who I'd like to address

11    first, Mr. Trump points to the fact that the Commissioner lived

12    and worked in D.C. many years ago before he assumed his

13    official position.  Quite frankly, it's unclear what provision

14    of the long-arm statute the plaintiff thinks that is relevant

15    to, but surely it just has absolutely no relationship to the

16    constitutional challenge here.  There's also some mention of

17    his work as a policy advisor for Secretary Clinton, and I can't

18    imagine what that has to do with anything, particularly because

19    Secretary Clinton's campaign headquarters were in Brooklyn,

20    New York, not in the District of Columbia.

21            Plaintiff next points to activities the Commissioner

22    hypothetically will undertake in the future, assuming that a

23    request is made under the Act.  He will purportedly review the

24    request.  He'll work with his staff to gather the material.

25    He'll redact the material.  He'll deliver it to Chairman Neal.

1    Conduct, quite honestly, that will never happen if there's no

2    request.  And even if there is a request, none of that conduct

3    will necessarily involve the Commissioner stepping foot into

4    D.C.

5         THE COURT:  Right.  You just put an adverb in there,

6    "necessarily."  And I just want to pause you for a second,

7    which is, as you know from prior hearings, I view this as a

8    complicated procedural question because we have a statute

9    passed by New York that would obviously allow it to produce

10   certain records if requested by the chairman, but we're

11   assessing a whole bunch of issues relating to the statute or we

12   might be assessing -- or a request in a very hypothetical

13   prerequest context, which poses a whole host of issues relating

14   to ripeness and mootness or potential mootness, things that

15   animated the last hearings, for me at least, to try to figure

16   out a way to ensure that the case didn't become moot as soon as

17   it became ripe.  So I -- I completely understand your focus on

18   the present state of facts.

19        But I also want to be thinking about at least a

20   hypothetical set of future facts in the event that events take

21   place that are the ones that led Mr. Trump to file this

22   lawsuit.  And so I'm going to pose another hypothetical, and I

23   get that it is not the present set of facts, but I'm -- I am

24   thinking about what happens in the future; and, that is, assume

25   a request is made by Chairman Neal to the Commissioner in

1    writing and it satisfies the requirements of the TRUST Act and

2    the Commissioner or someone acting at his direction traveled to

3    D.C. to produce the records to the House, wouldn't that

4    production, the traveling here, stepping foot in D.C. and

5    producing the records to the House be an act or omission

6    occurring in this District sufficient for the purpose of (a)(3)

7    of the long-arm statute?

8              MR. AMER:  It would not, Your Honor, and there are a

9    number of reasons why.  There's the -- there's the government

10   context doctrine that would cover that type of conduct, and it

11   would exclude consideration of that type of activity from a

12   long-arm jurisdiction analysis.  There's -- the fact that it's

13   not commercial activity, that would satisfy (a)(1).

14             THE COURT:  I was focused on (a)(3).

15             MR. AMER:  There's that the fact that it's conduct

16   undertaken, you know, outside the District, that's nothing more

17   than a federal official performing his duties as an appointed

18   official under a duly enacted statute.  This is so different

19   from the *Calder v. Jones* where the Court adopted an

20   effects-type analysis, because, first of all, it's not a tort

21   case here.  It's a facial and -- and in your hypothetical an

22   as-applied challenge.

23             THE COURT:  Correct.

24             MR. AMER:  *Calder* involved a tort claim.  It was a

25   libel claim, and the conduct had obvious consequences when it

1    occurred, which was prior to when the case was brought.  And,

2    in fact, the *Stroman* Fifth Circuit case and even the

3    D.C. Circuit case in *Ferrara* do a good job of distinguishing

4    *Calder.*

5            THE COURT:  Well -- but the whole point of the TRUST

6    Act, with respect, was to permit New York to produce

7    information into this District, and I take it that you're --

8    one of the arguments is that that production could occur

9    through the Commissioner acting only in New York.

10           MR. AMER:  Correct.

11           THE COURT:  And my hypothetical is designed to say,

12   well, aren't there some circumstances where the Commissioner or

13   someone acting on the Commissioner's behalf is acting in D.C.,

14   traveling to D.C., turning the records over to Congress in D.C.

15   But I don't think it's really disputable that the only point of

16   the TRUST Act is to enable the production to this District to

17   the House of information if requested.

18           So New York well knew and, frankly, intended that if

19   there was a request that the information would come here, and

20   it doesn't seem to me that that -- that there would be a

21   serious constitutional problem holding that so long as the

22   long-arm statute is satisfied, that in the circumstances I've

23   described requiring the Commissioner to answer about the

24   lawfulness of such conduct would be problematic.

25           MR. AMER:  Again, Your Honor, this goes back to our

1   point, which I know we assumed away before; that just

2   delivering material to an official based in D.C. is not the

3   injury that the plaintiff is really complaining about, because

4   for all we know, Chairman Neal could review the material,

5   determine that there's nothing there that requires any further

6   action, and can do nothing with the material.

7          So -- so what the statute provides for is the same

8   tax sharing information objective that that statute prior to

9   the amendment, you know, allowed for 20 years, including, you

10  know, Mr. Trump's tax returns because he filed in New York

11  before he was president.  So the amendment doesn't change the

12  nature of what New York was seeking to do in terms of tax

13  sharing.

14         I would also point out that, you know, you can't

15  today base personal jurisdiction or venue on highly speculative

16  conduct that may or may not happen in the future.  And I don't

17  think this is a complicated issue in terms of seeing a way for

18  Mr. Trump to protect his interests.  Mr. Trump has come to this

19  Court asking for extraordinary injunctive relief to protect

20  him, as Your Honor put it, from having his claim become ripe

21  and moot in the same instance.  And we don't claim that his

22  facial challenge is not ripe.  It is ripe, but it's ripe to be

23  determined in a New York court, and the same emergency motion

24  that he filed with this Court can be filed before a New York

25  judge.  The difference is that that New York judge will have

1    personal jurisdiction over the one defendant who needs to be a

2    party to that case, which is the Commissioner.

3              THE COURT:  So, as you know, one of the things

4    Mr. Trump argues is even if that were to happen, even if the --

5    I were to hold there is no jurisdiction over the New York

6    defendants, then he would still be permitted to litigate Count

7    II in this Court against the House defendants.  I didn't see

8    you disagree with that proposition in your brief.  You said it

9    would be inappropriate to enter All Writs Act relief in that

10   circumstance against your clients -- and I get that -- no

11   longer defendants -- but do you agree or not that Mr. Trump

12   could litigate the constitutionality of the TRUST Act without

13   your clients here as defendants?

14             MR. AMER:  He absolutely cannot do that.

15             THE COURT:  Why not?

16             MR. AMER:  Because the only proper procedural way to

17   challenge a state statute is to sue the official charged with

18   responsibility for that statute.

19             THE COURT:  Well, I don't think that's right.  I

20   mean, there are cases in which private parties litigate, among

21   other things, the constitutionality of the federal statute that

22   grants someone authority to do something and states -- or the

23   federal government sometimes intervenes in those disputes.

24   There are rules and statutes that require notice to the

25   relevant government entity whose action is challenged as

1      constitutional.

2             Often the government -- relevant government entity

3      will intervene, but I don't think -- but at least I'm not aware

4      of -- and if you have a -- a case that stands clearly for the

5      proposition that the constitutionality of a state statute can

6      never be passed upon absent a direct claim against the relevant

7      state official, you know, I'd love to hear it.  I'm just not

8      aware of such a case.

9             MR. AMER:  We are talking now about a facial

10     challenge, not an as-applied challenge.  I think the examples

11     you were citing are as-applied where -- where two private

12     individuals are in litigation somewhere and there's an -- an --

13            THE COURT:  Sure, let me just -- let me give you my

14     hypothetical just a little bit clearer.  Hypothetically, I

15     dismiss the New York defendants for lack of personal

16     jurisdiction.  The House has not moved to dismiss Counts I or

17     II.  Those counts are still around, and Chairman Neal poses a

18     specific request to the Commissioner of New York.  So now we're

19     talking about an as-applied challenge.

20            In that context, is Mr. Trump right that I could

21     determine not just whether the committee -- or Chairman Neal

22     has the authority to make the request but whether the TRUST

23     Act, at least in the particular context of that request, is

24     constitutional?

25            MR. AMER:  Well, you certainly couldn't enjoin the

1    New York defendants if they weren't present before you.  If in

2    that hypothetical Mr. Letter were to raise on behalf of his

3    clients -- or I should say Mr. Trump would raise a

4    constitutional challenge to that statute, that's obviously a

5    case that is not before the Court now.  I would have to

6    consider whether that would be one of those instances where,

7    for example, notice would have to be given to the New York

8    Attorney General and then she could intervene to assess that

9    argument.

10          But, honestly, because that issue hasn't been

11   presented here, I can't give you more on that.  If you would

12   like me to address it in a letter to the Court with any

13   additional authority on that case, I could try and do that,

14   but, again, that's not this indication.

15          THE COURT:  Sure.  This District disfavors letters,

16   but if you find something either on that question or something

17   else we discuss this morning that you want to bring to my

18   attention through a notice of supplemental authorities, of

19   course I'd consider it.

20          MR. AMER:  I think here the essence of the challenge

21   is not and cannot be an as-applied challenge because, as

22   Mr. Trump rightly points out, this statute, like most tax

23   sharing information statutes, doesn't provide the target of the

24   request with notice.  So there really isn't an opportunity for

25   this to be litigated in the context of an as-applied challenge,

1    because with no notice, the request will be made and responded

2    to before Mr. Trump is aware.  And so that's why this case has

3    to be brought as a facial challenge, and, quite frankly, it has

4    to be brought in New York because the only proper entity to

5    bring that facial challenge against is the Commissioner.

6           And -- and we don't think this Court can use it's All

7    Writs power to enjoin parties that are not present here,

8    because, number one, we don't see that the All Writs Act is

9    being utilized for purposes of trying to protect a preexisting

10   order of this Court, because there's been no -- no order of

11   this Court.  We don't see that the legal rights being sought to

12   be vindicated here, which is some First Amendment right based

13   on motivations of legislators, is -- is, you know, sufficiently

14   clear under the law to allow the All Writs Act to be invoked.

15   And, finally, you cannot invoke the All Writs Act when there is

16   another available remedy to you, and here there is.

17          There is a facial challenge to be brought in New York

18   against the Commissioner sued in his official capacity, which

19   is the way every other litigant brings that type of claim, and

20   for Mr. Trump to simply say that it is his personal preference

21   not to pursue that course doesn't mean that the remedy is not

22   available.  It simply means he chooses not to avail himself of

23   it, and that's not good enough for the All Writs Act.

24          THE COURT:  So I interrupted you while you were

25   talking about the various acts that Mr. Trump relies on.  You

1    started with the Commissioner.  Do you want to talk about the

2    Attorney General a little bit?

3              MR. AMER:  Sure.  So there are the -- there's -- with

4    respect to the Commissioner, just to finish that up --

5              THE COURT:  Sure.

6              MR. AMER:  -- there are the acts that he will take in

7    the future if there's some request that is made.  As we said,

8    we don't believe that a plaintiff can rely on alleged future

9    conduct to satisfy the long-arm statute.  It has to be conduct

10   that has already occurred.  We think the *Acorda* case that

11   plaintiff cites to, which is that amended new drug application

12   case --

13             THE COURT:  Yeah.

14             MR. AMER:  -- is easily distinguishable.  There the

15   Court said that the very act which had already occurred of

16   submitting those new drug applications committed the drug

17   manufacturer to market the drug in Delaware, which was the

18   basis -- the whole nexus for the patent infringement claim.  So

19   there was already conduct that predetermined the defendant's

20   presence in the District.  And here the mere passage of the

21   TRUST Act does not commissioner -- does not commit the

22   Commissioner to do anything in D.C., and he certainly can't act

23   on a request that he hasn't received yet.

24             And as we've already discussed, we don't think the

25   *Calder* case is applicable here.  The effects approach, as far

1     as I'm aware, has never been applied outside the context of a

2     tort action, certainly not in the 1983 constitutional case.

3              None of this conduct that the Commissioner would take

4     is commercial activity that would satisfy (a)(1).  There's a

5     host of cases from this District that catalog what commercial

6     activity looks like, and it's what you think it would look

7     like.  It's negotiating contracts, performing contracts,

8     holding board meetings, operating an office.  None of that

9     bears any relationship to conduct that would be official

10    conduct enforcing the dictates of the lawfully enacted statute.

11             I mentioned briefly before the government's context

12    doctrine, we think that would preclude relying on any of the

13    Commissioner's conduct here.  We think --

14             THE COURT:  Has any Court held that -- I think the

15    answer is no -- but passing a state statute for the purpose of

16    permitting information to be produced to Congress and then

17    producing that information is a government contact for purposes

18    of D.C.'s long-arm statute?

19             MR. AMER:  I'm not aware of any Court addressing that

20    specific fact pattern one way or the other, but I would say I

21    don't know why it would focus on the enactment of the statute.

22    I think what you would focus on is the communication between

23    the official charged with enforcing the statute and the

24    government officials situated in D.C., and I think what I would

25    say on that point is that, you know, one could imagine that the

1    Commissioner would need to pick up the phone and talk to

2    Chairman Neal to -- if there were questions about the request,

3    perhaps to discuss the need to make some redactions, perhaps

4    the need to communicate staff to staff about logistics of

5    delivering the material, but it seems to me that none of that

6    would be appropriate under the government context.

7              THE COURT:  To the extent government context doctrine

8    has been limited or interpreted to be -- to have a First

9    Amendment component, is the production of information in

10   response to a request activity that has any First Amendment

11   component to it?

12             MR. AMER:  I think the First Amendment considerations

13   do come into play because I think, essentially, what you're

14   posing is a Hobson's choice to the Commissioner in the absence

15   of the government context doctrine.  You're saying to the

16   Commissioner, You either fulfill your duties as you deem

17   necessary under the statute by contacting whoever you need to

18   contact on the committee in Chairman Neal's office or you

19   subject yourself to jurisdiction in D.C.  And I think that's

20   the very type of Hobson's choice that First Amendment

21   considerations would come into play on.  And so I think for

22   that reason, the government context doctrine would apply here.

23             This is not a situation where a principal has

24   retained an agent to act on his behalf before a federal office

25   here in D.C. and then has some dispute with his agent and

1    claims that that's not appropriate.

2              I think if Your Honor has no more questions about the

3    Commissioner's conduct, I would discuss the Attorney General's

4    conduct.

5              THE COURT:  Sure.

6              MR. AMER:  There's the allegation that the Attorney

7    General went to law school in D.C., which was obviously many

8    years ago before she was elected the Attorney General of

9    New York.  There are allegations that she attends conferences

10   and seminars and events and interviews in D.C. and that she is

11   a litigant in her official capacity in a number of cases here

12   in D.C.

13             I think it's patently obvious that none of that

14   activity bears any discernible relationship to plaintiff's

15   First Amendment claim.  Instead, I think it is the case that

16   plaintiff is trying to make a case under the persistent course

17   of conduct plus factor in (a)(4), and that's problematic for a

18   number of reasons.  First of all, there's no predicate conduct

19   of the Attorney General outside D.C. that's causing tortious

20   injury within D.C. that you have to have before you even look

21   to plus factors.  There's nothing in this amended complaint

22   that connects the Attorney General to the provision of state

23   tax information to the committee.  That's all put on the

24   Commissioner's shoulders.

25             So it seems to me that what they're trying to do here

1    is mix and match the defendants so that you have conduct

2    outside D.C. with tortious injury in D.C. at the hands of the

3    Commissioner coupled with persistent course of conduct by the

4    Attorney General, and you can't do that.  It's got to be the

5    same defendant that is conducting activities that satisfy both

6    elements of (a)(4).  So that's the first problem.

7          The second problem is that official activities do not

8    constitute persistent course of conduct.  That's the holding of

9    this Court in the *Pollack v. Meese* case, a case which is cited

10   many times in later decisions for that exact principle.  If

11   it's individual conduct, yes; if it's official conduct, no.

12   And there's nothing about any of the activities of the Attorney

13   General, particularly her appearance in -- I think it's nine

14   lawsuits that they cite to, that is anything other than

15   official conduct.

16         THE COURT:  What if -- what if -- I'm trying to keep

17   this as general as possible, because I understand your point

18   about mixing and matching defendants' conduct.

19         What if, hypothetically, again, someone acting on

20   behalf of the House of Representatives on the one hand and

21   someone acting on behalf of New York agreed, reached an

22   agreement, that one way to get Mr. Trump's New York state tax

23   return in the House of Representatives was for New York to pass

24   the TRUST Act and for the House to then request records under

25   it?  Wouldn't that allegation be close to a conspiracy

1    allegation sufficient to satisfy (a)(3)?

2         MR. AMER:  It would not, Your Honor.  That simply

3    goes to the motivation for enacting legislation.  That has --

4    that doesn't support any type of claim, let alone a First

5    Amendment claim, and it certainly hasn't been alleged here.

6    There's no conspiracy claim in this amended complaint

7    whatsoever.

8         And I would also point out that the allegations of

9    conduct by the Attorney General that are -- that purport to

10   justify some sort of conspiracy jurisdiction, as far as I read

11   them, relate to her and two other House committees, not the

12   House Ways and Means Committee, which is the only defendant in

13   this case.  And I think under any charitable reading of that

14   allegation, it's not conspiracy.  It's two or three entities

15   that have investigatorial functions pursuing information --

16   pursuing the same information that was made public during

17   certain hearings.

18        So its parallel track investigations has nothing --

19   has nothing to do with the House Ways and Means Committee, has

20   nothing to do with the TRUST Act, and it -- and it has nothing

21   to do with any sort of coordinated effort, other than it's just

22   parallel -- like I say, parallel investigations based off the

23   same information.

24        THE COURT:  Right, right.  That's what you say about

25   the complaint, but my hypothetical was, I think, more specific,

1    which is assume, again, an actual express agreement as

2    between -- I'll put it this way -- New York and the House for

3    New York to pass a statute that's called the TRUST Act,

4    ultimately, for the House -- one of the relevant committees --

5    one of the two relevant committees, I guess, including this

6    one -- to ask for the information, and so you have an

7    agreement -- which is obviously required for conspiracy

8    purposes.  And at least Mr. Trump argues that the acts in D.C.

9    of the relevant House players -- and I know I'm keeping it

10   general, but let's assume that includes the receipt of

11   information and the later public dissemination of that

12   information, wouldn't that be acts imputable to the

13   co-conspirators, again, assuming there's an express agreement

14   to have the TRUST Act passed for the very purpose of allowing a

15   request to be made by the House?

16           MR. AMER:  There's no such thing as conspiracy to

17   enact legislation, Your Honor.  I mean, you know, people

18   discuss and coordinate with respect to passing legislation all

19   the time.  Nonprofits, you know, suggest draft language.  Not

20   only is there no such thing as a conspiracy to enact

21   legislation, but, quite frankly, it's covered by the

22   deliberative process privilege.

23           You can't even get information relating to, for

24   example, executive branch discussions with the legislative

25   branch over the enactment of a statute.  A statute's passed,

1     and a party who claims they are harmed by the statute can bring

2     a challenge to that statute either on its face or as-applied,

3     but to argue that because individuals discussed passing that

4     statute and have ill motives doesn't make a conspiracy.  It

5     just doesn't.

6         I'm not aware of any case that holds that you can

7     challenge a statute because you contend that it was prompted by

8     ill motives and, further, you can bring in for jurisdictional

9     purposes people who never entered the jurisdiction on some kind

10    of conspiracy theory.  It just -- that just makes no sense.

11        Finally, for all these reasons, we would just in

12    terms of conduct mention that we don't think there's been a

13    good faith basis here for any jurisdictional discovery.

14    There's nothing that they have articulated with the required

15    specificity to meet the standard for granting jurisdictional

16    discovery.  There's no conduct of the AG that can constitute

17    persistent course of conduct because it's all, as I say, her

18    official conduct.  And so this effort to try to derail this

19    motion for jurisdictional discovery should be rejected.  It is

20    what the case has referred to as the proverbial fishing

21    expedition.

22        I did want to mention a couple of principles that

23    apply here that are separate and apart from the standard

24    jurisdictional long-arm analysis.  I alluded to them.  There's

25    the *Will v. Michigan*, holding that a suit against elected

1    officials in their official capacity is a suit against the

2    state itself, and that, again -- although it hasn't been

3    resolved by the D.C. Circuit Court -- was certainly recognized

4    as a potential issue, and we don't think the *Ex Parte Young*

5    doctrine would apply here.  This is a simple case of suing two

6    New York state officials in their official capacity, and it's

7    no different from haling the State of New York into this Court.

8    And the long-arm -- and then it's just a question of applying

9    the definitions of persons under the long-arm statute.  And on

10   that question, the *Ferrara* court was definitive.  They -- that

11   Court expressly held that the term "person" as used in the

12   long-arm statute does not include a sovereign state.  So that's

13   the end of the analysis.  There's really no room for this Court

14   to -- to make an exception to that definition.

15             THE COURT:  Well, I think it -- it requires one to

16   grapple with the question of if *Ex Parte Young* says that suits

17   like this are not suits against the state for purpose of the

18   Eleventh Amendment -- because if they were, then they would --

19   could not be brought.  So the suit is not a suit against the

20   state for purposes of the Eleventh Amendment, but it is a suit

21   against the state for purposes of the long-arm statute, there's

22   clearly a disconnect between those two things, and one could

23   imagine concluding that if it's not a suit against the state

24   for purpose of the Eleventh Amendment, it is also not a suit

25   against the state for purposes of a long-arm statute.

1          MR. AMER:  But, Your Honor, that's not what

2     *Ex Parte Young* says.  It says it's not a suit against the state

3     for the limited purpose of seeking prospective injunctive

4     relief, and the rationale of that case -- so it does bar suing

5     the state, qua state, and it bars state officials from monetary

6     damages --

7          THE COURT:  Right --

8          MR. AMER:  -- when they're sued in their official

9     capacity.

10          THE COURT:  And this is a case for declaratory

11     injunctive relief.

12          MR. AMER:  I understand.  The rationale of *Ex Parte*

13     *Young* is you are suing an elected official with respect to

14     conduct that violates the Constitution and, therefore, they

15     lose their immunity protection.

16          Here you're suing an elected official, the

17     Commissioner, not for violating a -- conducting -- conduct that

18     is in violation of a law, but -- but conduct that is pursuant

19     to a duly enacted statute.

20          THE COURT:  No, no, no.  I mean, the claim is that

21     the actions taken by the Commissioner would be

22     unconstitutional.

23          MR. AMER:  That's not the claim here.  The claim

24     here --

25          THE COURT:  That is what the claim would be in the

1    event that the Commissioner decides to produce records to the

2    House.

3             MR. AMER:  Again, the only claim asserted here is a

4    facial First Amendment challenge.  So it has nothing to do with

5    the Commissioner's conduct at all.

6             THE COURT:  Well, but even --

7             MR. AMER:  It has to do with that -- sorry.

8             THE COURT:  But even the claim as it's asserted here

9    is that the Commissioner is the person that is, as you conceded

10   earlier, the appropriate defendant for alleging that the

11   New York state statute is contrary to the Constitution, the

12   federal constitution.  That's the claim.  And it's -- the claim

13   seeks declaratory and injunctive relief relating to the alleged

14   unconstitutional nature of the New York state statute.

15            And the reason that the suit is even permitted to be

16   in this court in the first place is because *Ex Parte Young* says

17   that suit is a suit brought against those persons in their

18   official capacity and is not a suit against the state such that

19   the Eleventh Amendment would bar it.  So then one says, Well,

20   given that holding, why doesn't the same principle apply in the

21   context of the long-arm statute?  Which is that we conclude

22   this is not a suit against the State of New York under Sections

23   (a)(3) and (a)(4) -- or the whole long-arm statute because of

24   *Ex Parte Young*.

25            MR. AMER:  And what I would say, Your Honor, is that

1    *Ex Parte Young* doesn't say it's not a suit against the state.

2    It says it is a suit against the state, but we will make an

3    exception and we will allow a claim for prospective injunctive

4    relief.  My position is that that exception, if it is to be

5    made, is to be made by the D.C. Legislature in how it defines

6    persons who can be sued under the long-arm statute.  And it's

7    certainly perfectly, you know, amenable to that legislative

8    body to make an exception or to define persons differently so

9    that it would include an action against a state challenging a

10   statute.  And -- and, you know, there would be a separate

11   question whether that long-arm statute as amended would then

12   satisfy due process.

13           THE COURT:  Right.  For the reasons we --

14           MR. AMER:  That's a separate issue.

15           THE COURT:  -- discussed earlier.  Yes?

16           MR. AMER:  We also think that separately the Court

17   should apply principles of sovereign state immunity and

18   federalism under the due process clause to grant the motion,

19   and that's quite cogently laid out in the *Stroman Realty* case,

20   and I would commend the Court to review that case.  And by the

21   way, *Stroman* does have a discussion of *Ex Parte Young* as well.

22           THE COURT:  Yes, it does.

23           MR. AMER:  I want to just very briefly touch on

24   venue, Your Honor.

25           THE COURT:  Sure.

1          MR. AMER:   The plaintiff argues that venue is

2     appropriate under (b)(2) of the general venue statute and

3     that's where a substantial part of the events giving rise to

4     the claim occurs in D.C.  We say that's wrong for a couple of

5     reasons.

6          First, the First Amendment claim that's alleged here,

7     no part of the events relating to that claim occurred in D.C.

8     It's all about the enactment of the statute.  It's all about

9     retaliatory and discriminatory animus alleged on the part of

10    New York legislators in New York.  So that deals with Claim 2.

11         As to Claim 1 against the House defendants, again,

12    that claim isn't even ripe.  There's been no request.

13    Plaintiff argues that it's sufficient for venue purposes that

14    there will be future harm in D.C., and he relies on the *League*

15    *of Women Voters v. Browning*.  *Browning*'s distinguishable, as

16    are some other cases like *Browning,* because they deal with

17    venue as between two different districts within the same state.

18    So *Browning* dealt with whether the suit should have been in the

19    Northern District of Florida or the Southern District of

20    Florida, and as other Courts have recognized when that's the

21    issue, you don't raise the question of whether it's appropriate

22    for one state's court to exercise jurisdiction over another

23    state's officials and law.  So we think that's distinguishable.

24         And on this point, we think the *Leroy* case is

25    controlling.  The *Leroy* case on its facts is perhaps the

1    closest case to this one.  In *Leroy* it involved a plaintiff

2    suing an Idaho official in Texas to challenge the

3    constitutionality of an Idaho statute.  And the Supreme Court

4    did something a little unusual in that case in that it reversed

5    the analysis and dealt with venue before personal jurisdiction.

6              THE COURT:  That's pre-*Steel Co.*

7              MR. AMER:  Right.  And so addressing the venue issue,

8    the Court said there's only one obvious place this Court --

9    that this action should have been brought.  The only obvious

10   place is Idaho.  And a quick quote from that decision.  Quote,

11   "Federal judges sitting in Idaho are better qualified to

12   construe Idaho law and to assess the character of Idaho's

13   probable enforcement of that law than are judges sitting

14   elsewhere."  That's at page 1 -- 186 of 443 U.S.  We think that

15   applies here.  It's directly on point.

16             And the only other two points address more procedural

17   issues.  It's the All Writs Act, and I think we've discussed

18   that already.  We don't think that the All Writs Act can be

19   used here.

20             And then the final thing is just to say that the

21   suggestion by Mr. Trump that this Court should put this motion

22   on a shelf to gather dust while the injunction remains in place

23   against the New York defendants is not something the Court

24   should give any serious consideration to given the back --

25   procedural background that brought us to this motion.  As the

1    Court's aware, the *quid pro quo* for the Commissioner's good

2    faith proposal was that this motion be decided on an expedited

3    basis.  And to suggest that the Court without any good reason

4    simply hold this motion in abeyance so that it can keep in

5    place the temporary injunction that is currently in place is,

6    quite frankly, totally improper.  That wasn't the understanding

7    of the Commissioner as part of his good faith proposal, which

8    was something that the Commissioner put on the table in direct

9    response to this Court's invitation to resolve the problem that

10   Mr. Trump had.

11          We did that in good faith, and so we don't think it

12   would be at all appropriate to try and turn that good faith

13   proposal, which was based on expedited treatment of this

14   motion, into some sort of *de facto* concession to Mr. Trump's

15   proposal that we flatly rejected, quite frankly, which is

16   exactly what he's asking for now.

17          And, you know, here, when the Court -- if the Court

18   grants this motion, severs Count II, dismisses the New York

19   defendants, Mr. Trump's interests continue to be protected for

20   the very reason that the New York defendants' proposal was

21   found to be attractive to this Court.  We have for another week

22   an injunction in place, and Mr. Trump can seek the same relief

23   he sought from this Court in New York, and that fully protects

24   his interests.  And then it will be up to the New York court to

25   determine what to do.

1              So unless the Court has any other questions.

2              THE COURT:  Thank you, Mr. Amer.

3              MR. AMER:  Thank you.

4              THE COURT:  Mr. Strawbridge.

5              MR. STRAWBRIDGE:  May it please the Court.

6              I just want to start with kind of a point that

7    might -- probably won't, but it might actually make this whole

8    proceeding a lot simpler; and, that is, I think we pointed out

9    in our brief that it actually makes very little practical

10   difference in this case if this matter proceeds with the

11   New York Attorney General as a defendant or as an intervenor.

12   I did not -- we invited in our opposition brief, we pointed out

13   the fact that the New York Attorney General would almost

14   certainly intervene to defend a statute.  The New York Attorney

15   General has made statements to that effect, even if they were

16   dismissed as a party in this case.  I did not hear my friend on

17   the other side deny that the New York Attorney General would

18   intervene to defend the constitutionality of the statute.

19             As the case sits right now -- and you can look at the

20   complaint -- we asserted Count II against both defendants, says

21   both defendants right there in the caption.

22             THE COURT:  Yes.

23             MR. STRAWBRIDGE:  We are absolutely entitled to

24   proceed against both defendants.  I think Your Honor pointed

25   out that it is not unusual -- I know it may not be typical --

1    but it is certainly not rare that actions between two parties

2    can involve determinations of the constitutionality of

3    statutes, and there's nothing wrong with that proceeding.  We

4    cited several examples of that in our briefs.  So there's a

5    little bit of a -- not sure if there's actually, you know -- if

6    the candles were to burn here, if -- if in two weeks they're

7    going to be here intervening -- and I guess I didn't get a

8    clear answer to that question.  It might be worth asking again.

9          THE COURT:  I think it depends on a lot of things.

10    They do make the point that if they're dismissed then any

11    injunctive All Writs relief could not run as to them.  And so

12    your defendants made that argument.

13          MR. STRAWBRIDGE:  They make that argument, but we

14    don't agree with it.

15          THE COURT:  I know you don't agree with it, but

16    that's one reason it matters.  They might not decide to

17    intervene right away also.  In any event, I mean, I think --

18    I -- I tend to agree with Mr. Amer that the whole point of the

19    negotiations, in my pressing for a -- a proposal, was based on

20    the assumption that I would decide the motion before.  And it's

21    actually important to decide whether this Court can exercise

22    jurisdiction against -- or over the New York defendants.

23          MR. STRAWBRIDGE:  And so we recognize that.  The

24    issue here -- I think the Court probably appreciates it -- is

25    that there's a lot of competing interests here, and there are

1    reasons why having the New York Attorney General as the subject

2    of an All Writs Act injunction is somewhat -- you know, at

3    least the Court was more comfortable --

4          THE COURT:  While we're on the subject, though, of,

5    I'll put it, nonpersonal jurisdiction-related arguments, your

6    papers says that if I were to dismiss New York, you would not

7    pursue claims against the New York defendants in New York.

8          MR. STRAWBRIDGE:  That -- that is not our intention

9    because we think we can get all the relief that we need in this

10   case against the remaining defendant.

11         THE COURT:  So I guess I'd like to know a little bit

12   more why if you feel so strongly that the TRUST Act is plainly

13   unconstitutional and inappropriate you wouldn't sue New York in

14   New York -- again, hypothetically assuming I've decided I don't

15   have jurisdiction over New York -- why you wouldn't pursue

16   claims against New York in New York.

17         MR. STRAWBRIDGE:  Well, I guess it's not our

18   intention to do so because we'd rather litigate one case rather

19   than two.  There's obviously resource issues and difficulties

20   that are presented when we're forced to split claims and

21   litigate them in two different jurisdictions.  There would be

22   personal jurisdiction issues with respect to the other

23   defendant in New York, and this is a statute --

24         THE COURT:  If you were bringing only one case;

25   correct?

1          MR. STRAWBRIDGE:  Correct.  And -- and -- and this is

2     a statute, of course, and this is sort of the whole point.  The

3     statute takes two parties to tango.  The -- the -- the New York

4     defendants can't do anything unless the committee in D.C., the

5     defendants in D.C., take actions in D.C. that are designed to

6     ensure that they can obtain the tax returns of people who are

7     in D.C. -- in this case, President Trump -- and so, you know,

8     the -- the case is -- the case here is sufficient.  We're

9     prepared to proceed in this case, and, again, I think -- and

10    again, I invite -- I don't know what they'll do, but it seems

11    inconceivable to me that the Attorney General wouldn't fall

12    through on their promise to defend this action as an intervenor

13    in this case.

14          THE COURT:  What is your best case for the

15    proposition that in a suit against the House here -- assuming,

16    again, the New York defendants are dismissed as parties -- that

17    you can litigate not just the constitutionality of the House

18    request for the information but the constitutionality of the

19    TRUST Act?

20          MR. STRAWBRIDGE:  We cited a few cases.  *Becerra*, for

21    example, is a case we're very familiar with because we happen

22    to be litigating it.  That involved litigation against a city

23    and a state where the city was basically only doing it because

24    state law had reformed -- had forced them to put in a new plan

25    for elections.  The argument was that the state law itself was

1    unconstitutional, and the relief could be -- we argued there,

2    the -- all of the relief could be obtained against the city.

3           But there's a number of other examples I think

4    Your Honor was sort of -- sort of right to point out.  I mean,

5    not to -- not to get too close to home here, but personal

6    jurisdiction is an example.  Sometimes there are long-arm

7    statutes that have provisions that are -- the constitutionality

8    of which are suspect, and that can be litigated between two

9    parties, and it -- it may result in a finding that a particular

10   state statutory provision is unconstitutional.  Per se

11   defamation statutes are another good example; private party

12   litigation that results in a finding that some state's action

13   is unconstitutional.  So there's various examples why -- where

14   that can happen.  I don't think it's -- it's certainly not

15   beyond the pale.

16          THE COURT:  So let's turn, if we could, to the

17   question most directly at hand at least.  And I take it you

18   agree that you have to satisfy at least one provision of the

19   D.C. long-arm statute as to each New York defendant for this

20   Court to exercise jurisdiction over that defendant?

21          MR. STRAWBRIDGE:  Yeah, I think that's correct.  It's

22   a defendant-by-defendant analysis.

23          THE COURT:  And those questions are ultimately

24   questions of D.C. law.  I know that I'm sitting in D.C., but

25   I -- to the extent that there are -- obviously I have to follow

1          the D.C. long-arm statute, but I have to follow whatever

2          decisions are out there from the D.C. Circuit but also the D.C.

3          Court of Appeals.

4                    MR. STRAWBRIDGE:  That is a precedent is the D.C.

5          forum law governs the --

6                    THE COURT:  And so on (a)(1), it seems to me that the

7          more recent line of D.C. Court of Appeals cases have said that

8          transacting any business has to be something that is commercial

9          or business related.  And, in particular, there's a case called

10         *Haarmann* from 2001.  That's a D.C. Court of Appeals 2001.

11         Assuming that's right, is it your position that one or both of

12         the defendants have or will take acts that are of a commercial

13         or business nature?

14                   MR. STRAWBRIDGE:  So I guess -- I guess I'll fight

15         the premise first.

16                   THE COURT:  Yes, please do and --

17                   MR. STRAWBRIDGE:  I don't think that the cases can be

18         read so broadly.  I think in a lot of those cases -- in

19         *Haarmann* in particular -- there's nothing in there, for

20         example, as New York argues, that actually overrules, at least

21         the gist of what was being said in *Rochon*.  I think that *Lex*

22         *Tex* and the -- and the Brazilian case -- I'm not going to try

23         to pronounce the name of the case, but both talk about context

24         that go out at least the ordinary commercial transaction

25         context, which I think is how New York tries to argue this

1    case.

2          So I think the general authority that recognizes

3    (a)(1) is intended to extend to the maximum extent that's

4    consistent with due process is inconsistent with imposing a

5    tight definition of commercial activity rather than the plain

6    language of business, we think *Rochon* is still good law.  So

7    all of that said, you know, I think the business needs to be

8    interpreted more broadly.

9          With respect to your question do we think that -- I

10   mean, no, most of those cases that speak of it being a

11   commercial transaction involve one of two situations.  One, you

12   know, it -- it is a commercial case.  It's a case about a

13   business dispute, and so the obvious analysis is only going to

14   be with the commercial activity of the parties, and I think

15   that's what that *Haarmann* case is.  I don't think it's going --

16   I don't think it means to be saying anything broader than the

17   fact that in this case it's obviously going to be commercial

18   activities.

19         There's also some cases that I think are essentially

20   attempts to use, really, family connections, family law cases.

21   Of course, the long-arm statute has a separate family law

22   provision.  So it's really not -- I think -- I think it kind of

23   makes sense to interpret (a)(1) in the context of the other

24   subsections that direct the family law -- law places.

25         You know, *Steinberg* --

1          THE COURT:  So -- okay.  Fair enough.

2          MR. STRAWBRIDGE:  Go ahead.

3          THE COURT:  Let's just talk about the Commissioner,

4     then.

5          MR. STRAWBRIDGE:  Right.

6          THE COURT:  What has the Commissioner done that, in

7     your view, constitutes transacting business in the District of

8     Columbia?

9          MR. STRAWBRIDGE:  Well, we can't -- obviously we

10    can't answer that question without -- without any discovery

11    into -- into the Commissioner's contacts.

12         THE COURT:  What do you allege the Commissioner has

13    done?

14         MR. STRAWBRIDGE:  I think that our claim against the

15    Commissioner is strongest based on what the face of the statute

16    will require him to do the second that our claim,

17    essentially -- you know, our injury is felt.  And we can get

18    into the injury ripeness discussion and the facial challenge,

19    but let's -- holding that aside.

20         THE COURT:  Let's talk about the Commissioner.

21         MR. STRAWBRIDGE:  I mean -- I mean, it's obvious in

22    this case, right, that -- that what's going to happen is -- is

23    the House committees in D.C. are going to make some decisions

24    in D.C.  They're going to make some sort of decisions in D.C.

25    in an attempt to obtain the information of the President who is

1    a resident in D.C.  They're then going -- having made all those

2    decisions in D.C. to affect somebody who is in D.C., they're

3    then going to notify the Commissioner, who under the statute

4    has no discretion whatsoever at that point -- that statute

5    speaks in terms of "shall" -- and at that point, basically, all

6    of the prerequisites will be in place, and the only thing left

7    to do is to send the materials to D.C. to cause harm in D.C.

8         And I do want to be very clear about the point that

9    the injury and the harm is a disclosure of the state tax

10   records which would otherwise be private to these committees of

11   Congress, not what they decide to do with them after the fact.

12   That's true for Article III injury and it's also true for harm

13   under the long-arm statute.

14        THE COURT:  All right.  So when I was asking Mr. Amer

15   those questions, I was focused mostly on (a)(3) and (a)(4).

16   But is your position that the sending of the materials to D.C.

17   by the Commissioner -- again, assuming this course of conduct

18   that you've just articulated occurs -- would constitute

19   transacting business in D.C.?

20        MR. STRAWBRIDGE:  I think that we -- I think that we

21   have made that argument.  We think that that's consistent with

22   the broader definition of business, but we also think that

23   it -- it can satisfy (a)(3) and (a)(4) as well.  And, I mean,

24   (a)(3) and (a)(4), to some extent -- especially (a)(4) -- is

25   clearly premised on the *Calder v. Jones* scenario.  *Calder* is on

1   all fours with this case in a lot of important ways.  It is the

2   key case for us, and it is the case that I think they simply

3   cannot distinguish, and in their briefing they do not

4   distinguish.  I mean, yes, it's defamation.  It doesn't involve

5   a state defendant, but it's precisely the scenario.  It's

6   somebody in the state of Florida doing activities in Florida

7   but all of the activities are premised on communications with

8   people in another state.  In that case, California.  All of the

9   harm is going to be felt in California, and the subject of

10  the -- in that case the newspaper article is all in California.

11  And, you know, *Calder* was not considered a hard case by the

12  Supreme Court.

13          Even *Stroman*, the case that they rely on most

14  strongly in this case, specifically recognizes that *Calder* is

15  an exception to what would ordinarily be the rule.  This is --

16  this is an unusual statute.  It's not surprising that we

17  haven't found a lot of states that support -- that provides

18  support for the notion that you can bring a constitutional

19  challenge in another jurisdiction to a state statute, but

20  this -- they wrote in the statute that all these people in D.C.

21  have to undertake all of this action in D.C. to obtain the tax

22  returns of someone who's in D.C.  They didn't write that for

23  any other jurisdiction in any of these other general statutes.

24          THE COURT:  So the injury you're talking about is the

25  production of the information that would otherwise be private

1    to the committee?

2              MR. STRAWBRIDGE:  Correct.

3              THE COURT:  The act that would cause that injury is

4    the act by the Commissioner in responding to a request.

5    Obviously there's a request that occurs first, but you talk --

6    as it relates to the New York defendants, the act is the act by

7    the Commissioner.  Where in there is the Attorney General

8    taking an act that would injure Mr. Trump?

9              MR. STRAWBRIDGE:  Well, we think the Attorney General

10   is a proper defendant for a couple of reasons, and it made --

11   one, the Attorney General is obviously -- the Commissioner is

12   an executive branch employee in New York.  The Attorney General

13   is actually representing that Commissioner in this proceeding

14   today.  Presumably, the Attorney General has general

15   responsibilities to both advise and to defend the Commissioner

16   under New York law.  We've cited a whole host of provisions --

17   I think it's on page 5 of our opposition -- that provide for

18   the New York Attorney General's authority over state tax

19   statutes.  That particular act, not the subsection -- I

20   think -- I take it that my friend's argument is essentially

21   because the words "Attorney General" appear nowhere within

22   subsection (f)(1), that is the beginning and the end as to who

23   is the proper defendant.  I don't think that's -- that's --

24             THE COURT:  I'm asking a little bit different

25   question.

1           MR. STRAWBRIDGE:  Sure.

2           THE COURT:  It may be that in a suit brought in

3   New York the Attorney General is a proper defendant in a case

4   challenging either facially or as-applied this provision, but I

5   think you conceded at the beginning that we have to go

6   defendant by defendant under the long-arm statute.  And at

7   least as if we're in (a)(3) and (a)(4), what I'm trying to

8   figure out is what act by the Attorney General is causing the

9   tortious injury to Mr. Trump, which you're saying is the

10  provision of information to the committee.

11          MR. STRAWBRIDGE:  Let me -- let me revise my answer.

12  It somewhat gets into the point of the discussion I think

13  you've had, which is sort of the oddity of the *Ex Parte Young*

14  action.  I mean, the problem with the *Ex Parte Young* action is

15  although it is against individuals and they are to be treated

16  as individuals for the personal jurisdiction analysis, it is

17  ultimately the acts of the state.

18          So -- so I should say that in this particular context

19  it may not be as clear that you have to sever the actions of

20  the two defendants so clearly in this case.  The -- the

21  Attorney General's actions are -- I think that although we've

22  alleged -- although we have certainly alleged, I think,

23  sufficient allegations of coordination and potential conspiracy

24  that would open the door under the liberal standard for

25  discovery, but what we have alleged, I think, is at least some

1    action by the Attorney General that not only indicates that

2    there's persistent conduct in this jurisdiction apart from the

3    actual actions giving rise to this case, but there's also -- it

4    is not unfair to hale the Attorney General into this state.

5              Now, to what extent was the Attorney General -- would

6    be involved in the process?  It's hard to say without any

7    discovery, given the Attorney General's authority over the

8    statute, including punishing people who violate the statutes,

9    including the TRUST Act.  I think we've at least met the burden

10   for pleading, and at a minimum we'd be entitled to some

11   jurisdictional discovery on that question.

12             THE COURT:  So just so I've got it -- and I think

13   I've got it, but I think this goes to the present state of the

14   case and the nature of Count II, but implicit in everything

15   you've said, I believe, is Mr. Trump is not injured here at

16   least before the tax returns are delivered to the committee.

17             MR. STRAWBRIDGE:  I think -- I think it is -- I think

18   the delivery is obviously what -- what the -- what the suit is

19   intended to prevent.  We very much listened to Your Honor's

20   concern about the ripeness issues.  We are -- I think the Court

21   probably recognizes that this -- the whole reason we brought an

22   All Writs Act case -- and that's really all this case remains

23   for the time being, an All Writs case -- is because we just

24   wanted to preserve our right for review.  We didn't bring the

25   case initially because there was no indication that the request

1    was ever going to be made.  Once we became concerned the

2    request was going to be made and that it might actually ripen,

3    that's when we brought the case.

4            THE COURT:  But, as you know, I was concerned and

5    remain concerned about the ripeness/mootness issue.  But for

6    present purposes we have one count, Count II, being asserted

7    against the New York defendants based on a particular set of

8    allegations, and at least right now it seems to me that the

9    President -- or Mr. Trump, in his personal capacity, is not

10   suffering any injury from the passage of the TRUST Act, the

11   mere passage.

12           MR. STRAWBRIDGE:  If that's -- if that's true -- and

13   I think, you know -- it is -- it is a tough question.  It's a

14   tough question for me to answer as opposing counsel because I

15   don't want to concede in any way that we don't have a case that

16   then becomes ripe so fast that we don't have time to prevent it

17   from being moot.  But, yes, that is a concern.  It is a concern

18   that even --

19           THE COURT:  Let me put it in terms of the D.C.

20   long-arm statute.

21           MR. STRAWBRIDGE:  Sure.

22           THE COURT:  You concede, I assume, that Mr. Trump has

23   not yet suffered a tortious injury, the -- that results from an

24   act either outside of D.C. or in D.C. as of this date under the

25   provisions or as interpreted by D.C. and this Court and the

1    D.C. Circuit under the D.C. long-arm statute.

2          MR. STRAWBRIDGE:  Yes, but I do not think that

3    that -- that that prevents us from making a showing of -- of

4    jurisdiction under the long-arm statute.

5          THE COURT:  Understood.

6          MR. STRAWBRIDGE:  And -- and, you know, they --

7    they -- they -- they, I don't think, do a very persuasive job

8    disputing what the Third Circuit said in the case that we found

9    that I think is most on point, which is the *Acorda* case.  And

10   the *Acorda* case stands very clear that says Mylan -- in that

11   case the party that was opposing jurisdiction -- does not

12   meaningfully develop an argument that a rigid past or future

13   dividing line governs the minimum contact standard.  I think

14   that's true for the long-arm statute.  So imminent harm

15   presents just the greatest threat and allows for the -- the

16   provision of jurisdiction as opposed to --

17         THE COURT:  So here's the thing I'm struggling with.

18   It seems to me that there in the *Mylan* case, the future conduct

19   was a 100 percent guarantee to occur in the relevant form and

20   to cause injury there.  And the only question was whether it

21   was going to happen, and the Court basically said, yes, it's

22   going to happen.

23         Here it says to me, at least hypothetically, that

24   there are a host of ways in which -- I'll just make it simple:

25   The Commissioner could respond to a request if posed, some of

1     which might be -- might involve significant and substantial

2     acts taken in D.C., the hypothetical that I gave to Mr. Amer.

3     Imagine the Commissioner of New York gets on the plane -- gets

4     on a plane and brings a box of documents to Congress and walks

5     Commissioner Neal and his staff through the New York state tax

6     returns of Mr. Trump and otherwise takes a bunch of acts in

7     D.C.  That's one hypothetical set of outcomes.  There's another

8     set of the outcomes which is clearly what Mr. Amer highlights

9     in his papers and in the argument here, which is the

10    Commissioner does nothing in D.C., at least in one sense.  The

11    Commissioner prepares the returns in New York, the Commissioner

12    packages them up for production in New York, and either, you

13    know, hits a transmit button on the computer to make them

14    available to the House or puts them in a box and FedExes them

15    out.

16           Assuming that I thought there was a difference for

17    purposes of the long-arm statute as between those two courses

18    of conduct -- I don't know yet what will happen, and it seems

19    distinguishable to me from the Third Circuit where it

20    necessarily flowed from what *Mylan* had done there that you knew

21    there would be acts taken and you knew with quite specificity

22    what those acts would be taken in Delaware.

23           And here we don't know -- or at least there's one set

24    of facts that would involve very little activity by the

25    Commissioner in D.C.  And so it seems to me that the Third

1    Circuit only gets all of us so far because it answers the

2    question of if you know in the future there will be acts

3    sufficient to establish personal jurisdiction or to satisfy the

4    long-arm statute, does it matter that those acts haven't yet

5    been taken?  But it doesn't answer the question of what if

6    there's a range of possible future acts, some of which would

7    and some of which wouldn't satisfy either the due process

8    clause or the long-arm statute.

9          So, in some respect, I obviously need to drill down

10   on the question of whether I believe that if the Commissioner

11   does nothing more than respond to a request by not leaving his

12   office in New York, whether that's sufficient under the

13   long-arm statute.

14         MR. STRAWBRIDGE:  And we obviously dispute that.

15         THE COURT:  And you obviously think there is, but --

16         MR. STRAWBRIDGE:  Or at least that there's some

17   discovery that we're entitled to to determine whether or not --

18   I think the statute on its face essentially appoints people in

19   D.C. as agents for the determination; that is, the only

20   discretionary thing that needs to happen --

21         THE COURT:  If you are right that the Commissioner by

22   producing records from New York to D.C. is enough to have him

23   haled into D.C. --

24         MR. STRAWBRIDGE:  That was *Calder*.

25         THE COURT:  Well, but you also wouldn't need

1    discovery if you're right about that proposition.

2              MR. STRAWBRIDGE:  Certainly.

3              THE COURT:  Because that's the most extreme outcome

4    of the hypothetical set of future outcomes that I'm positing.

5              MR. STRAWBRIDGE:  Correct.  Correct.  And I guess my

6    point that we're making that argument, we think we can win

7    without discovery.

8              THE COURT:  Well, what discovery -- at least as it

9    relates to the Commissioner, what discovery do you need now

10   when there's not a request and when the Commissioner hasn't

11   been presented with either the requirement to gather or the

12   requirement to produce the records?

13             MR. STRAWBRIDGE:  Well, I mean, there may be -- there

14   may be documents or -- or information in the Commissioner's

15   possession about how they plan to comply with the statute or --

16   or what steps they do intend to take.  There may be some

17   communications that are relevant to establishing some line of

18   communication that suggests an agency theory.  That's what the

19   conspiracy argument really is.  It's a form of agency.  We

20   don't have to plead civil conspiracy under the federal

21   statutes.  We just simply have to demonstrate that basically

22   these parties are working together with one party being in D.C.

23   to fairly attribute their actions to all of the defendants.

24             I think you can actually get there from the face of

25   the statute for all the reasons that I said, but -- but we do

1    think that some discovery could be had.  What -- is it going to

2    be productive or not?  It's hard to say until we -- we ask for

3    it, but I think we've alleged the general coordination that the

4    state is having.  The Commissioner -- we do not know the

5    extent -- it's not public information -- to the extent the

6    Commissioner has plans or has some communications with anybody

7    at the House about how it would comply with this Act.  And I

8    think that would be a fair game for discovery if the Court

9    thinks discovery -- we can't get there at least on the statute

10   alone, and it's a very low burden, as I'm sure the Court knows,

11   for discovery on -- on these jurisdictional questions.

12              I did want to -- I'll come back to that thought.

13              THE COURT:  And, again, this is, in some respects,

14   just making sure I understand the parties' respective positions

15   and arguments.

16              MR. STRAWBRIDGE:  Let me just -- I'm sorry.  Let me

17   just make the point that I wanted to make.

18              THE COURT:  Please.

19              MR. STRAWBRIDGE:  I recognize sort of having to drill

20   down on that, but I guess where I think all of that ends is

21   sort of where we began.  And I'm not trying to backslide on the

22   agreement that New York made to come into here, but the

23   simplest way to resolve the case for the time being is to leave

24   some sort of All Writs Acts injunction intact.  It's a very

25   limited injunction.  It requires only notice, and it solves the

1    problem that we're all facing, which is that this case could

2    become moot before it's ripe or an instant after it's ripe and

3    deny the President his chance to retain review on his claims.

4         THE COURT:  Let me -- I guess because we might be

5    tight for time depending on what happens ultimately with this

6    motion, but are you -- or would you -- I take it you would --

7    renew your All Writs Act request, put it -- the day that --

8    again, assuming hypothetically I would dismiss the New York

9    defendants, you would renew your All Writs Act request, and

10   would you ask in the first instance that I order Congress or

11   Chairman Neal of the House Ways and Means Committee to provide

12   notice before posing the request?

13        MR. STRAWBRIDGE:  Yeah.  I think we would actually

14   renew it -- renew it as to -- as to both defendants, even with

15   that defendant out of the case.  We've cited authority for the

16   proposition --

17        THE COURT:  Right.

18        MR. STRAWBRIDGE:  -- that All Writs Act relief can be

19   granted to --

20        THE COURT:  And I understand that you would ask for

21   the relief to go against, you know, nonparties, but --

22        MR. STRAWBRIDGE:  Yes, we would also renew it.

23        THE COURT:  But the particular relief that you would

24   request in the context that I've described, if you were to say,

25   Option 1 we prefer, Option 2 we prefer, is Option 1 back to

1    provide notice?

2              MR. STRAWBRIDGE:  Yes.  I don't think that we've ever

3    been -- I think that we've always been clear that -- that --

4    that we don't want to litigate a case that the Court is

5    concerned isn't -- isn't ripe yet, and it's the Court's right

6    to raise ripeness on its own.  And -- and that's all we're

7    seeking for here.  I think its -- its limited form of relief is

8    a reasonable request.

9              THE COURT:  So why would I need that relief to run

10   against nonparty New York defendants?

11             MR. STRAWBRIDGE:  I guess -- I guess relief against

12   one or other defendant would be sufficient.  I think -- I think

13   I'm mindful of concerns the Court expressed regarding the

14   coordinate branch of government --

15             THE COURT:  Yeah, understood.

16             MR. STRAWBRIDGE:  -- which is not to downplay the

17   sovereignty interests of New York, but New York did pass the

18   statute and did -- I mean, at the end of the day, I don't think

19   this case is that difficult on personal jurisdiction because

20   the Court -- the state elected to put itself in the same

21   position as the reporters and publishers in *Calder*.

22             THE COURT:  Let's assume that I think we are for

23   long-arm statute purposes most likely in Subsection (a)(4),

24   which obviously requires tortious injury to occur here.  The

25   act can be -- the act causing the tortious injury can occur in

1    New York, but there also has to be a regular doing or

2    soliciting of business, engaging in other persistent course of

3    conduct, or the derivation of substantial revenue from goods

4    and services in D.C.

5         MR. STRAWBRIDGE:  Right.  As the D.C. Court of

6    Appeals had made, those -- those were all basically variations

7    on an overriding concern, which is that it's somehow unfair or

8    inappropriate to bring in who -- somebody who is otherwise a

9    stranger to D.C., and its courts by extension, into the action.

10   And we think that we have -- I think that's where our arguments

11   with respect to the Attorney General do carry some weight to

12   the extent you think the Attorney General is a proper

13   defendant.

14        THE COURT:  What if I think that you can't aggregate

15   the actions of the defendants together; that is to say, that

16   the injury-causing event is the production by the Commissioner

17   of the information to D.C., to the House in D.C.?  What how, in

18   your view, is the Commissioner engaging in activity sufficient

19   to satisfy that second provision of (a)(4)?

20        MR. STRAWBRIDGE:  I think that in this case -- I

21   guess my view is that -- is that, one, we would need discovery

22   to have a complete record to -- to reach that question.  So can

23   I -- can I -- can I spit out a large number of examples at the

24   moment?  No, I cannot.

25             I do think that, you know, even -- even my friend on

1   the other side suggested that there is -- there are other

2   provisions of the statute that do suggest that the New York

3   Attorney General can -- or I'm sorry.  The New York

4   Commissioner can engage in interplay with federal officials and

5   official authorities, I don't know to the extent that that

6   would -- that would be played here.

7          I think the answer is that we would -- if we were

8   only looking at the Commissioner, which we don't think is the

9   right way to look at it, we would -- because it's an *Ex Parte*

10  *Young* action and they're both essentially representatives of

11  the state in this case; but if we were only looking at the

12  Commissioner, I think jurisdictional discovery would be our

13  answer to that question beyond -- beyond this.

14         I don't think it's speculative to assume -- and I

15  think you pointed out -- that -- that there could be some sort

16  of communication.  There could even be communication that's

17  related to this case with respect to how to get these tax

18  returns here.

19         THE COURT:  So --

20         MR. STRAWBRIDGE:  And persistence is not the same

21  as -- as the level that would be necessary to make something

22  domicile.  I do think the D.C. Court of Appeals cases are clear

23  on that.

24         THE COURT:  Speaking of which, this is just a

25  question I have for you.  I don't think it actually matters

1    ultimately, but is Mr. Trump still a New York citizen in the

2    way we think about citizenship for constitutional purposes?

3              MR. STRAWBRIDGE:  I -- I am very hesitant to answer

4    that question because I'm thinking back to citizenship and

5    domicile and everything else.  I'm happy to give you the

6    written answer.  I don't want to be put on the spot on that

7    one.

8              THE COURT:  Fair enough.

9              MR. STRAWBRIDGE:  I know he remains a big Yankees

10   fan.

11             THE COURT:  Say that again.

12             MR. STRAWBRIDGE:  I know he remains a big Yankees

13   fan.

14             THE COURT:  I ask in part because while he, of

15   course, would suffer the injury that you allege here in D.C.,

16   he was a New York domiciliary, I believe, probably a New York

17   citizen.  The reason that New York has his state tax returns is

18   because of those contacts with the New York -- I'm sure there

19   are other reasons, but those are probably some of the reasons.

20   And he may, for all we know, still remain a New York citizen in

21   the sort of ultimate constitutional sense, in which case, while

22   I understand he's uniquely here in D.C., he may also be a

23   New York citizen attempting to sue a set of New York defendants

24   over a New York state statute relating to conduct or

25   information that was provided to New York arising out of that

1    New York relationship, doing all of that in D.C.  And it seems

2    to me that that's at least a little different than a D.C.

3    citizen/resident harmed in D.C. suing New York in D.C., or

4    potentially.

5              MR. STRAWBRIDGE:  I don't think that distinction

6    matters in this case because it's pretty clear -- I mean,

7    setting aside all of the evidence that we have in the complaint

8    with respect to what the purpose of the TRUST Act is.  On the

9    face of the statute -- and when you look at President Trump --

10   the only reason he's subject to this requirement or to this

11   provision that we allowed him to do it is because --

12             THE COURT:  He's the President.

13             MR. STRAWBRIDGE:  -- of his status as the President,

14   obviously, based in D.C.

15             THE COURT:  Sure.

16             MR. STRAWBRIDGE:  That's -- that is the only bucket

17   he falls within even on the face of the statute, all the

18   various categories.  So I think my answer to that question

19   is -- is it doesn't matter, ultimately, in this case.

20             THE COURT:  And so just to go back to the

21   conversation we're having about injury and acts, I think --

22   correct me if I'm wrong -- that if Mr. Trump is not injured by

23   the TRUST Act at present, then it may be irrelevant to ask

24   whether any acts were taken in passing the TRUST Act in D.C.,

25   whether any acts were taken in D.C. in passing the TRUST Act,

1    at least for purposes of (a)(3) and (a)(4).

2                 MR. STRAWBRIDGE:  In passing the TRUST Act?

3                 THE COURT:  Yeah.

4                 MR. STRAWBRIDGE:  I mean, I guess -- I guess if we're

5    getting into the question as to facial or as-applied --

6                 THE COURT:  Yeah, why don't you give me your view on

7    that.

8                 MR. STRAWBRIDGE:  Yeah.  I mean, I don't -- I don't

9    think we've ever described it as a facial challenge.  I mean, I

10   think that -- and I think as the Court probably knows, even

11   when parties bring a facial challenge it is entitled to

12   basically convert that challenge to an as-applied challenge

13   because there are various jurisprudential reasons why courts

14   are instructed not to treat things as facial challenges if they

15   are better read as as-applied challenges.

16                 THE COURT:  Right.

17                 MR. STRAWBRIDGE:  Two, I don't think -- I mean -- I

18   mean, the clearest way -- and, again, I think this is

19   consistent with the limited relief we filed initially in this

20   case.  You know, we're not interested in litigating a case that

21   is not actually going to result in the harm to us.  The harm,

22   the injury that occurs to us in this case is not the passage of

23   the statute.  It's -- it's the request that triggers the

24   disclosure.  That's the harm.  That is -- that is the injury

25   that we clearly allege we're trying to stop.

1          THE COURT:  Right.  I mean, I think we're on the same

2     page about that --

3          MR. STRAWBRIDGE:  Right.

4          THE COURT:  -- but even though it's a First Amendment

5     claim, you aren't alleging that the President is somehow

6     chilled or otherwise suffers injury from the Act?

7          MR. STRAWBRIDGE:  Right.  It's a retaliation claim.

8     It's not a -- it's not a free speech claim.

9          THE COURT:  Right.  Exactly.  Okay.

10         So let's talk about, at least very briefly, the

11    conduct that you say the AG has engaged in D.C. and whether and

12    to what extent that either constitutes transacting business or

13    the relevant course of conduct for purposes of (a)(4).

14         MR. STRAWBRIDGE:  Well, there's two -- there's two

15    basic points that they make, I guess, and I'll just address

16    them both in turn.  Obviously is -- one is what the status of

17    the government context doctrine is in D.C.  I will not try to

18    convince the Court that that is a question of absolute clarity

19    on -- under the -- under the case law.  I think that the better

20    reading and the more recent reading from the D.C. Court of

21    Appeals is embodied in the *Rose* case and the *Lex Tex* case.

22         And at a minimum it seems to soften the doctrine in

23    cases that don't involve the right to petition for redress and

24    in cases in which the alleged injury is arising from the

25    context themselves.  In other words, when it's -- when it's

1    more of a specific jurisdiction case as opposed to a -- a

2    reliance on general jurisdiction, and obviously we're not here

3    relying on New York's General interfacing with the federal

4    government.  We're not even here relying on -- on particular,

5    you know, just -- the receipt of grants or -- or federal

6    partnerships and that sort of stuff.

7         THE COURT:  Well, and to be sure -- just to make sure

8    the record is clear, I'll put it, you're not arguing that there

9    is general jurisdiction here --

10        MR. STRAWBRIDGE:  Correct.

11        THE COURT:  -- full stop.  This is a specific

12   jurisdiction case.

13        MR. STRAWBRIDGE:  Yeah.  I mean, I suppose without

14   discovery I can't be -- I can't -- I don't know what I don't

15   know, but, yes, our -- I think -- I think we made it pretty

16   clear that we don't think it's likely we could ever satisfy

17   general jurisdiction, but we do think that we could meet the

18   various factors for specific jurisdiction.

19        THE COURT:  Aren't there -- it may not be outcome

20   determinative, but aren't there federalism concerns with the

21   federal court sitting in one state or district passing on the

22   constitutionality of another state's law?

23        MR. STRAWBRIDGE:  That might be true in a different

24   case, but not in a case where essentially the -- the

25   New York -- New York has invited that -- that possibility by

1   essentially passing a statute that's premised entirely on

2   actions that are going to take place in D.C. and harm that's

3   going to be realized in D.C.

4          I guess to the extent that -- we do disagree with

5   their reading of *Leroy*.  I don't doubt that *Leroy* raised that

6   concern.  I think they actually specifically described it as a

7   lesser concern in their opinion, and it is completely part and

8   parcel of their interpretation of the then-venue statute, which

9   is not the statute as it exists today for the reasons that

10  we've explained.

11         Just to go back to the point on government context.

12  Their other argument -- and I do want to address this -- is

13  this notion that official conduct can never serve as the basis

14  of -- of some kind of -- you know, official conduct doesn't

15  count for purposes of a long-arm statute.  I think that's just

16  flatly wrong.  The cases that they're citing for that are

17  basically cases where someone --

18         It's a line of cases that begins where an employee

19  comes into the District on behalf of their employer, and the

20  Courts sort of make the -- the point that, like -- that's not a

21  sufficient basis for individual jurisdiction over that

22  defendant.  That's -- that works for the principal, but not for

23  the agent.  In the *Meese* case, which is the one that they

24  really kind of rely on a bunch, that's -- that's also the

25  point, because *Meese* was a *Bivens* action.  And so you needed to

1     have individual personal jurisdiction in that case.

2          And the argument there was that the Attorney General,

3     by being the -- the head of the Department of Justice, was

4     engaged in an official act and that wasn't sufficient, but this

5     is an *Ex Parte Young* case.  It's not an individual capacity

6     case.  They're being sued in their official capacity.  And so

7     it just completely stands at a different spot than a *Bivens*

8     action does or those cases that they're citing.

9          THE COURT:  So on the *Ex Parte Young* point, obviously

10    I asked Mr. Amer a series of questions about the relationship

11    between *Ex Parte Young* and a person's status under the long-arm

12    statute.  If it's the case that one could aggregate the conduct

13    of the defendants for purposes of thinking about the contacts

14    with D.C., because *Ex Parte Young* is really about -- it's --

15    this is really a case against New York, if that's true, then

16    why isn't it the case that this is really a suit against the

17    state and not against a person for purposes of the long-arm

18    statute?

19         MR. STRAWBRIDGE:  Well, as --

20         THE COURT:  Seems to me it's hard to both aggregate

21    the conduct and say it's because these are all state actors and

22    then argue at the same time this is not a suit against the

23    state for purposes of the long-arm statute.

24         MR. STRAWBRIDGE:  I guess at the end of the day, I

25    think that's -- I think that's a frustration that arises with

1   *Ex Parte Young* and not with treating the jurisdictional

2   analysis slightly different, because, I mean -- I mean,

3   *Ex Parte Young* is the one that -- that -- that imposes

4   essentially the fiction upon us that this is not a suit against

5   the state; it's a suit -- and that's the whole reason we can

6   get relief.

7         So I think it would be just fighting -- fighting the

8   nature of the action, and it's really -- it's really a fight

9   with *Ex Parte Young's* theory, as opposed to a fight.  Under the

10  *Ferrara* -- as I read the *Ferrara* case and the concurring

11  opinion in that case, they both seem to be acknowledging that

12  at least under the current state of play, in an *Ex Parte*

13  *Young*-type action, what matters is we are going to look at the

14  individual, not -- it's their official capacity, but for

15  personal jurisdiction purposes we look at the -- the individual

16  defendants, not the state itself.

17        THE COURT:  Right.  In some respects that's why I

18  started where I did.  Was it seems to me that the D.C. Circuit

19  has essentially said if you're in an *Ex Parte Young* world or

20  official-capacity-defendant world for long-arm statute

21  purposes, you look at each individual official defendant's

22  conduct independently.

23        MR. STRAWBRIDGE:  Right.  And I just -- I do want

24  to -- I do want to make the point that we continue to think

25  that the Attorney General is tied to the enforcement of the

1    Act, so --

2              THE COURT:  Tell me why.

3              MR. STRAWBRIDGE:  Well, because, like I said, they

4    had general authority to enforce the Act, including other

5    subsections of the statute in which the TRUST Act appears.  The

6    fact that they are not the party that is tasked with actually,

7    you know, compiling the information and sending it over doesn't

8    mean that they don't have any role in either advising or

9    ultimately taking responsibility for compliance with that

10   statute.

11             That statute does impose some requirements.  If the

12   Commissioner or one of the Commissioner's subordinates were to

13   violate those requirements -- for example, the redaction

14   requirement or the requirement that there be these

15   prerequisites that occurred in D.C. before you can send the

16   information over -- I don't understand who would enforce that

17   in New York except for the Attorney General.  So I think the

18   Attorney General does have concurrent enforcement power over

19   the Act.  And I -- I don't necessarily think that it's unfair

20   to attribute the enforcement of the provision and the actions

21   that are going to be taken to the Attorney General, even

22   accepting this view that we can't just aggregate them, which

23   I'll concede --

24             THE COURT:  Well, again, assuming we're

25   disaggregating them -- and I get you will probably say I would

1    like some discovery, potentially, to answer these questions --

2    but what act by the Attorney General would cause

3    tortious interfer- -- tortious injury to Mr. Trump sufficient

4    to satisfy (a)(3) or (a)(4)?

5              MR. STRAWBRIDGE:  I guess --

6              THE COURT:  The AG may be a proper defendant in a

7    challenge to the statute, which I think of as, at least,

8    potentially a different question about then whether there's

9    personal jurisdiction over the Attorney General in the

10   particular context of this case.

11             MR. STRAWBRIDGE:  Understood.  Understood.  I think

12   in this case -- I mean, well, one, I do think that we would

13   need some discovery on it.  We have at least alleged some --

14   some coordination, and particularly coordination with the

15   Attorney General's office.  And so I can't rule out the

16   possibility that there is going to be some information that

17   suggests the Attorney General has a role to play with respect

18   to these particular requests.

19             In fact, we've identified, I think, in paragraph 39

20   of the amended complaint, coordination specifically between the

21   Attorney General and the House of Representatives to obtain the

22   private financial information.  I think that's sufficient to

23   meet the low threshold for jurisdictional discovery on those

24   points.

25             THE COURT:  Okay.  The question of whether you can

1    impute or rely on -- that's probably a better way to put it --

2    the other acts in D.C. of House employees, I think, turns on

3    the question of whether you have sufficiently alleged a

4    conspiracy -- or plausibly alleged a conspiracy as between at

5    least people located in D.C. and the New York defendants.

6           MR. STRAWBRIDGE:  Yeah.  And I think -- I think you

7    can actually get there on the face of the Act because of the

8    fact that all the discretionary conduct is taken by the people

9    in D.C.  And once those requirements are satisfied, the -- the

10   New York -- the Commissioner -- the New York officials' actions

11   are automatic.  They're -- they're mandatory.  It says "shall."

12          THE COURT:  But let's imagine --

13          MR. STRAWBRIDGE:  It's essentially deputization, I

14   guess, is my view.

15          THE COURT:  What if New York came up with this idea

16   to pass the TRUST Act entirely on its own, knowing that there

17   was a good chance that if it passed it the House would make a

18   request?  There's no communication, let alone agreement, as

19   between the House and New York.  You would agree that in that

20   context we -- there would not be a conspiracy.

21          MR. STRAWBRIDGE:  So it would not, certainly, meet

22   the -- the common definition of a conspiracy.  It would not be

23   a conspiracy which would require some evidence of an agreement

24   and an overt act in the District.  I guess what I was just --

25          THE COURT:  Right.

1          MR. STRAWBRIDGE:  -- saying is I still think that you

2     could get to those actions, basically, under a theory of the

3     agency, given what the statute said.

4          No different than if New York had entered into a

5     contract in which it basically appointed people to take certain

6     acts that would, you know, condition New York taking some

7     consequence as a result of those people's acts in D.C.  That's

8     essentially what the statute does.

9          THE COURT:  So your view is -- just -- let me make

10    sure I have it.  We can think of the -- the House to New York

11    relationship as principal agent and the -- for purposes of

12    asserting personal jurisdiction over the agent, we're going to

13    impute the acts of the principal to the agent?

14         MR. STRAWBRIDGE:  I think --

15         THE COURT:  Isn't that, like, reversed?

16         MR. STRAWBRIDGE:  I -- well, no.  I think it's -- I

17    think it's the idea that -- that basically having knowingly --

18    it's -- it's really not that different than *Calder*, I think, is

19    what I'm trying to say here; is that by -- by essentially

20    ensuring that certain acts have to take place by certain people

21    who are in D.C., you know, against somebody who lives in D.C.,

22    the -- the state has satisfied whatever requirement does to

23    have essentially taken an act in D.C.

24         You can impute the acts of the people it is relying

25    upon in D.C. back to the New York defendants because the

1    statute essentially melds the two of them together.

2              THE COURT:  Are you --

3              MR. STRAWBRIDGE:  It's unusual, but it's an unusual

4    statute.  I don't -- we haven't found anything quite like it.

5              THE COURT:  It is.  Are you aware of any cases in

6    which the D.C. Court of Appeals or D.C. Circuit have said that

7    Sections (a)(3) and (a)(4) of the long-arm statute should be

8    interpreted to the maximum breadth available under the

9    Constitution?

10             MR. STRAWBRIDGE:  No, I don't -- no, I think that's

11   generally what's been said about (a)(1).  And there's at least

12   some suggestion in the cases in this court that the sort of

13   implication of that is that's not the case with respect to

14   (a)(3) and (a)(4).

15             THE COURT:  It seems to me that one -- and I agree

16   with that.  It seems to me that one could conclude that it

17   would not be unconstitutional to hale New York into court here,

18   but that D.C. has not permitted it under the long-arm statute.

19   It's at least a hypothetical possibility.

20             MR. STRAWBRIDGE:  I think there's a basket in

21   which -- in which -- in which some cases will fall.  I don't

22   think this case falls in that basket.

23             THE COURT:  Understood.  Understood.  I think -- I

24   think I've -- I think I've asked the questions I have.  If you

25   have anything further, Mr. Strawbridge.

1          MR. STRAWBRIDGE:  No.  I think I've made the -- I

2     think I've made the points that I want, obviously.  If

3     something new comes up, we can deal with it then.

4          THE COURT:  Yes.  Of course.

5          Mr. Amer.

6          Actually, Mr. Letter, would you -- do you have

7     something you'd like to add?

8          MR. LETTER:  Judge, I merely wanted to note a factual

9     point.  You had pretty early on in the hearing noted that there

10    had been no motion to dismiss by the House yet.  I merely want

11    to let you know that the House is intending to file a motion to

12    dismiss.  I believe our due date is October 21st, and our plan

13    is to file a motion to dismiss by that date.  So just want to

14    make sure you were aware of that.

15         THE COURT:  While you're at the podium -- and this

16    may be unfair, and I'm happy for you to defer until your motion

17    or respond in writing, but do you agree with Mr. Trump that it

18    would be appropriate for the Court, potentially, to decide the

19    lawfulness of the TRUST Act, Count II, even if I were to

20    dismiss the New York defendants for lack of personal

21    jurisdiction?  In other words, can he bring a claim about the

22    constitutionality of the TRUST Act in a claim against the House

23    defendants?

24         MR. LETTER:  And you know the first thing I have to

25    say is we won't ever get there because you will dismiss this

1    for -- under the Speech or Debate Clause and other --

2             THE COURT:  Yes.  Let's assume away all those, you

3    know, hypo-fighting answers.

4             MR. LETTER:  I -- if -- as you said, I would probably

5    want to defer.  We have not taken a position on that, and --

6    and I don't know, depending on how the litigation went, whether

7    that issue would ever properly come before you.

8             THE COURT:  So let me pose another procedural

9    question then to all three of you, which is that if the House

10   is going to file a motion to dismiss on October 21st, which

11   is -- I mean, it's not tomorrow, but it's not a lifetime from

12   now.

13            MR. LETTER:  Right.

14            THE COURT:  That will potentially raise that

15   question, because that Count II is asserted against the House;

16   it will obviously raise Speech or Debate Clause issues, and

17   maybe other questions.

18            MR. LETTER:  Yes.

19            THE COURT:  Article III, who knows.

20            MR. LETTER:  Yes.

21            THE COURT:  Does it make sense to decide what would

22   then be both motions to dismiss together, rather than take them

23   piecemeal?

24            MR. LETTER:  Your Honor, my only reaction to that is

25   to echo what Mr. Amer said.  They -- they -- as I understood

1     it, New York made an offer based on the assumption that they

2     would then be making a motion to dismiss, which would be

3     promptly ruled upon, was my understanding.  So I -- I don't

4     wish to say anything that gets in the way of Mr. Amer's

5     understanding of that's what was to happen.  I believe Mr.

6     Strawbridge indicated that was what he understood also.  So

7     I -- I would -- I don't want to say anything that would get in

8     the way of your ruling on that promptly.

9              THE COURT:  And -- and as I said earlier, I both

10    appreciated the proposal, and it is not my intention to simply

11    sit on the motion.  I'm not intending to do that.

12             On the other hand, you know, in the normal course,

13    one would consider motions to dismiss filed by multiple

14    defendants that raise related issues together.  And that's

15    really why I posed the question.  I am not wedded to that as a

16    possibility.  I just -- I asked the question for that reason.

17             MR. LETTER:  Your Honor, remember, if -- if we file

18    on October 21st -- I don't know -- briefing probably -- on our

19    motion to dismiss -- probably would not finish until well into

20    November or something.  Presumably you would have a hearing.

21    So that would mean you wouldn't be making a decision on

22    New York's motion for at least several months, I would guess,

23    so that would --

24             THE COURT:  Right.  And I understand -- well,

25    probably -- why don't we start with you, Mr. -- and I said

1    Mr. Amer before.

2              MR. AMER:  It is Mr. Amer.

3              THE COURT:  Mr. Amer, why don't you start there --

4              MR. AMER:  Yes.

5              THE COURT:  -- which I know is probably not what you

6    were prepared to stand up and rebut.  But what do you think

7    about that question?  And then let's get back to the substance

8    of what we're here talking about.

9              MR. AMER:  We would certainly vehemently oppose

10   holding this motion in abeyance for a separate motion by the

11   House defendants to dismiss.  We don't think that motion would

12   be related to this motion at all.  This motion raises

13   specific -- by design, specific personal jurisdiction and venue

14   issues that are unique to Count II and the New York defendants.

15             And, quite frankly, if that were the -- the ask at

16   the get-go, we would not have agreed to that proposal.  We

17   would have had no deal, and the Court would have had to deal

18   with the emergency application.  So that would be our position

19   on that.

20             I know we've been going for a long time.  So I only

21   have a couple points to respond to.

22             THE COURT:  Thank you very much.  And I suspect that

23   the court reporter is probably getting tired.  So I appreciate

24   that.

25             MR. AMER:  I want to talk about this prospect of

1    going forward with Count I, plus some claim that repeats the

2    First Amendment facial challenge in the absence of the New York

3    defendants being parties here.

4              THE COURT:  Yeah.

5              MR. AMER:  I think, first of all, to suggest that

6    you'd ever get to the First Amendment question, I think, is --

7    is probably -- misses the point that we already know the House

8    defendants will raise.  There was an emergency application for

9    a TRO, and in response to that, the House defendants raised

10   their Speech or Debate Clause immunity argument.  I don't see

11   any reason why that wouldn't be exactly what happens, because

12   if the Court dismisses the New York defendants, there's a

13   one-week clock that ticks on the current injunction.

14             And so Mr. Trump can either go to New York, which he

15   says he has no intention of doing -- and he does that at his

16   peril -- or he can file the same emergency motion, which will

17   prompt the House defendants to raise the same defense, and the

18   Court will be faced with the question of whether the House

19   defendants can be sued.  And I think we can all agree,

20   including my friend, that they can't bring a First Amendment

21   challenge if they don't have the defendant.  At least they need

22   a defendant.  And that's going to be their problem.

23             And we're never going to reach the First Amendment

24   issue unless the Court first deals with the Speech or Debate

25   Clause immunity question.  And I think, you know, the Court

1    would need to deal with that within a week, if they're not

2    going to go to New York.  Because when that week is up and

3    we're no longer in the case, there's no injunction that

4    applies.

5              So that was the first point I want to make.

6              THE COURT:  But let me just --

7              MR. AMER:  Yes.

8              THE COURT:  I understand all of those other hurdles

9    to getting to -- I'll put it -- the merits of the TRUST Act

10   First Amendment claim.  But assuming, again, hypothetically,

11   that either the House doesn't have Speech or Debate Clause

12   immunity or, you know, this were a case that didn't involve a

13   set of defendants that had that immunity argument to make, my

14   question remains whether you agree that I could determine the

15   constitutionality of the TRUST Act in the event that it's in a

16   case over which I have jurisdiction, both for the defendants in

17   Article III, even if the New York defendants are not sued in

18   that litigation.

19             MR. AMER:  And -- and I had a chance to think about

20   that question, and I think the answer is no, because we're

21   ignoring the venue issue.  And I think you run right into the

22   *Leroy* concerns.  I think you run into the *Cameron v.*

23   *Thornburgh* issue of a party naming federal officials solely for

24   the purpose of getting venue in D.C.

25             Count I is completely unnecessary to their First

1    Amendment facial challenge.  So I think combining Count I and

2    Count II is an artifice that's being used to venue this case in

3    D.C.  So I think even if you put aside everything you've asked

4    me to assume away, I don't think this Court should be passing

5    on the facial constitutionality of a New York statute.  And I

6    think you can look to the *Leroy* decision and the *Cameron v.*

7    *Thornburgh* decision to get there, not on personal jurisdiction

8    grounds, but on venue grounds.

9           My -- my last two points are just to mention that the

10   *Ferrara* case rejected the plaintiff's reliance on *Calder*.  And

11   I think the Court can look at that analysis and come to the

12   same result and be guided by it.  Obviously, the D.C. Circuit

13   Court's discussion of *Calder* is very instructive and

14   controlling.

15          And then, finally, on the (a)(4) point, I do think

16   this Court would go against the *Pollock* decision and the line

17   of cases that follow *Pollock* in holding that official conduct

18   doesn't -- can't constitute the persistent course of conduct

19   that's necessary for the plus factor.  And I think here is

20   probably a stronger case for calling the conduct official

21   conduct than in *Pollock* and the other cases because here you

22   have an elected official sued in their official capacities.

23   And what could be more official than official capacity conduct?

24          That's all I have, Your Honor.  Thank you.

25          THE COURT:  Thank you.

1          Mr. Letter.

2          MR. LETTER:  I apologize.  It's just you had asked

3    about timing.  I did want to also make sure you're aware, if --

4    when we do make the motion to dismiss, there'll be briefing.

5    If you deny the motion to -- the motion to dismiss based on

6    Speech or Debate immunity, the House has an automatic right to

7    take an immediate appeal.

8          So if you don't decide New York's motion, you could

9    be keeping New York on the -- for a very long time.  So I

10   wanted to make sure --

11         THE COURT:  Sure.  Understood.  I assumed that was

12   the case; that like other immunities, it's immediately

13   appealable and that you would --

14         MR. LETTER:  Right.

15         THE COURT:  -- potentially exercise that right.

16         MR. LETTER:  Right.  Right.  Obviously different from

17   sovereign immunity, which is not immediately appealable.  But,

18   yes, Speech or Debate is immediately appealable.

19         Thank you.

20         THE COURT:  Mr. Strawbridge, briefly.

21         MR. STRAWBRIDGE:  I just want to say that, obviously,

22   your sort of proposal I think -- if the Court ends up

23   dismissing -- granting the motion to dismiss for personal

24   jurisdiction, you're essentially going to be faced with the

25   same issues because we're going to be renewing the -- the writ

1    as to both parties -- or both current parties.  So I'm just --

2    I'm just pointing that out.  Obviously, we think that would be

3    the appropriate way of proceeding.  You've heard the other

4    side's.

5         On the venue point that was just raised, just want to

6    point out that if New York's no longer in this case, we have

7    venue under (b)(1).  We don't need venue under (b)(2).

8         THE COURT:  Thank you.  So I'm going to take the

9    motion under advisement.

10        We talked about a few things today that you might

11   decide warrant filing of supplemental authority, whether with

12   respect to case law or if you wanted to answer my question

13   about the -- Mr. Trump's citizenship status.  I'm not

14   requiring anything.  I'm just saying you're -- you're welcome

15   to.  I would ask that anything that is filed be concise and

16   filed by next Wednesday.  I'm not going to have responses.  If

17   you decide you want to send something in, do so by next

18   Wednesday.  And, otherwise, I'm going to take the motion under

19   advisement.

20        I have no present intention of not deciding it.  I

21   appreciate both the discussions that led to the proposal and

22   the proposal itself and the basis on which the proposal was

23   made, Mr. Amer.  So I'm not intending to treat the fact that

24   you filed the motion as a reason to have a *de facto* All Writs

25   Act injunction here.  But that's not to say that I find this an

1    easy matter and will be, you know, issuing an opinion in 24

2    hours or anything like that.

3              So I will take it under advisement and hope to get

4    something out, obviously, as soon as I can, but no specific

5    commitments there.  So thank you.

6              (The proceedings were concluded.)

1            <u>CERTIFICATE OF OFFICIAL COURT REPORTER</u>

2

3        I, Nancy J. Meyer, Registered Merit Reporter,

4   Certified Realtime Reporter, do hereby certify that the above

5   and foregoing constitutes a true and accurate transcript of my

6   stenograph notes and is a full, true, and complete transcript

7   of the proceedings to the best of my ability.

8

9               Dated this 19th day of September, 2019.

10

11             /s/ Nancy J. Meyer
               Nancy J. Meyer

12           Official Court Reporter
               Registered Merit Reporter

13           Certified Realtime Reporter
               333 Constitution Avenue Northwest, Room 6509

14           Washington, D.C. 20001

15

16

17

18

19

20

21

22

23

24

25